**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF OKLAHOMA**

SUSAN PARISI,

        **Plaintiff,**

v.

OKLAHOMA WINDOWS AND
DOORS, LLC d/b/a RENEWAL BY
ANDERSON OF OKLAHOMA, and
BMO HARRIS BANK, NA d/b/a
GREENSKY, LLC,

        **Defendant.**

Case No.: 5:23-cv-00115-R

**PLAINTIFF PARISI'S RESPONSE IN OPPOSITION TO DEFENDANT
GREENSKY, LLC'S MOTION TO COMPEL ARBITRATION AS TO ALL
CLAIMS ASSERTED BY PLAINTIFF AND TO DISMISS OR STAY
<u>CLAIMS OF PLAINTIFF PENDING ARBITRATION</u>**

Plaintiff, Lt. Col. Susan Parisi (Ret.) ("Parisi") responds in opposition to

Defendant GreenSky, LLC's ("GreenSky") Motion to Compel Arbitration as to All

Claims asserted by Plaintiff and to Dismiss or Stay Claims of Plaintiff Pending

Arbitration (the "Motion"). [D.E. 17]. Parisi disputes that there is a valid and

enforceable arbitration agreement with Defendant GreenSky.

**BACKGROUND AND DISPUTED FACTS**

GreenSky failed to prove the existence of an agreement to arbitrate between

it and Parisi. Although it is GreenSky's burden to demonstrate mutual assent,

GreenSky offers no evidence that Parisi assented to arbitration. If anything,

GreenSky's evidence proves the opposite: the purported loan agreement submitted

contains a signature line for the borrower, yet the signature line is blank because it was never presented to Parisi and she never signed it. GreenSky also does not offer any proof of an electronic signature. And while the agreement says it can be accepted through "use" of the loan, Parisi never used the account to purchase windows as evidenced, in part, by the fact that no windows were ever installed on her home. The "use" of the account, if any, was done by GreenSky's merchant, Defendant Oklahoma Windows ("Oklahoma Windows"). GreenSky also does not offer any proof that Parisi received the agreement before the loan's first "use." To the contrary, when Parisi realized that GreenSky was attempting to obligate her on the loan, she objected profusely. [D.E. 36-2].

**A.    CFPB's Consent Order with GreenSky Found that GreenSky Originates Unauthorized Loans**

Parisi did not agree to the contract GreenSky is attempting to enforce against her. *See* Amended Petition, [D.E. 36]; Parisi Declaration (hereafter Parisi Dec.), Ex. 1. That was also the central issue in a Consent Order issued by the Consumer Financial Protection Bureau ("CFPB"), which details GreenSky's scheme to lure consumers into paying on loans they never authorized. [D.E. 19-1, Consent Order, hereafter "CO", attached hereto as Ex. 2, ¶2]. As a result of GreenSky's conduct, the CFPB required the company to refund or cancel up to $9 million in loans for customers harmed by its illegal practices, pay a $2.5 million civil penalty, and implement new procedures to prevent future fraudulent loans. *See* CFPB website, newsroom,           available           at           https://www.consumerfinance.gov/about-

2

us/newsroom/cfpb-takes-action-against-fintech-company-greensky-for-enabling-merchants-to-secure-loans-for-consumers-without-their-authorization/#:~:text=The%20CFPB%20issued%20a%20consent,to%20prevent%20future%20fraudulent%20loans (last visited August 23, 2023). Specifically, the CFPB found that GreenSky "engaged in origination and servicing activities for loans to consumers that consumers did not authorize." Ex. 2, CO, ¶60. According to the Findings in the Consent Order, GreenSky injured consumers by causing new unauthorized credit lines to appear on their credit profiles; causing some consumers to pay on unauthorized loans to avoid negative credit reporting; and causing consumers to spend time and money attempting to rescind the loans, reverse charges, and remove negative credit reporting. *Id*. The Consent Order states that between 2014 and 2019, GreenSky received over 6,000 complaints from consumers who stated that they did not authorize a loan application submission. *Id*., ¶25.  The Consent Order required GreenSky to rectify its conduct in exchange for resolving its potential liability for violations of the law. *Id*., ¶71. GreenSky's conduct toward Parisi shows that it has not done so.

**B.    <u>Parisi Falls Victim to GreenSky's Continuing Scheme</u>**

Parisi fell victim to a sales scam perpetrated by Oklahoma Windows and facilitated by GreenSky. As of today, not a single window has been installed in her home, yet GreenSky insists that she owes money to BMO Harris Bank on loan terms Parisi never accepted. [D.E. 1-3, ¶¶69- 74].  In its Motion, GreenSky essentially argues that Parisi, simply by applying to purchase windows from Oklahoma

Windows under one set of terms (zero money down, zero percent interest, zero payments for 24 months), became obligated under *any* loan agreement with any terms that a third-party financial technology company, GreenSky, decided to secretly process on her behalf without her consent.

GreenSky is a financial technology company that allows its merchants – including Oklahoma Windows – to apply, through a proprietary mobile app for point-of-sale loans for consumers. Ex. 2, CO, ¶11.  The GreenSky App is used not only to run a formal credit check, but also to apply for a loan and then (without the consumer's knowledge in some cases) use that loan to pay the merchant. Ex. 2, CO, ¶10.  GreenSky trains the merchants on how to operate the app and how to originate loans *Id*.  Thus, while the consumer is the borrower on the loan, it is the merchant that performs most of the key actions to originate the loan and then to use the loan to pay for the merchant's services. Importantly, the terms of the loan are sent to the borrower at some unspecified future point in time.

GreenSky-serviced loans are typically approved within just minutes of applying through the GreenSky App. Ex. 2, CO, ¶13. So, sometime after the Oklahoma Windows sales person visited Parisi, the app would have generated a "GreenSky Shopping Pass" with a code that is akin to a credit card number. Ex. 2, CO, ¶16; [D.E. 18-3]. According to GreenSky's publicly available training materials for merchants, that shopping pass code and other information are accessible to merchants. Thus, GreenSky controls the entire system that enables merchants to fraudulently create loans and then gives them the ability to begin charging the

consumer's account before ever revealing the terms of the proposed loan. That is precisely what happened here.

### C.   Parisi Only Agreed to Apply for the Advertised Loan to Purchase Windows from Oklahoma Windows for Zero Money Down, Zero Interest, Zero Payments for 24 Months

Sometime in late 2021, Parisi received an advertisement from a company offering replacement windows for zero money down, zero interest, and zero payments for 24 months after installation. Parisi Dec., ¶4. A representative from Oklahoma Windows came to her home on November 23, 2021. [D.E. 1-3, ¶60]; Parisi Dec., ¶4. The Oklahoma Windows representative confirmed that just as advertised, Parisi would be able to purchase replacement windows for her home with zero money down, zero interest, and zero payments for 24 months after installation. [D.E. 1-3, ¶¶ 59-61]. Parisi told the salesman that because she had recently been diagnosed with multiple myeloma cancer, she would need the 24-month deferred payment option due to her health issues and the cost and time related to her treatment. [D.E. 1-3, ¶62].  The salesman said that Parisi would need to sign his iPad to authorize a credit review required for her loan application.  Parisi Dec., ¶8. Parisi was not informed of her right to review, nor provided with any opportunity to review, a paper copy of the document she was signing; nor was Parisi ever asked to provide consent to conduct transactions by electronic means.  Parisi Dec., ¶¶ 11, 12. Parisi was never informed that her signature was to be used to agree to the terms of the loan for which she was applying without any further review.  Parisi Dec., ¶13. She was not informed that her signature could mean that she assented to the terms

5

of any loan with any terms that GreenSky chose to process. *Id.*  Parisi was never provided with any method to learn that that she was agreeing to arbitrate any claims with any party nor that she could be waiving any rights to pursue any claims in a class action. Parisi Dec., ¶ 20.  After she signed the iPad, where she was directed one time, the salesman swiped through several screens.  Parisi Dec., ¶¶15, 16.  Other than a signature line, Parisi was only able to see the box she was asked to check to allow use of her electronic signature.  Parisi Dec., ¶17.  Parisi only intended to apply for a loan that required zero money down, zero interest for 24 months, and zero payments for 24 months after installation, just as she discussed with the Oklahoma Windows representative. Parisi Dec., ¶21. Thirty minutes after the salesman submitted her application, the Oklahoma Windows representative received a phone call from GreenSky, and placed the call on speakerphone.  Parisi Dec., ¶25. The GreenSky representative congratulated Parisi and told her she was approved for the 2-year loan program with GreenSky.  Parisi Dec., ¶26.  Parisi was not given the opportunity to read the purported contract after the GreenSky representative said that her loan had been approved.  Parisi Dec., ¶28.  Despite a promise from the Oklahoma Windows salesman that he would send a copy of the iPad-signed approved contract via the U.S. Mail, he did not. [D.E. 1-3, ¶¶ 65-68]; Parisi Dec., ¶¶29, 30.

Unbeknownst to Parisi until two weeks ago, the sales representative emailed a copy of the contract to Parisi which went to her spam folder. Parisi Dec., ¶¶31, 32. The emailed document contained a GreenSky Financing Form that identified

Parisi's loan plan as follows: "#3541 – 24-month promotional period. Interest waived if balance paid off before promotional period ends." Parisi Dec., ¶33, Ex. 1. Several pages include Parisi's purported electronic signature but Parisi never consented to such use of her electronic signature. Parisi Dec., ¶34. A page entitled GreenSky financing form was included that was executed with Parisi's purported signature, but upon information and belief, the signature is forged.  Parisi Dec., ¶¶36, 37. Another page includes what appears to be a forged signature as well. Parisi Dec., ¶¶36, 38.

Within a few days of her meeting with the Oklahoma Windows salesman, the salesman called Parisi and told her that he did not know what had happened but she had not qualified for the 2 year no interest no payment loan. Parisi Dec., ¶39.

On or around November 26, 2021, Parisi received a letter from GreenSky notifying her that it had sent a payment for $8,871.50, directly to Oklahoma Windows. Parisi Dec., ¶40; [D.E. 1-3, ¶69].  The GreenSky letter informed Parisi that if she had not authorized the payment to contact them immediately. [D.E. 1-3, ¶70]. Parisi did just that. *Id*.  On November 29, 2021, Parisi emailed GreenSky to state that she was never informed of the $8,871.50 payment that had been issued by GreenSky to Oklahoma Windows and had not authorized it.  Parisi Dec., ¶41. She told GreenSky that she had applied for a two year "nothing down, no interest, no payments" loan and was promised that nothing would be due until two years after the windows were installed. *Id*.

A few days later, Parisi received a mailing from GreenSky. Parisi Dec., ¶42.

The mailing indicated that there was a loan agreement identified as loan number of

7541. Parisi Dec., ¶43. The loan agreement attached to GreenSky's Motion to

Compel Arbitration is Plan #7541 ("Loan Agreement"). [D.E. 18-3], Ex. 3.[1] The

document includes a statement that the loan plan is "a different plan than requested."

*Id*. This Loan Agreement required 84 monthly payments that would begin within

six months or earlier, terms to which Parisi had never seen and to which she had not

agreed:

> Plan 7541. THIS IS A DIFFERENT PLAN THAN REQUESTED.
> 84 payments. Up to 6 month purchase window. At the earlier of
> purchase window expiration date or job completion, a 24 month
> promotional (promo) period begins with minimum monthly
> payments required followed by 60 amortized payments based on the
> balance at the end of promo.

A number of calls and emails were exchanged in which Parisi disputed the

Loan Agreement and the unauthorized payment to Oklahoma Windows. [D.E. 1-3,

¶¶76-82]. In one such email exchange, a GreenSky representative asked, "[a]fter

explaining the loan process, do you authorize this transaction?" [D.E. 1-3, Ex. 2].

Parisi responded,

> You did NOT explain any loan process to me and I do NOT authorize
> any transaction which I have already stated.  I do NOT do well with
> lies.  I have many questions related to this situation.  I was told I
> qualified for a 24 month, NO money down, No Interest, and NO
> payment situation to begin 24 months after installation, now I am
> being told I did NOT qualify for that and you have removed that
> original offer. Well this is to inform you again that I am NOT doing

---

[1] For the Court's convenience, a highlighted copy of Loan Plan 7541, the Loan
Agreement attached to GreenSky's Motion, is attached hereto as Ex. 3.

business with you or Renewal by Anderson and IF you sent them money without my consent that is ON you NOT me. I did NOT authorize anything. I will provide you the name of my attorney and they will deal with this. This is a very sketchy situation you have set up with Renewal by Anderson. I suggest this gets straightened out quickly.

[D.E. 1-3, Ex. 2].

In response to Parisi's email, the GreenSky representative falsely claimed that "our records shows (sic) you signed agreeing to the loan terms. Loan plan 7541," despite the plain legend on the mailed contract stating that loan plan 7541 was "a different plan than requested" and despite the new terms. [D.E. 1-3, Ex. 2, 3].

No windows were ever installed at Parisi's home. [D.E. 1-3, ¶75]; Parisi Dec., ¶45. Parisi refused to sign the Loan Agreement. Parisi Dec., ¶44. This is why the contract attached to GreenSky's Motion does not include Parisi's signature. Motion, Ex. 2. And despite acknowledging that Parisi disputed authorizing the loan, GreenSky did not inform the credit bureaus of any dispute, ignored her requests for a copy of a signed contract, began billing her for payments and late fees, failed to conduct a written investigation, and then inexplicably closed the matter after stating that she had failed to "participate" in her own complaint and resolution. Parisi Dec., ¶¶45, 46.

D.    **GreenSky's Involvement with Oklahoma Windows**

GreenSky attempted to obligate Parisi for a loan without her consent by choosing to accept loan applications from Oklahoma Windows and by training

Oklahoma Windows sales representatives on the loan application system. GreenSky did not properly respond to the obvious signs of fraud, Parisi's complaints and objections, nor did it put systems into place that would detect the fraud despite being under a valid Consent Order to do so. To the contrary, it put incentives in place that induced the fraudulent conduct and forgery. First, Parisi's electronic signature from the salesman's IPad was taken without her consent and affixed on several pages of the original loan plan without her review of those pages. Second, GreenSky created a "Shopping Pass" and allowed that account to be used for an $8,871.00 direct payment to Oklahoma Windows from the unauthorized loan without Parisi's knowledge or consent.

The CFPB Consent Order includes a description of the precise conduct alleged in this complaint on GreenSky's part:

> When a Merchant submits a loan application on a consumer's behalf, [ ] the consumer may view the approved loan terms on the computer or tablet only if the Merchant shares the screen with the consumer.

[Ex. 2, CO ¶14].

> [GreenSky] also issues consumers a "shopping pass" number, which functions like a credit card (Shopping Pass). [GreenSky] treats use of the Shopping Pass, or associated funds, as acceptance of the loan.

[Ex. 2, CO ¶16].

> Consumers sometimes received mailed loan documents [ ] only after the Merchant had already used the Shopping Pass number without the consumer's knowledge.

[Ex. 2, CO ¶ 23].

10

Parisi never signed the loan plan belatedly offered to her from GreenSky. It is this unsigned Loan Agreement that GreenSky claims is the parties' contract. Now GreenSky seeks to avoid responsibility for its fraudulent, unfair and deceptive conduct, and to avoid her petition to certify a class of consumers who, like Parisi, have been subjected to the very conduct GreenSky agreed to stop when it stipulated to the CFPB Consent Order.

As is clear from the above and Parisi's Complaint, GreenSky's claim that "a Loan Agreement was created that established Plaintiff's contractual agreement with GreenSky" cannot reasonably be considered undisputed.  Whether a loan agreement was created is the central disputed fact of the case.

## STANDARD OF REVIEW

The Supreme Court has consistently emphasized that "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration*." See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S.Ct. 588, 591, 154 L.Ed.2d 491 (2002) (courts will not require a party to submit a controversy to arbitration where it has not been so agreed). "[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (citing *Gateway Coal Co. v. Mine Workers*, 414 U.S. 368, 374, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974)).

When deciding whether the parties have agreed to arbitrate, courts apply ordinary state law principles that govern the formation of contracts. *Kaplan,* 514 U.S at 944; *Walker v. BuildDirect.com Techs., Inc*., 733 F.3d 1001, 1004 (10th Cir. 2013) ("Generally, courts should apply ordinary state-law principles that govern the formation of contracts to determine whether a party has agreed to arbitrate a dispute.") (citation omitted).  Thus, in this case, whether an arbitration agreement exists between Parisi and GreenSky is governed by principles of Oklahoma contract law.

Courts will not impose arbitration upon parties where they have not agreed to arbitrate. See *Morgan v. Sundance, Inc*., ⸺ U.S. ⸺, 142 S. Ct. 1708, 1709, 212 L.Ed.2d 753 (2022) ("The federal policy is about treating arbitration contracts like all others, not about fostering arbitration."); *See also, Okla. Oncology & Hematology P.C. v. U.S. Oncology, Inc*., 2007 OK 12 ¶ 22, 160 P.3d 936 (citing *Volt Info. Sciences Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ*., 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (arbitration is a matter of consent, not coercion)).

This Court can decide as a matter of law that Parisi did not consent to the Loan Agreement and therefore never consented to its arbitration clause. *See Quazilbash v. Wells Fargo & Co*., 2010 WL 1643778, *2 (N.D. Ok. April 22, 2010) (denying motion to compel arbitration where defendant failed to meet burden that an agreement to arbitrate existed). *See Harris v. David Stanley Chevrolet*, *Inc*., 2012 OK 9, ¶ 8, 273 P.3d 877, 878 (holding no evidentiary hearing was required where

arbitration clause did not apply as a matter of law because subsequent contract for insurance was separate contract from car sale contract requiring arbitration). The record is quite clear that Parisi did not agree to the Loan Agreement containing the arbitration clause and thus GreenSky's Motion should be denied.

**ARGUMENT**

### A.      <u>There Is No Presumption in Favor of Arbitration</u>

As the Supreme Court held in *Morgan v. Sundance, supra*, arbitration agreements are contracts just like all other contracts – a court may not devise novel rules to favor arbitration over litigation. *Id.*, at 1709. The general presumption in favor of arbitration "disappears when the parties dispute the existence of a valid arbitration agreement." *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002); *accord Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017) ("[W]hen the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away.") (Quoting *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998))). "To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation ... of the specific arbitration clause that a party seeks to have the court enforce." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010). "Such issues always include whether the clause was agreed to, and may include when that agreement was formed." *Id.*

13

In the instant case, there is no presumption that GreenSky should be able to arbitrate Parisi's claim. Parisi and the record before the Court have called into question the very existence of an agreement to arbitrate because Parisi never agreed to the loan agreement. Without a contract, there can be no arbitration agreement.

**B.    Parisi Did Not Agree to the Loan Agreement or its Arbitration Provision, Nor Authorize Use of a Shopping Pass**

Consent to arbitrate is an essential component of an enforceable arbitration agreement. Thus, in order to be sure that the parties have consented to arbitration, the courts will decide whether there is a valid enforceable arbitration agreement, whether the parties are bound by it and whether the parties agreed to submit a particular dispute to arbitration. *Johnson v. Convalescent Ctr. of Grady Cty., LLC*, 341 P.3d 71, 73 (Okla. 2014); *See also* 12 O.S.§1857(B) (If necessary, a court shall decide whether an agreement to arbitrate exists or whether a controversy is subject to an agreement to arbitrate). GreenSky has not proven by a preponderance of the evidence, that Parisi had reasonable notice of an assent to loan terms that include arbitration.

Here, GreenSky employs the very same objectionable conduct that led to a Consent Order from the CFPB – attempting to demonstrate consent to an agreement by Oklahoma Windows' use of a credit account that Parisi did not authorize. The record evidence does not, therefore, establish Parisi's consent to arbitrate. Quite the opposite. GreenSky submits a copy of a loan agreement between a Bank and Parisi that she did not sign. [D.E. 18-3, at p. 12] (listing a signature line and date line for

14

"Borrower" with no signature or date). This leaves GreenSky to argue that the use of the shopping pass (or loan proceeds) by Oklahoma Windows constitutes assent to the loan terms.[2] GreenSky provides NO evidence that Parisi was on notice of the terms of the loan agreement when that shopping pass was used by Oklahoma Windows. No reasonably prudent consumer could have known that Oklahoma Windows would forge her signature on documents that would trigger acceptance. Parisi should not be compelled into arbitration based on a contract she was never offered, which she never accepted and never signed.

## C.    There Was No Meeting of the Minds

If there is no meeting of the minds there is no contract. *Jacks,* 856 F.3d at 1304 ("To determine whether a party has agreed to arbitrate a dispute, we apply ordinary state-law principles that govern the formation of contracts.") (cleaned up))(Quoting *Walker*, 733 F.3d at 1004. "As every first-year law student knows, 'an agreement or mutual assent is of course essential to a valid contract.'" *Jacks*, 856 F.3d at 1304 (alteration and citation omitted). That mutual consent, "or a meeting of the minds [must be] on all the essential terms of the contract." *South Central Industries v. Kerrtas Marketing, LLC*, 2022 WL 1518935, *2 (W.D. Ok. February 7, 2022) (quoting *Young v. Chappell*, 239 P.3d 476, 479 (Okla. Civ. App. 2010) (cleaned up).

---

[2] GreenSky's only evidence – which is no evidence at all – is an unsourced, unidentifiable ledger listing the shopping pass expenditure. See Motion, Ex. 4. This obviously does not reflect Parisi's authorization of the Shopping Pass's use.

15

In Oklahoma, mutual assent as an essential element of a valid contract has been a basic rule "even before its admission to the Union." *Jacks*, 856 F. 3d at 1304.") (citing *McCormick v. Bonfils*, 9 Okla. 605, 60 P. 296, 299–300 (1900) ("The gist and meaning of the word 'contract' is that the minds of the parties must meet and agree upon a given proposition.)) A contract is defined by Oklahoma statute as "an agreement to do or not to do a certain thing." *Id.* (citing Okla. Stat. Ann. tit. 15, § 1.) Simply put, "without an agreement, there is no contract." *Id.*

To form an enforceable contract under Oklahoma law requires an offer, an acceptance, and consideration. *See National Outdoor Adver. Co. v. Kalkhurst*, 418 P.2d 661, 664 (Okla.1966) ("It is an elementary rule of law in this jurisdiction that in order to constitute a contract there must be an offer on the part of one and an acceptance on the part of the other."). Consent must be free, mutual, and communicated. 15 O.S.2001 § 51. Consent is not mutual unless the parties all agree upon the same thing in the same sense. 15 O.S.2001 § 66; *see also, Beck v. Reynolds*, 903 P.2d 317, 319 (Okla. 1995) (cleaned up) ("The consent of the parties must be mutual, and consent is not mutual unless the parties all agree upon the same thing in the same sense."). Parisi accepted one set of terms and GreenSky tried to provide a contract with another. When Parisi discovered GreenSky's conduct, she immediately objected. Because Parisi and GreenSky did not agree on the same thing in the same sense, there was no mutual consent, and therefore no contract.

An acceptance must be absolute and unqualified; if qualified, it is a new proposal. 15 O.S.2001 § 71. An acceptance will not bind the offeror unless it is

unconditional, identical to the offer, and does not modify, delete or introduce any new terms into the offer. *Ollie v. Rainbolt*, 1983 OK 79, 669 P.2d 275. Thus, a binding contract exists where the parties had a meeting of the minds on all the essential terms. Parisi agreed to an offer for window installation subject to terms of zero money down, zero interest, and zero payments until 24 months after installation. Instead, GreenSky tried to bind her to a contract requiring payments that began within six months of the issuance of a direct payment to Oklahoma Windows that she never authorized. Parisi was offered one set of terms but was provided with an entirely different set of terms which she clearly rejected.

Of course, GreenSky has a documented history of similar efforts to obligate consumers on loans that they never authorized.  The Court need not ignore this very relevant history of the precise conduct at issue in this complaint that is the subject of a federal Consent Order. In any case, GreenSky has the burden of showing that there is a viable contract between the parties, and this it cannot do. *See Hancock v. Am. Tel. & Tel. Co*., 701 F.3d 1248, 1261 (10th Cir. 2012); *see also Pioneer Supply Co. v. American Meter Co*., 484 F. Supp. 227, 229 (W.D. Ok 1979) (holding defendant failed to meet burden to stay pending arbitration and proceeding to evidentiary hearing).

The Court must afford Parisi, as the party resisting arbitration, "the benefit of all reasonable doubts and inferences that may arise." *Hancock,* 701 F.3d at 1261. Although GreenSky points to a statement of account allegedly reflecting that the "Shopping Pass" was used, Parisi has denied ever authorizing that use, and when

17

she learned of it, immediately contested it. Accordingly, there are material questions of fact regarding the formation of the agreement to arbitrate, and more specifically, whether there was ever a meeting of the minds on the essential terms of the agreement. *See Riley Mfg. Co., Inc.*, 157 F. 3d at 780 (citing *First Options*, *supra.*) (Courts will not force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.).

This Court must resolve the question central to GreenSky's arbitration demand: did Parisi enter into a contract with GreenSky that was "validly formed, is legally enforceable, and is best construed to encompass the dispute." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297, 130 S.Ct. 2847, 2851, 177 L.Ed.2d 567 (2010) (citing *Gibson v. Wal-Mart Stores, Inc.*, 181 F.3d 1163, 1169 (10th Cir.1999) ("Because arbitration is a matter of contract, a party may not be required to arbitrate a dispute unless it has agreed to arbitration of that dispute.") Indeed, Section 4 of the FAA "does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that *'arbitration proceed in the manner provided for in [the parties'] agreement.'" Volt Information Sciences, Inc.*, 489 U.S. at 474-75 (quoting 9 U.S.C. § 4) (emphasis in original).

Here, at a minimum, there are genuine issues of material fact regarding the existence of any agreement. No presumption in favor of arbitration exists. *Dumais v. American Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir.2002) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Riley Mfg. Co., Inc.*, 157 F.3d at 779 ("[W]hen the dispute is whether there

18

is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away.") (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983));

Forcing Parisi to arbitrate her claims would be grossly unjust because she never accepted the terms of the Loan Agreement.  There was no meeting of the minds, and thus no contract formed.  Moreover, given the documented history of the same pattern and practice by GreenSky, it would be unfair to prohibit Parisi from representing a class of others who have had similar experiences with GreenSky attempting to obligate them for loans they did not authorize.

**D.** **Oklahoma Windows Failed to Comply with Federal and Oklahoma Electronic Signature Laws**

Parisi never assented to the terms of the Loan Agreement.  In addition to the "bait and switch" GreenSky employed to attempt to obligate Parisi to a loan with different terms than the loan for which she applied, there is question of material fact as to whether Parisi ever assented to the terms of the first loan offered by GreenSky. Parisi only provided her electronic signature because she was told it was needed for a check on her creditworthiness as part of an application for a loan – a loan with terms of zero money down, zero interest, zero payments for 24 months. Parisi did not affirmatively consent, as required by law, to having her electronic signature used to agree to loan terms.

The Electronic Signatures in Global and National Commerce Act ("E-Sign Act") requires that where a transaction involves a consumer, like Parisi, the

19

consumer must affirmatively consent to the use of her electronic signature and have not withdrawn her consent. 15 U.S.C. §7001(c)(1)(A). The E-Sign Act defines an electronic signature as follows: "The term 'electronic signature' means an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the *intent* to sign the record." (emphasis added). 15 U.S.C. §7006(5). Pursuant to the E-Sign Act, prior to consenting, a consumer must be provided with a clear and conspicuous statement, *inter alia*, of (1) any right or option to have the record provided or made available on paper or in non-electronic form; (2) the right to withdraw the consent to have the record provided in electronic form; and (3) whether the consent applies only to the particular transaction which gave rise to the obligation to provide the electronic signature or to identified categories of records that may be provided or made available during the course of the relationship.  15 U.S.C. §7001(c)(1)(B).

The Uniform Electronic Transactions Act ("UETA") is a model act for adoption by states that encourages the lawful use of electronic documents and records. Oklahoma has adopted its own version of the UETA, the Oklahoma Uniform Electronic Transactions Act ("OUETA"). 12A O.S. § 15-101 *et. seq*. The OUETA includes the same definition of electronic signature as the E-Sign Act: "Electronic signature" means an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the *intent* to sign the record. (emphasis added). 12A O.S. §15-102(10). The OUETA requires that electronic signatures are valid "only between parties each of which has

20

agreed to conduct transactions by electronic means." 12A O.S. §15-105(b). Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." *Id*. ¶ 15-105(b).

Parisi disputes that she was ever asked to provide consent to conduct transactions by electronic means. She was not provided with a clear and conspicuous statement that she had the right to receive a copy of what she signed provided on paper or non-electronic form, the right to withdraw her consent to have the record provided in electronic form, and most importantly, whether her consent applied to the credit check and loan application only or whether there were other identified categories of documents to which her e-signature could be applied. Consequently, Parisi had no intent to agree to provide her approval to any specific loan terms that she had yet to review. *See* 15 U.S.C. §7006(5) ("The term 'electronic signature' means an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the ***intent*** to sign the record.") (emphasis added). As such, Parisi disputes that she ever validly assented to the arbitration provision in the first loan plan offered to Parisi. Certainly, the same e-signatures used to agree to have credit checked for a loan application without any notice of further potential use cannot be evidence of an agreement to arbitrate disputes between the parties.

21

### E.  Disputed Issues of Fact May Be Resolved After Discovery and a Trial

Under the FAA, if there is a need to resolve material factual disputes as to the formation of an agreement to arbitrate, the court must proceed to a summary trial. *See* 9 U.S.C. § 4. ("If the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof.").  The 10th Circuit agrees that "when factual disputes may determine whether the parties agreed to arbitrate, the way to resolve them ... is by proceeding summarily to trial". *See Howard*, 748 F.3d at 984. "When parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) (quoting *Avedon Engineering Inc v. Seatex*, 126 F 3d 1279, 1283 (10th Cir. 1997).

GreenSky cannot meet its burden to show there is an agreement to arbitrate. Parisi denies ever entering into a valid loan agreement with GreenSky. The evidence of an agreement attached to GreenSky's Motion is an unsigned contract and an unidentifiable accounting ledger. Accordingly, this Court can deny GreenSky's Motion as a matter of law. *See Quazilbash*, 2010 WL at *2 (denying motion to compel arbitration where defendant failed to show that there was an agreement to arbitrate and there was genuine issue of fact whether plaintiff entered into account agreement at issue). However, if the Court does not so find, Parisi has the right to demand a jury trial on the disputed facts regarding the existence of a binding agreement. See 9 U.S.C § 4:

> If the making of an arbitration agreement or the failure, neglect or refusal to perform the same be an issue, the court shall proceed summarily to the trial thereof ... if the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed.

*Id.*

Because Parisi has provided her Declaration supporting the lack of a valid arbitration agreement, and the record reflects that Parisi never accepted the Loan Agreement and never authorized payment to Anderson from the loan, a jury trial on the existence of a valid and enforceable agreement is required if the Court does not deny the Motion.

### F.    If the Court Finds that Arbitration Is Warranted (It Is Not), The Case Should Be Stayed, Not Dismissed.

Although arbitration should not be compelled for the reasons set out above, even if this Court were to require arbitration, the matter should be stayed and not dismissed. 9 U.S.C. § 3. This statutory requirement is followed in the Tenth Circuit. *See Fancher v. Westwind Enterprises, Ltd.,* 2018 WL 11411336, *2 (W.D. Ok Aug. 8, 2018) (citing *Williams v. Imhoff*, 203 F.3d 758, 764 (10th Cir. 2000) ("Under the FAA, a court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.") (quotation marks and citation omitted); *Adair Bus Sales, Inc. v. Blue Bird Corp.*, 25 F.3d 953, 955 (10th Cir. 1994) (indicating, when a district court dismissed a suit and ordered the parties to arbitrate, that "[t]he proper course ... would have been for the district court to grant [the movant's] motion and stay the action pending

23

arbitration"); *see also, Hill v. Ricoh Ams. Corp., 201*0 U.S. App. LEXIS 7979, *6-7 (10th Cir. Kan. Apr. 19, 2010) ("Section 3 of the Act, 9 U.S.C. § 3, obliges courts to stay litigation on matters that the parties have agreed to arbitrate").

## CONCLUSION

For the reasons stated above, this Court should deny GreenSky's Motion. Parisi never agreed to arbitrate her claims. The Court should find that, as a matter of law GreenSky has failed to meet its burden to show an agreement to arbitrate. At a minimum, there is a dispute as to the existence of an agreement to arbitrate between GreenSky and Parisi. If the Court does not deny GreenSky's Motion as a matter of law, the Court should move summarily to a jury trial as to the existence of a valid and enforceable arbitration agreement.

Respectfully submitted this 24th day of August, 2023.

**Varnell & Warwick, P.A.**

/s/ Janet R. Varnell
Janet R. Varnell, FBN: 0071072
400 N. Ashley Drive, Suite 1900
Tampa, FL  33602
Telephone: (352) 753-8600
jvarnell@vandwlaw.com

/s/ M. Kathi Rawls
M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA # 22145
Rawls Gahlot, PLLC
2404 S. Broadway
Moore, Ok 73160
Phone: 405-912-3225
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

*Attorneys For Plaintiffs*

24

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 24, 2023, I electronically filed the foregoing with the Clerk of the Court through the CM/ECF System, which will send a notice of electronic filing to all counsel of record.

/s/ Janet R. Varnell
Janet R. Varnell