# EXHIBIT B

# UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING
File No. 2021-CFPB-0004

|  |  |
|---|---|
| In the Matter of:<br><br><br>**GREENSKY, LLC** | **CONSENT ORDER** |

The Consumer Financial Protection Bureau (Bureau) has reviewed certain origination and servicing activities of GreenSky, LLC (Respondent, as defined below) and has identified the following law violations: (1) Respondent engaged in unfair acts and practices with regard to loans to consumers who did not authorize them in violation of §§ 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B); and (2) Respondent engaged in unfair acts and practices by structuring its loan origination and servicing activities in a manner that enabled unauthorized loans in violation of §§ 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B). Under §§ 1053 and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

## I.

### Jurisdiction

1.    The Bureau has jurisdiction over this matter under §§ 1053 and 1055 of the

CFPA, 12 U.S.C. §§ 5563 and 5565.

## II.

### Stipulation

2.    Respondent has executed a "Stipulation and Consent to the Issuance of a

Consent Order," dated June 29, 2021 (Stipulation), which is incorporated by

reference and is accepted by the Bureau. By this Stipulation, Respondent has

consented to the issuance of this Consent Order by the Bureau under §§

1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or

denying any of the findings of fact or conclusions of law, except that

Respondent admits the facts necessary to establish the Bureau's jurisdiction

over Respondent and the subject matter of this action.

## III.

### Definitions

3.    The following definitions apply to this Consent Order:

a.  "Affected Consumers" means any consumer who received an

unauthorized loan through the Green Sky Program between March 1,

2

2014, and the Effective Date of this Consent Order, as determined by the Settlement Administrator, and further described in Section VIII.

b. "Board" means the duly elected and acting Board of Directors of GreenSky, Inc., the ultimate parent of Respondent.

c. "Clearly and Prominently" means:

i. In textual communications (e.g., printed publications or words displayed on the screen of an electronic device), the disclosure must be of a type size and location sufficiently noticeable for an ordinary consumer to read and comprehend it, in print that contrasts with the background on which it appears;

ii. In communications disseminated orally or through audible means (e.g., radio or streaming audio), the disclosure must be delivered in a volume and cadence sufficient for an ordinary consumer to hear and comprehend it;

iii. In communications disseminated through video means (e.g., television or streaming video), the disclosure must be in writing in a form consistent with subsection (i), and must appear on the screen for a duration sufficient for an ordinary consumer to read and comprehend it;

iv. In communications made through interactive media such as the internet, online services, and software, the disclosure must be unavoidable and presented in a form consistent with subsection (i);

v. In communications that contain both audio and visual portions, the disclosure must be presented simultaneously in both the audio and visual portions of the communication; and

vi. In all instances, the disclosure must be presented before the consumer incurs any financial obligation, in an understandable language and syntax, and with nothing contrary to, inconsistent with, or in mitigation of the disclosures used in any communication with the consumer.

d. "Effective Date" means the date on which the Consent Order is entered on the administrative docket.

e. "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his or her delegate.

f. "GreenSky Program" means a consumer financing and payments program created and administered by Respondent for certain federally insured banks ("GreenSky Program banks") where Respondent provides

point-of-sale financing technology and payments technology, and engages in origination and servicing activities.

g. "Identified Consumer Account Information" means the loan files, complaints, call recordings, and related documentation of Potential Affected Consumers to be reviewed by the Settlement Administrator pursuant to Section VIII.

h. "Merchant" means any third-party provider of services or seller of retail products to consumers that intakes, submits, or facilitates submission of consumer loan applications to Respondent for the purpose of financing consumer purchases from such provider or seller through the GreenSky Program. This definition shall not include any third-party provider or seller that, as of January 1, 2014, required consumers to contact Respondent directly to activate a loan.

i. "Potential Affected Consumers" consists of the following groups of consumers:

  i. Consumers who filed complaints about unauthorized loans or unauthorized transactions between March 1, 2014 and the Effective Date of this Consent Order; and

  ii. Consumers who both (1) completed loan applications between March 1, 2014 and the Effective Date of this Consent Order and

meet any one of the criteria described in subparagraphs (a) – (d) below; and (2) respond to a communication from the Settlement Administrator indicating they did not authorize a GreenSky Program loan. The criteria consist of the following:

    (a)  Consumers whose loan application listed a Merchant's physical address as the consumer's own;

    (b)  Consumers whose loans were identified by Respondent as part of a customer-authorization audit for fraud as loans for which Respondent did not possess or obtain evidence of authorization;

    (c)  Consumers who submitted disputes directly to Respondent claiming information on their consumer report related to unauthorized loans or associated unauthorized transactions; and

    (d)  Consumers who submitted disputes to consumer reporting agencies claiming information on their consumer report related to unauthorized loans or associated unauthorized transactions.

j.   "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another

6

governmental agency brought against Respondent based on substantially the same facts as described in Section IV of this Consent Order.

k. "Relevant Period" includes from March 1, 2014 to the Effective Date of this Consent Order.

l. "Respondent" means GreenSky, LLC, and its subsidiaries, successors and assigns.

## IV.

### Bureau Findings and Conclusions

The Bureau finds the following:

4. Respondent is a limited liability company with its principal place of business at 5565 Glenridge Connector, Suite 700, Atlanta, Georgia 30342.

5. Respondent transacts business throughout the United States.

6. Respondent administers the GreenSky Program and engages in origination and servicing activities related to the GreenSky Program, and therefore engages in offering or providing a "financial product or service" within the meaning of 12 U.S.C. § 5481(15)(A)(i).

7. Respondent engages in origination activities and services loans offered or provided for use by consumers primarily for personal, family, or household purposes within the meaning of 12 U.S.C. § 5481(5)(A).

8. Respondent is therefore a "covered person" under 12 U.S.C. § 5481(6).

Respondent's Business Model

9.     Respondent engages in origination and servicing activities on behalf of GreenSky Program banks. Respondent uses Merchants to market and intake loan applications from consumers at the point of sale. Most of these Merchants provide home improvement products and services, health care services, or retail products.

10.    Merchants must apply to participate in the GreenSky Program. If accepted into the GreenSky Program, Respondent generally trains Merchants, including on how to market and promote the GreenSky Program loans, intake consumers' personal and financial information, submit loan applications to Respondent on behalf of consumers or assist consumers in submitting loan applications directly to Respondent, as well as on GreenSky Program rules regarding consumers.

11.    Respondent allows most Merchants to submit consumer loan applications online using Respondent's website or mobile applications, or over the phone if the Merchant indicates it has a signed application information form or a signed application from a consumer.

12.    Respondent's Patient Solutions Program, which provides financing for elective medical procedures, requires consumers to apply for loans directly through Respondent.

13. Once Respondent receives an application, it makes an on-the-spot financing decision by comparing a consumer's application data with the lending criteria of the GreenSky Program banks, using proprietary technology and algorithms. These loans typically range from a few thousand dollars to tens of thousands of dollars.

14. When a consumer or Merchant submits a loan application through Respondent's website or mobile application, the approved loan terms are displayed on the computer or tablet at the conclusion of the application process. Where a Merchant submits a loan application on a consumer's behalf, however, the consumer may view the approved loan terms on the computer or tablet only if the Merchant shares the screen with the consumer.

15. Until at least April 2019, if Respondent determined that an applicant qualified for a loan, the loan application process was complete. Respondent mailed or emailed loan documentation to consumers, but consumers were not required to sign and return that loan documentation to consummate the loan.

16. Respondent also issues consumers a "shopping pass" number, which functions like a credit card (Shopping Pass). Respondent treats use of the Shopping Pass, or associated funds, as acceptance of the loan.

17. Respondent does not disburse the loan proceeds to the consumer. Rather, to pay for a product or service, a consumer provides the Shopping Pass number to her Merchant or otherwise authorizes a transaction and the Merchant, in turn, uses the Shopping Pass number or other authorization to apply for payment from Respondent.

18. Respondent then disburses loan proceeds directly to the Merchant.

19. Most of Respondent's revenue is earned from fees that Merchants pay to Respondent every time they receive payment from the proceeds of a consumer's loan.

20. In some instances, Merchants misused these Shopping Pass numbers.

21. Merchants sometimes applied for a loan without a consumer's knowledge and entered their own email addresses as the consumer's own on the loan application. Because of this, Respondent emailed the consumer's loan documents or Shopping Pass number to the Merchant instead of the consumer.

22. In other instances, Merchants applied for a loan without a consumer's knowledge and entered the consumer's correct mailing address on the application, but because the consumer was unaware of the loan, the consumer ignored the loan documents Respondent mailed, thinking they were promotional materials.

23. Consumers sometimes received mailed loan documents–which could take weeks to arrive after a loan application–only after the Merchant had already used the Shopping Pass number without the consumer's knowledge.

<u>Respondent Engaged in Origination Activity on Loans That Consumers Did Not Authorize</u>

24. During the Relevant Period, some Merchants submitted loan applications to Respondent without consumers' consent. Respondent performed origination and servicing activities with regard to these loans and, in some instances, disbursed loan proceeds directly to the Merchant, without consumers' knowledge or consent.

25. Between 2014 and 2019, Respondent received at least 6,000 complaints from consumers who stated they did not authorize submission of a loan application. Respondent's complaint investigation found that in at least 1,600 instances the Merchant was at fault.

26. Some consumers became aware of the loan for the first time when they noticed Respondent's name on their credit report, or received billing statements, collection letters, and calls from Respondent.

27. After receiving a complaint about an unauthorized loan, Respondent sometimes cancelled the loan, refunded consumers' money, wrote off the

unauthorized loan, or convinced the relevant Merchants to return money to consumers.

28. At least 2,800 consumers who complained about unauthorized loans however, received neither refunds nor write-offs from Respondent or its Merchants.

### Respondent's Loan Application and Funding Process Created Opportunities for the Origination of Unauthorized Loans

29. Respondent uses a completely paperless application process for both its mobile and web-based application platforms.

30. Until at least 2019, if a Merchant had certain personal information about a consumer, Respondent's systems and application process enabled Merchants to submit an entire loan application online without the consumer's knowledge or consent.

31. While Respondent's program agreement with Merchants requires Merchants to obtain a written authorization from consumers to submit a loan application, Respondent does not request or review such documentation prior to loan application approval and disbursement of the loan proceeds.

32. Instead, Respondent generally requires Merchants to provide proof of consumer authorization only after a consumer files a complaint. In some

instances, however, Merchants are unable to provide evidence that a consumer ever authorized submission of a loan application.

<u>Respondent's Merchant Training Program was Inadequate and Inconsistent</u>

33.   Respondent's Merchant training practices exacerbated the circumstances that led to unauthorized loans.

34.   During the Relevant Period, Respondent permitted Merchants to intake and submit loan applications for up to two months before completing any loan application training.

35.   Further, until at least October 2019, the training Respondent provided to Merchants was inadequate and inconsistent.

36.   Merchants who generated more loans for Respondent received a dedicated "Client Growth Manager," who was supposed to conduct one-on-one trainings with the Merchant and provide the Merchant opportunities to ask questions about the loan application process.

37.   Merchants who did not meet the required business threshold received online training on the GreenSky Program rules, how to market loans, intake loan applications, submit applications to Respondent, and apply for payment.

38.   Even when Respondent did provide individualized training, the training often did not adequately teach Merchants how to comply with consumer protection laws.

39.    For example, some Client Growth Managers failed to teach Merchants that consumer authorization is required before submitting a loan application and some even instructed Merchants on how to directly access and use consumers' Shopping Pass numbers.

40.    Further, Respondent only required that one representative from each Merchant attend a training session; this representative was then responsible for training all other Merchant employees intaking and submitting loan applications.

41.    Respondent also did not require Merchants to verify that each employee intaking and submitting loan applications had been trained. And Respondent did not always take action when it learned Merchant employees had not received training.

42.    Until at least January 2020, Respondent also sometimes failed to notify and train Merchants when it made changes to the GreenSky Program and did not require Merchants to attend annual compliance training.

Respondent's Merchant Oversight Program was Ineffective

43.    In some instances, Respondent did not discipline or terminate Merchants known to have submitted unauthorized loan applications.

44.   Respondent's Merchant Risk department is tasked with investigating Merchant activity to root out fraud and discipline or terminate Merchants who engage in practices that violate Respondent's policies and procedures.

45.   But employees in the Merchant Risk department are not consistently trained and do not follow written investigation guidelines. In some cases, they were instructed to apply different, more lenient investigative standards to high-volume Merchants and to change their recommendations regarding Merchant suspensions and terminations based on the volume of business a Merchant generates.

46.   As a result, the Merchant Risk department's investigations are not governed by a consistent set of principles or standards and its disciplinary action recommendations differ depending on the Merchant and the volume of business the Merchant generates.

### Respondent's Complaint Resolution Practices were Deficient

47.   In 2014, Respondent created a department to respond to and resolve consumer complaints.

48.   In many instances, because of understaffing and frequent staff turnover, Respondent took over 75 days to investigate and resolve complaints, even though Respondent's stated policy is to strive to investigate and resolve complaints within 15 days. In over 100 cases where consumers complained

about an unauthorized loan, Respondent took six or more months to resolve the complaint.

49. Further, in some instances, Respondent closed complaints in its system without ever resolving the case or informing consumers of the result of the investigation.

50. As a result, some consumers had to call or contact Respondent multiple times over several months to receive a response from Respondent or any resolution to their complaints.

51. Frequently, Respondent told consumers they must attempt to resolve their unauthorized loan complaint with the Merchant first before Respondent would open an investigation.

52. When Respondent did open an investigation, Respondent requested evidence of the consumer's authorization of submission of the loan application from the Merchant.

53. If a Merchant could not provide evidence of consumer authorization, Respondent asked the Merchant to refund the consumer's account. Merchants, however, did not always agree to provide a refund and Respondent did not always require them to do so.

54. If a Merchant refused to provide a refund, Respondent required the consumer in question to seek a "chargeback" of the amounts charged to the

Shopping Pass. If the consumer did not do so within four to fifteen months, this remedy was unavailable because of the transaction processor's chargeback rules. Due to the length of time Respondent took to resolve some unauthorized loan complaints, some consumers lost out on the opportunity to pursue this remedy because Respondent could not pursue chargeback rights for the consumer until the complaint was resolved.

55. In these circumstances, the consumer had no other recourse, except for taking legal action.

56. Respondent, however, had the discretion to cancel and write off the loan, and absolve the consumer from liability, if it determined a Merchant submitted a loan application without consumer authorization.

57. Respondent did, in some instances, determine that Merchants had submitted loans without authorization and canceled and wrote off loans for some consumers.

58. But, until at least May 2018, Respondent lacked any policies or procedures governing these practices. As a result, Respondent granted loan write-offs inconsistently with regard to complaints about unauthorized loans.

<u>Findings and Conclusions as to Respondent's</u>

<u>Origination and Servicing Activities on Unauthorized Loans (Unfair Acts and Practices)</u>

59. Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause consumers substantial injury that is not reasonably avoidable and that is not outweighed by countervailing benefits to consumers or to competition.

60. Respondent engaged in origination and servicing activities for loans to consumers that consumers did not authorize. Respondent's actions caused or were likely to cause substantial injury to consumers by causing: (1) new unauthorized credit lines to appear on consumers' consumer reports, potentially adversely affecting their credit profiles; (2) some consumers to make payments on unauthorized loans in order to avoid negative impact to their credit profiles from nonpayment; and (3) consumers to spend time and money attempting to rescind the loans, reverse charges, and remove Respondent's tradeline from their credit reports.

61. Some consumers did not learn of the loans until well after they were funded.

62. The substantial injuries consumers suffered were therefore not reasonably avoidable.

63.    Nor were they outweighed by any countervailing benefit to consumers or to competition.

64.    Thus, Respondent engaged in unfair acts and practices in violation of Sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

Findings and Conclusions as to Respondent's Structuring of Loan Origination and Servicing Practices in a Manner that Enabled Unauthorized Loans (Unfair Acts and Practices)

65.    Respondent's lack of appropriate and effective: (i) controls during the loan application, approval, and funding processes; (ii) merchant training and oversight; and (iii) complaint management, resulted in Respondent's engaging in origination and servicing activities on loans that consumers did not authorize.

66.    Respondent's practices caused or were likely to cause substantial injury to consumers by causing: (1) new unauthorized credit lines to appear on consumers' credit reports, potentially adversely affecting their credit profiles; (2) some consumers to make payments on unauthorized loans in order to avoid negative impact to their credit profiles from nonpayment; and (3) consumers to spend time and money attempting to rescind the loans, reverse charges, and remove Respondent's tradeline from their credit reports.

67. Some consumers did not learn of the loans until well after they were funded.

68. The substantial injuries consumers suffered were therefore not reasonably avoidable.

69. Nor were they outweighed by any countervailing benefit to consumers or to competition.

70. Thus, Respondent engaged in unfair acts and practices in violation of Sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## CONDUCT PROVISIONS

## V.

## Required Conduct

**IT IS ORDERED**, under §§ 1053 and 1055 of the CFPA, that:

71. Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, in connection with consumer loan authorizations, must take the following affirmative actions:

   a. Obtain and retain evidence of a consumer's authorization of a loan in one of the following forms prior to asserting or reporting to a credit reporting agency any obligation on the part of the consumer and prior to the loan being activated:

    i.  A signed written authorization from the consumer;

    ii.  An audio recording of a phone call with the consumer containing the consumer's verbal authorization; or

    iii.  Other documentary evidence evidencing consumer authorization of the loan obtained during loan activation procedures using email, the internet, or mobile messaging technology (such as SMS).

  b.  To the extent that a consumer complains about authorization of a loan application, Respondent must delete any credit inquiry unless it has or obtains evidence of consumer authorization of the loan application.

  c.  This paragraph shall not apply to Respondent's Patient Solutions Program, which requires consumers to apply for loans directly through Respondent.

72.  Respondent, whether acting directly or indirectly, must take the following affirmative actions with respect to Respondent's consumer complaint management program:

  a.  Develop, implement, and monitor a consumer complaint management program designed to efficiently and accurately intake, investigate, document, resolve, and track consumer complaints regarding unauthorized loans and related unauthorized transactions;

b.  Acquire and allocate the systems and staff necessary to administer the complaint management program in a manner consistent with the requirements of subparagraph (a);

c.  Develop and implement written policies, practices, and procedures, including specific standards of investigation, to govern the consumer complaint management program described in subparagraph (a);

d.  Develop and implement a training program on the requirements of subparagraphs (a) and (c) for Respondent's employees or agents responsible for any aspect of the complaint management program;

e.  Review and analyze complaints in the consumer complaint management program on a routine basis for the purpose of identifying trends, emerging issues, and Merchants potentially involved in unauthorized loans and related unauthorized transactions; and

f.  Based on the analyses conducted pursuant to subparagraph (e), periodically revise policies and procedures, and implement updated practices or solutions designed to prevent unauthorized loans.

73.  Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, in connection with receiving consumer complaints, must take the following affirmative actions following receipt of a complaint regarding an

22

unauthorized loan for which Respondent cannot obtain or produce evidence of consumer authorization as set forth in paragraph 71(a):

a. Issue the consumer a provisional account credit within 5 business days of receiving the complaint, provided such complaint remains unresolved;

b. Cancel the loan within 7 business days following resolution of a complaint of an unauthorized loan in the consumer's favor because Respondent does not possess or cannot obtain evidence of consumer authorization as required by paragraph 71(a);

c. Issue a permanent account credit within 7 business days following resolution of a complaint of an unauthorized loan in the consumer's favor because Respondent does not possess or cannot obtain evidence of consumer authorization as required by paragraph 71(a);

d. Refund the consumer for any amounts paid on the unauthorized loan within 10 business days following resolution of a complaint of an unauthorized loan in the consumer's favor because Respondent does not possess or cannot obtain evidence of consumer authorization as required by paragraph 71(a); and

e. Submit a request to update or correct any incorrect or inaccurate information furnished to a consumer reporting agency in the subsequent reporting cycle following resolution of a consumer complaint of an

unauthorized loan in the consumer's favor because Respondent does not possess or cannot obtain evidence of consumer authorization as required by paragraph 71(a).

74. Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, in connection with loan application, verification, activation, and transaction procedures, must take the following affirmative actions:

a. Develop and implement policies, practices, procedures, and training materials regarding:

   i. Obtaining and retaining evidence of consumers' loan authorizations consistent with paragraph 71(a).

   ii. Attempting to verify consumers' email addresses and mobile telephone numbers before sending loan activation messages to a consumer's email address or mobile telephone number.

   iii. Using knowledge-based authentication procedures or other comparably effective authentication procedures before activating a loan or disbursing loan proceeds, if Respondent cannot verify a consumer's email address or mobile telephone number;

   iv. Establishing affirmative loan activation steps a consumer must take after a loan application is submitted and before Respondent may

24

disburse a consumer's loan proceeds or furnish information to a

consumer reporting agency; and

v.  Obtaining and retaining evidence of consumers' approval of

transactions before Respondent may disburse loan proceeds to a

Merchant.

b.  Provide Clear and Prominent disclosures to consumers describing the

steps the consumer is taking, including their effect. Such disclosures shall

be provided, as applicable, before: (1) submission of a loan application;

(2) activation of a loan; and (3) a consumer approves the initial loan

transaction.

75.  Respondent, whether acting directly or indirectly, must take the following

affirmative actions regarding Merchant training and oversight:

a.  Develop and implement policies, procedures, and training materials

designed to prevent and prohibit Merchants from applying for loans

without consumers' knowledge or authorization, or using Shopping Pass

numbers without consumers' consent;

b.  Require any Merchant employee who intakes, facilitates, or submits

consumer loan applications to: (1) attend both an initial and subsequent

annual internet-based training on loan application submission procedures;

25

and (2) pass a knowledge test on loan application submission procedures following the initial internet-based training before the employee may begin intaking, facilitating, or submitting loan applications;

    i. This provision shall not prevent a Merchant employee who has not received such training from assisting consumers in contacting Respondent, and then having the consumer directly communicate with Respondent to apply for a GreenSky Program loan.

c. Develop and implement a process to verify the attendance of all Merchant employees required to receive training pursuant to subparagraph (b) at all required initial and annual trainings;

d. Discipline, including through suspension and termination, any Merchant who violates Respondent's loan application, activation, or transaction approval policies or procedures as outlined in paragraph 71, as set forth in the approved Compliance Plan; and

e. Develop and implement policies, practices, procedures, and training materials for effective oversight, risk management and audit of Merchants.

76. Respondent, whether acting directly or indirectly, must:

a. Develop, implement, and consistently apply policies, practices, and procedures governing Respondent's write-off practices, including clear

26

and detailed guidelines to govern write-off decisions, which must be set forth in the approved Compliance Plan; and

b.  Develop and implement training materials and a training program on Respondent's write-off policies, practices, and procedures.

## VI.

## Compliance Committee and Compliance Plan

**IT IS FURTHER ORDERED that:**

77.  The Board must establish a Compliance Committee of at least 3 directors, of which at least 2 are not officers or employees of Respondent or any of its affiliates. Within 14 days of the Effective Date, the Board must provide in writing to the Enforcement Director the name of each member of the Compliance Committee. If there is a change of membership to the Compliance Committee, the Board must submit the name of any new member in writing to the Enforcement Director.

78.  For 5 years from the Effective Date, the Compliance Committee will be responsible for monitoring and coordinating Respondent's adherence to the provisions of this Consent Order. The Compliance Committee must meet at least quarterly and must maintain minutes of its meetings.

79.  Within 50 days of the Effective Date, the Compliance Committee must submit to the Board a comprehensive compliance plan designed to ensure

that Respondent's loan origination and servicing activities comply with all applicable Federal consumer financial laws and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:

a. Detailed steps Respondent will take to effectuate each of the Conduct Provisions required by this Consent Order;

b. A mechanism to ensure that the Board is kept apprised of the status of compliance actions;

c. Specific steps, timeframes, and deadlines for implementation of the requirements described above; and

d. A proposal for who the Respondent will retain as the Assessor to complete the initial Assessment set forth in Section XI.

80. Within 60 days of the Effective Date, the Board must submit a copy of the Compliance Plan, with any additional comments by the Board, to the Enforcement Director for review and determination of non-objection.

81. The Enforcement Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Respondent to revise it. If the Enforcement Director directs Respondent to revise the Compliance Plan, Respondent must revise and resubmit the Compliance Plan to the Enforcement Director within 30 days.

82.   After receiving notification that the Enforcement Director has made a determination of non-objection to the Compliance Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

## VII.

## Role of the Board

**IT IS FURTHER ORDERED** that:

83.   The Board or a relevant committee thereof must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau.

84.   Although this Consent Order requires Respondent to submit certain documents for review or non-objection by the Enforcement Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with the laws that the Bureau enforces, including Federal consumer financial laws and this Consent Order.

85.   In each instance that this Consent Order requires the Board to ensure adherence to, or perform certain obligations of Respondent, the Board or a relevant committee thereof must:

a.  Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

b.  Require timely reporting by management to the Board or a relevant committee thereof on the status of compliance obligations; and

c.  Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section.

## MONETARY PROVISIONS

## VIII.

### Order to Pay Redress

**IT IS FURTHER ORDERED** that:

86.  Respondent shall pay redress to Affected Consumers as follows:

a.  Cash redress totaling between $750,000 and $3,000,000 in the form of checks mailed to consumers (Cash Redress); and

b.  Loan cancellations in an amount no more than $6,000,000 (Credit Redress).

87.  Within 10 days of the Effective Date, Respondent shall reserve or deposit into a segregated deposit account an amount not less than $750,000 for the purpose of providing Cash Redress to Affected Consumers as required by this Section.

a.  If, at any time during the administration of this Consent Order, the Settlement Administrator, as defined in paragraph 88, determines that Cash Redress owed to Affected Consumers exceeds $750,000, Respondent shall reserve or deposit into a segregated deposit account, such additional amounts, not to exceed $3,000,000 in aggregate, for purposes of paying Cash Redress.

b.  If, at any time during the administration of this Consent Order, the Settlement Administrator determines that Cash Redress owed to Affected Consumers is less than $750,000, Respondent may use the remainder of the funds in the segregated deposit account to pay the Settlement Administrator as required by this Section. If funds remain in the segregated deposit account after paying Cash Redress and the Settlement Administrator, within 30 days of the completion of the Redress Plan, Respondent must pay the remainder to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions. The Bureau will deposit any remaining funds in the U.S. Treasury as disgorgement. Respondent will have no right to challenge any actions that the Bureau or its representatives may take under this Section.

88. Within 30 days of the Effective Date, Respondent must submit to the Enforcement Director for review and non-objection a proposal for retaining an independent third-party settlement administrator (Settlement Administrator) for the purpose of: (1) communicating with Potential Affected Consumers as set forth in subparagraph 3(i)(ii)(a-d); (2) conducting a review of Identified Consumer Account Information of Potential Affected Consumers to identify all Affected Consumers; (3) determining the amount of redress due to each Affected Consumer; and (4) administering redress pursuant to this Consent Order (Settlement Administrator Proposal).

89. The Settlement Administrator Proposal shall identify the Settlement Administrator that Respondent proposes to retain and must include:

   a. The proposed Settlement Administrator's qualifications and specialized expertise; and

   b. A description of all work the proposed Settlement Administrator has performed for Respondent in the five years preceding the Effective Date (if any), including the amount Respondent paid the Settlement Administrator for each engagement.

90. If the Enforcement Director directs Respondent to revise the Settlement Administrator Proposal or select a different Settlement Administrator,

Respondent must make such revisions or selection and resubmit the proposal within 10 days of the Enforcement Director's request.

91. Within 15 days of the Enforcement Director's determination of non-objection, Respondent shall engage the Settlement Administrator for the purposes described in paragraph 88.

92. Within 30 days of retaining the Settlement Administrator, Respondent must submit to the Enforcement Director for review and non-objection a comprehensive written plan for providing redress consistent with this Consent Order (Redress Plan). The Enforcement Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Respondent to revise it. If the Enforcement Director directs Respondent to revise the Redress Plan, Respondent must revise and resubmit the Redress Plan to the Enforcement Director within 15 days. After receiving notification that the Enforcement Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the approved Redress Plan.

93. The Redress Plan must:

   a. Describe the methodology the Settlement Administrator will use to identify Potential Affected Consumers;

b.  Describe the steps the Settlement Administrator must take to communicate with the Potential Affected Consumers described subparagraphs 3(i)(ii)(a-d) and as required by subparagraphs 93 (e)- (f) including, without limitation: (1) how the Settlement Administrator will locate Potential Affected Consumers, (2) the form and method the Settlement Administrator will use to contact Potential Affected Consumers (e.g. mail, phone, email), (3) a representative exemplar of each form of communication, (4) how Potential Affected Consumers may respond to the Settlement Administrator's communication(s), and (5) the number of times and methods by which the Settlement Administrator must attempt to contact non-responsive Potential Affected Consumers.

c.  Describe the steps the Settlement Administrator will employ to conduct a review of the Identified Consumer Account Information of Potential Affected Consumers to identify all Affected Consumers, including the Settlement Administrator's discretion to take all reasonable steps where appropriate to verify the authenticity of Identified Consumer Account Information obtained from Merchants;

d.  Identify the parameters that the Settlement Administrator will use to determine which of the Potential Affected Consumers are Affected Consumers. At a minimum, Affected Consumers must include Potential

34

Affected Consumers for whom Respondent does not possess or obtain at least one the following forms of evidence of authorization:

i.  Respondent's loan application or loan application information form with the consumer's signature;

ii. An audio recording of a phone call with the consumer in which the consumer acknowledges that he or she submitted a loan application to Respondent for financing, authorized submission of a loan application by a Merchant, or confirmed that he or she wished to keep the GreenSky Program loan;

iii. An email or other written communication from the consumer in which the consumer acknowledges that he or she submitted a loan application for financing to Respondent, authorized submission of a loan application by a Merchant, or confirmed he or she wished to keep the GreenSky Program loan;

iv. Respondent's "Borrower Payment Certificate," signed by the consumer, indicating he or she agrees to the GreenSky Program loan;

v.  Respondent's "Limited Transaction Authorization Form," signed by the consumer, indicating he or she authorizes payments from the GreenSky Program loan to a Merchant; or

vi. A consumer's written or text response to an email or mobile messaging technology (such as SMS) alert from Respondent authorizing or acknowledging a loan transaction.

e. The requirement in paragraph 93(d) that Affected Consumers must include, at minimum, Potential Affected Consumers for whom Respondent does not possess or obtain one of the listed forms of evidence may not apply if the Identified Consumer Account Information contains evidence that the consumer: (i) signed an agreement with the Merchant for goods and services, and (ii) also applied for financing as a part of that agreement. In such instances, the Settlement Administrator must take the steps outlined in the approved Redress Plan to contact the Potential Affected Consumer to: (i) determine whether the Merchant provided the goods or services, (ii) determine how the Potential Affected Consumer paid for such goods or services, and, (iii) if applicable, invite the Potential Affected Consumer to submit any relevant evidence for the Settlement Administrator's consideration.

    (a) For purposes of the Redress Plan, "evidence that the consumer (i) signed an agreement with the Merchant for goods and services, and (ii) also applied for financing as a part of that agreement," shall not include:

(1) Respondent's customer representative notes stating the consumer has authorized the loan;

(2) A writing from a Merchant or Respondent's own notes regarding communications with a Merchant where the Merchant states the consumer authorized the loan or transaction; or

(3) A transaction ledger or payment history for Respondent's loan.

f. Specify the methodology the Settlement Administrator will use to:

i. Cancel loans for Affected Consumers;

ii. Calculate Cash Redress and Credit Redress, including any setoff pursuant to subparagraphs (iii)(a) to (c) below, for each Affected Consumer;

iii. For purposes of calculating redress pursuant to this Order, the Redress Plan shall provide that the Settlement Administrator may consider from Respondent a request for a setoff of Cash Redress or Credit Redress for goods and services actually provided, as follows:

(a) Respondent shall bear the burden of proving that set off is appropriate.

(b)  If Respondent provides evidence to the Settlement Administrator that setoff may be appropriate, the Settlement Administrator must take the steps outlined in the approved Redress Plan to contact the Potential Affected Consumer to determine whether the Merchant provided goods or services to the Potential Affected Consumer, how the consumer paid for such goods or services, and, if applicable, invite the Potential Affected Consumer to submit any evidence for the Settlement Administrator's consideration.

(c)  If Respondent and the Potential Affected Consumer present conflicting evidence, the Settlement Administrator may take any steps she or he deems necessary to determine whether setoff is appropriate, as will be further described in the Redress Plan.

iii.  Delete Respondent's tradeline information with consumer reporting agencies; and

iv.  Administer Cash Redress and Credit Redress to Affected Consumers.

g.  Provide that the Cash Redress or Credit Redress due to any Affected Consumer shall be paid pursuant to this Consent Order;

h.  Describe the Settlement Administrator's procedures for issuing and tracking Cash Redress and Credit Redress to each Affected Consumer;

i.  Provide that the Settlement Administrator shall mail each Affected Consumer owed redress under this Order an explanatory letter (Redress Notification Letter) that: (i) includes a statement that redress is being provided in accordance with the terms of this Consent Order; (ii) states why the Affected Consumer is receiving the letter; and (iii) states, if applicable, that the Affected Consumer's loan is being canceled and that the relevant tradeline will be deleted from their consumer report;

j.  Provide that neither the Settlement Administrator nor Respondent shall include in an envelope containing a Redress Notification Letter any materials other than the letter and a redress check, as applicable;

k.  Attach, as exhibits, an exemplar of each Redress Notification Letter envelope and letter template and any other scripts or correspondence used to communicate with Potential Affected Consumers;

l.  Specify timeframes and deadlines for implementing the Redress Plan;

m.  Allow Respondent to review the work conducted by the Settlement Administrator required by this Section to assure compliance with this Consent Order and the Redress Plan, provided however that: (i) the Settlement Administrator retains full and final decision-making rights as

39

to the class of Affected Consumers and the amounts of Cash Redress or

Credit Redress due to Affected Consumers under this Consent Order; and

(ii) a detailed accounting of any changes or modifications to the class of

Affected Consumers or amounts of redress due to Affected Consumers as

a result of Respondent's review under this provision shall be documented

and provided to the Bureau prior to completion of redress administration;

and

n.  Provide that Respondent will pay all costs of administering redress as

required by this Consent Order, subject to paragraph 87.

94.  After the Settlement Administrator has completed redress administration

under the Redress Plan, Respondent must submit a report to the Enforcement

Director, and identify: (i) the number of Potential Affected Consumers; (ii)

the number of Affected Consumers; (iii) the amount of Cash Redress

distributed and Credit Redress applied to Affected Consumers; (iv) the

number and amount of setoffs granted; (v) the amount of the Cash Redress

checks deposited by Affected Consumers; and (vi) the number of tradelines

deleted to correct inaccurate consumer reports.

95.  Respondent may not condition the payment of any redress to any Affected

Consumer under this Consent Order on that Affected Consumer waiving any

right.

## IX.

## Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED** that:

96. Under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section IV of this Consent Order, and taking into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of $2,500,000 to the Bureau.

97. Within 10 days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

98. The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by § 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

99. Respondent, for all purposes, must treat the civil money penalty paid under this Consent Order as a penalty paid to the government. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

    a. Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

    b. Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any

41

insurance policy, with regard to any civil money penalty paid under this Consent Order.

100.  To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund. If the court in any Related Consumer Action offsets or otherwise reduces the amount of compensatory monetary remedies imposed against Respondent based on the civil money penalty paid in this action or based on any payment that the Bureau makes from the Civil Penalty Fund, Respondent must, within 30 days after entry of a final order granting such offset or reduction, notify the Bureau, and pay the amount of the offset or reduction to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

# X.

## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

101.    In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

102.    Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

103.    Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer-identification numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

104.    Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Enforcement Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid

43

or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

## COMPLIANCE PROVISIONS

## XI.

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

105.  Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but in any case, no later than 14 days after the development.

106.  Within 7 days of the Effective Date, Respondent must:

a.  designate at least one telephone number and email, physical, and postal addresses as points of contact that the Bureau may use to communicate with Respondent;

   b.  identify all businesses for which Respondent is the majority owner, or that Respondent directly or indirectly controls, by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; and

   c.  describe the activities of each such business, including the products and services offered, and the means of advertising, marketing, and sales.

107.  Respondent must report any change in the information required to be submitted under paragraph 106 above at least 30 days before the change or as soon as practicable after the learning about the change, whichever is sooner.

108.  Within 90 days of the Effective Date, and again one year after the Effective Date, Respondent must submit to the Enforcement Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board, sworn to under penalty of perjury, which, at a minimum:

   a.  Lists each applicable paragraph and subparagraph of the Order and describes in detail the manner and form in which Respondent has complied with each such paragraph and subparagraph;

   b.  Describes in detail the manner and form in which Respondent has complied with the Redress Plan and Compliance Plan;

c. Includes a report on Respondent's consumer complaint management program, including, at a minimum:

i. The number of complaints received relating to allegedly unauthorized loans and related unauthorized transactions;

ii. The number of complaints of allegedly unauthorized loans resolved with evidence of authorization as specified in the Consent Order;

iii. The number of unauthorized loan complaints resolved by cancelling the loan because Respondent did not have proof of authorization or the consumer provided evidence indicating that the authorization was fraudulent;

iv. The number of unauthorized loan complaints where Respondent determined the consumer was liable but resolved the complaint with a goodwill gesture of cancelling the loan;

v. The mean and median number of days to resolve unauthorized loan complaints;

vi. The number of unauthorized loan complaints resulting in chargebacks for consumers because Respondent did not have proof of authorization or the consumer provided evidence indicating that the authorization was fraudulent;

vii. The aggregate amount of such chargebacks;

viii.  The number of unauthorized loan complaints resulting in refunds to consumers because Respondent did not have proof of authorization or the consumer provided information indicating that the authorization was fraudulent;

ix.  The number of unauthorized loan complaints where Respondent determined the consumer was liable but resolved the complaint with a goodwill gesture of refunding the consumer;

x.  The aggregate amount of refunds to consumers relating to unauthorized loan complaints because Respondent did not have proof of authorization or the consumer provided information that authorization was fraudulent;

xi.  The aggregate amount of refunds to consumers where Respondent determined the consumer was liable but resolved the complaint with a goodwill gesture of refunding the consumer;

xii.  The number of unauthorized loan complaints resulting in write-offs because Respondent did not have proof of authorization or the consumer provided information indicating that the authorization was fraudulent; and

xiii.  The aggregate amount of the write-offs on loans with unauthorized loan complaints because Respondent did not have proof of

47

authorization or the consumer provided information indicating that the authorization was fraudulent.

   d.  Describe in detail the manner and form in which Respondent has complied with the Redress Plan and Compliance Plan; and

   e.  Attaches a copy of each Order Acknowledgment obtained under Section XII unless previously submitted to the Bureau.

109.  In connection with Section V of this Consent Order, Respondent must obtain an initial and annual assessments (Assessments) from an independent third-party professional (Assessor) as set forth in the approved Compliance Plan. The reporting period for the Assessments must cover: (1) the period from the Effective Date to 180 days after the Bureau non-objects to the Compliance Plan; and (2) each 1-year period thereafter until termination of this Consent Order for the annual Assessment. Respondent must submit each Assessment to the Bureau within ten days after the Assessment has been completed.

110.  Each Assessment must evaluate whether Respondent has effectively implemented and maintained the requirements set forth in paragraphs 71-76, and make recommendations to remediate or cure any ineffective implementation or maintenance of the requirements set forth in paragraphs 71-76.

111.  No finding of any Assessment shall rely solely on assertions or attestations by Respondent's management. The Assessment shall be signed by the Assessor and shall state that the Assessor conducted an independent review and did not rely solely on assertions or attestations by Respondent's management.

## XII.

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

112.  Within 7 days of the Effective Date, Respondent must submit to the Enforcement Director an acknowledgment of receipt of this Consent Order, sworn under penalty of perjury.

113.  Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

114.  For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future board members and executive officers, as well as to any managers, employees, service providers, or other agents

and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

115.  Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. § 7001 *et seq.*, within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

116.  Within 90 days of the Effective Date, Respondent must provide the Bureau with a list of all persons and their titles to whom this Consent Order was delivered through that date under paragraphs 113-114 and a copy of all signed and dated statements acknowledging receipt of this Consent Order under paragraph 115.

## XIII.

## Recordkeeping

**IT IS FURTHER ORDERED** that:

117.  Respondent must create and retain the following business records:

a.  all documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau;

b.  all documents and records pertaining to the Redress Plan, described in

Section VIII above;

c.  copies of all sales scripts, training materials, advertisements, websites, and other marketing materials, including any such materials used by a third party on Respondent's behalf;

d.  all consumer complaints and refund requests (whether received directly or indirectly, such as through a third party), and any responses to those complaints or requests;

e.  records showing, for each employee providing services related to Respondent's loans, that person's name, telephone number, email, physical, and postal address, job title or position, dates of service, and, if applicable, the reason for termination; and

f.  records showing, for each Merchant and any other service provider providing services related to the GreenSky Program loans, the name of a point of contact, and that person's telephone number, email, physical, and postal address, job title or position, dates of service, and, if applicable, the reason for termination.

118.  Respondent must make the documents identified in paragraph 117 available to the Bureau upon the Bureau's request.

## XIV.

## Notices

**IT IS FURTHER ORDERED** that:

119. Unless otherwise directed in writing by the Bureau, Respondent must provide all submissions, requests, communications, or other documents relating to this Consent Order in writing, with the subject line, "*In re GreenSky, LLC, File No. 2021-CFPB- 0004*," and send them by overnight courier or first-class mail to the below address and contemporaneously by email to Enforcement_Compliance@cfpb.gov:

> Assistant Director for Enforcement
> Consumer Financial Protection Bureau
> ATTENTION: Office of Enforcement
> 1700 G Street, N.W.
> Washington D.C. 20552

## XV.

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

120. Respondent must cooperate fully to help the Bureau determine the identity and location of, and the amount of injury sustained by, each Affected Consumer. Respondent must provide such information in its or its agents' possession or control within 14 days of receiving a written request from the Bureau.

## XVI.

## Compliance Monitoring

**IT IS FURTHER ORDERED** that:

121. Within 14 days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

122. For purposes of this Section, the Bureau may communicate directly with Respondent, unless Respondent retains counsel related to these communications.

123. Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview regarding: (a) this matter; (b) anything related to or associated with the conduct described in Section IV; or (c) compliance with the Consent Order. The person interviewed may have counsel present.

124. Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVII.

### Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

125. Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Enforcement Director.

126. The Enforcement Director may, in his or her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he or she determines good cause justifies the modification. Any such modification by the Enforcement Director must be in writing.

### ADMINISTRATIVE PROVISIONS

## XVIII.

**IT IS FURTHER ORDERED** that:

127. The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau from taking any other action against Respondent, except as described in paragraph 128. Further, for the avoidance of doubt, the provisions of this Consent Order do not bar, estop, or otherwise prevent any other person or governmental agency from taking any action against Respondent.

128. The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section IV of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

129. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under § 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

130. This Consent Order will terminate 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent. If such action is dismissed or the relevant adjudicative body rules that Respondent did not violate any provision of the Consent Order, and the dismissal or ruling is either not

appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

131. Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

132. Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

133. The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under §1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found, and Respondent may not contest that court's personal jurisdiction over Respondent.

134. This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises,

representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

135.   Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 12th day of July 2021.

*David K. Uejio*
David Uejio
Acting Director
Consumer Financial Protection Bureau