**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF OKLAHOMA**

SUSAN PARISI,

                **Plaintiff,**

v.

OKLAHOMA WINDOWS AND
DOORS, LLC d/b/a RENEWAL BY
ANDERSON OF OKLAHOMA, and
BMO HARRIS BANK, NA d/b/a
GREENSKY, LLC,

                **Defendants.**

**Case No.: 5:23-cv-00115-R**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO GREENSKY'S
SECOND AND REDUNDANT MOTION TO DISMISS**

Defendant BMO Harris Bank, NA, d/b/a GreenSky, LLC ("GreenSky") takes a second bite at the apple in this redundant attempt to compel Plaintiff Susan Parisi ("Parisi") to arbitration despite having no evidence that she agreed to GreenSky's contract, let alone the arbitration agreement in it. Although this is GreenSky's second Motion to Dismiss (the "Motion"), it is based on virtually identical arguments as its first, the Motion to Compel Arbitration as to All Claims Asserted by Plaintiff and to Dismiss or Stay Claims of Plaintiff Pending Arbitration ("Motion to Compel Arbitration and Dismiss") (Doc. No. 18). Filing this second Motion does little to change the facts or the law, and, like GreenSky's previously filed Motion to Compel Arbitration and Dismiss, it is due to be denied. No arbitration agreement exists because no loan agreement exists.

## I.    BACKGROUND AND DISPUTED FACTS[1]

GreenSky tried a bait and switch, but Parisi rejected it.  Parisi never agreed to the loan contract GreenSky is attempting to enforce (the "Loan Agreement"), nor did she provide "assent" in any other way as GreenSky claims without evidence. Having never agreed or assented to the Loan Agreement, Parisi could never have agreed to the arbitration clause within the agreement.

### A.    <u>There Was No Meeting of the Minds</u>

In this current Motion, GreenSky argues that because Parisi "agreed to purchase" the Andersen replacement windows with zero money down and zero interest with no payments due until two years after the installation, the Loan Agreement was created that established Parisi's contractual agreement with GreenSky. (Doc. No. 47, at p. 4-5, ¶¶3, 6, 9). GreenSky ignores and hopes this Court will ignore the fact that GreenSky, after receiving Parisi's application, did not offer Parisi a loan with zero down and zero interest, with no payments for two years after installation.  Instead of the no down payment, no interest, no payments for two years loan for which Parisi applied, GreenSky sent Parisi the Loan Agreement, which had different material terms. *See* Declaration of Susan Parisi, hereafter Parisi Dec., ¶¶42, 43, attached hereto as **Exhibit 1**. As set forth in Parisi's Opposition to GreenSky's Motion to Compel Arbitration and Dismiss, the Loan Agreement

---

[1] Much of the background and disputed facts are more fully set forth in Parisi's Opposition to GreenSky's Motion to Compel Arbitration and Dismiss (Doc. No. 39). Because GreenSky incorporated its Motion to Compel Arbitration and Dismiss and its Reply Brief in Support into its Motion, Parisi will refer to those documents as necessary.

had a different identification number and required payments within six months, not two years after window installation. Parisi Dec., ¶43; (Doc. No. 39, at p. 8). It specified, "THIS IS A DIFFERENT PLAN THAN REQUESTED." *Id.*

GreenSky now admits there was no meeting of the minds for the formation of GreenSky's proposed Loan Agreement when GreenSky sent Parisi this "DIFFERENT PLAN." (Doc. No. 42, at p. 6). Nor did Parisi "assent" later through the alleged use of the Shopping Pass by its vendor, Renewal by Anderson, because Parisi did not authorize its use. Parisi Dec., ¶¶41, 44, 45. Nevertheless, GreenSky claims that "[b]ecause she activated the Shopping Pass, she manifested her assent to the arbitration agreement, and she is legally bound to the arbitration agreement as much as other terms in the Loan Agreement". (Doc. No. 42, at p. 4). Parisi, however, provides clear evidence that she did not activate the Shopping Pass, nor authorize its use. Parisi Dec., ¶¶41, 44, 45.

**B.** **GreenSky Admits Parisi Was Not Bound to its Loan Agreement Simply Because GreenSky Mailed and Emailed it to Parisi**

In this Motion, GreenSky argues that Parisi is bound to its Loan Agreement because she "agreed to purchase the replacement windows and was approved for a loan with BMO Harris Bank, NA [ ]". (Doc. No. 47, at p. 5, ¶9. In GreenSky's Reply in Support of its Motion to Compel Arbitration and Dismiss however, GreenSky admitted that "[a]t the time the copies of the Loan Agreement were sent by U.S. Mail and by electronic delivery to [Parisi] she was not yet bound to the Loan Agreement." (Doc. No. 42, at p. 6). With this admission, GreenSky hangs its entire argument on its claim that Parisi manifested her "assent to the payment terms of the Loan Agreement – and became bound to the terms of

3

the Loan Agreement – by using the Shopping Pass on November 29, 2021." *Id*., at p. 7. The problem with GreenSky's reliance on the Shopping Pass is that Parisi did not activate it or authorize its use, and GreenSky's "evidence" that she did fails to pass the laugh test. Moreover, on the very same day GreenSky claims Parisi authorized use of the Shopping Pass (November 29, 2021), Parisi denied – in writing – that she did so. Parisi Dec., ¶41; *See also*, Doc. No. 39-1. p.40.

GreenSky tries to skirt around this inconvenient set of facts when it states that the "facts and circumstances surrounding [Parisi's] approval and use of the Loan Agreement are set forth in Paragraphs 7 – 30 of the Kaliban Declaration [ ]." (Doc. No. 47, at ¶12). The Kaliban Declaration, however, contains a number of misleading and disputed "facts," few of which even address the Shopping Pass use. For example, in paragraph 12, Kaliban states that "[o]n November 23, 2021, Ms. Parisi applied for and was approved for a loan from BMO Harris Bank, NA, through the GreenSky Program for a home improvement project with Renewal by Andersen of Oklahoma, the company reflected on Plaintiff's Loan Agreement." *Id*. This is misleading, because Parisi applied for one loan with one set of terms but was approved for and offered a different loan with entirely different terms, to which she never agreed. Parisi Dec., ¶¶39, 43, 44. Similarly, in paragraph 17, Kaliban states that "[a] representative of GreenSky contacted Ms. Parisi by telephone on November 23, 2021. . . and verified that she was aware of, and authorized, the application. Ms. Parisi was approved for a loan from BMO Harris Bank, NA with a credit limit in the amount of $19,000.00." (Doc. No. 47-5, ¶17). Again, this is misleading. Parisi was aware of and authorized an *application* for a loan with specific terms, *i.e*., zero money down and zero

4

interest with no payments due until two years after the installation of her windows. Parisi Dec., ¶¶7, 21.  The fact that GreenSky approved Parisi for a loan with entirely different terms did not bind her to that approved loan.  No evidence exists that Parisi ever accepted GreenSky's offer of a loan with entirely different terms than the loan for which Parisi applied.  No meeting of the minds occurred.

GreenSky cannot show this Court a Loan Agreement signed by Parisi because Parisi refused to sign the newly offered Loan Agreement. Parisi Dec., ¶44.  Kaliban's declaration states that GreenSky mailed and emailed the Loan Agreement to Parisi. (Doc. No. 47-5, ¶¶18 – 27.)  GreenSky admits, however, this did not bind Parisi to the Loan Agreement. (Doc. No. 42, at p. 6) ("At the time the copies of the Loan Agreement were sent by U.S. mail and by electronic delivery to [Parisi], she was not yet bound to the Loan Agreement."). Instead, GreenSky claims Parisi's "use" of the Loan Agreement Shopping Pass was the way in which Parisi became bound and assented to the Loan Agreement.  (Doc. No. 42, at p. 4) ("[Parisi] manifested her assent to the payment terms of the Loan Agreement—and became bound to the terms of the Loan Agreement—by using the Shopping Pass on November 29, 2021."). But Parisi never used or authorized use of the Shopping Pass.

**C.     Parisi Did Not Use or Authorize Use of Shopping Pass and GreenSky Offers No Contrary Evidence She Did**

Kaliban states that "[o]n November 29, 2021, Ms. Parisi used the Shopping Pass included with, and part of, her Loan Agreement, and authorized Renewal by Andersen of Oklahoma to charge her account in the amount of $8,871.50.  (Doc. No. 47-5, ¶28). Kaliban declares that this "use" constituted an affirmance and acceptance of the terms of the Loan

5

Agreement.[2] *Id.*, ¶29.   Yet, just as with GreenSky's Motion to Compel Arbitration and Dismiss filed previously, the sum total of GreenSky's purported evidence of Parisi's authorization for use of the Shopping Pass is a document Kaliban refers to as a "transaction history" for Parisi's "loan account." *Id.*, ¶30.   Kaliban declares, "[t]his document shows the charges to Ms. Parisi's account number ending in 2561.   The funds were settled and disbursed directly to Renewal by Andersen of Oklahoma's designated bank account in order to pay for the services Ms. Parisi requested from Renewal by Andersen of Oklahoma." *Id.*   Of course, an unsigned document that "shows" charges as a line item on what is purported to be a GreenSky internal "transaction history" that an unidentified individual may or may not have created at a relevant time, does not evidence, in any way, Parisi's approval, assent, or authorization of the Shopping Pass's use.

Parisi expressly disputes that she ever approved, assented to, or authorized the use of the Shopping Pass.   Parisi Dec., ¶¶41, 44, 45.   GreenSky's only "proof" of her authorization is a self-serving accounting ledger printout (if even that) showing the charge as a line item.   GreenSky cannot point to any evidence that Parisi signed a document approving of the Shopping Pass's use.   Nor does GreenSky point to any correspondence in an email or a text message evidencing that Parisi authorized the Shopping Pass use.   Nor does GreenSky point to an audio recording of Parisi's authorization.   To the contrary, evidence that Parisi did **not** know of, approve, or authorize use of the Shopping Pass is evident from Parisi's declaration, and correspondence Parisi sent to GreenSky on the very

---

[2] Of course, what constitutes an affirmance and acceptance is not a fact to be declared but a legal conclusion.

day GreenSky claims she used the Shopping Pass and in the days that immediately followed.  Parisi Dec., ¶¶41, 44, 45.  In written communication, dated the same day as the alleged use of the Shopping Pass – November 29, 2021 – Parisi stated that that she was never informed about the Shopping Pass use:

> OK, I was never informed/told that an $8,000 + dollar charge was going to take place! I chose the two-year nothing down, no interest, no payment option.  And I was informed the clock started ticking when the windows were installed.  So what else is going to be done **without my knowledge**? This little trick makes me think twice about proceeding.  Someone best be ta[l]king to me about this.  I am under treatment for bone marrow cancer and I don't need any more surprises! **It is not right [to find] this out after the fact.**

Parisi Dec., ¶41; (Doc. No. 27-8) (Emphasis added).

On December 1, 2021, a GreenSky representative told Parisi that there was a payment transaction for $8,871.50 because the "merchant charges a percentage upfront on the loan" account. (Doc. No. 27-11).  Parisi responded:

> Well it certainly would help to know this information up front which I wasn't told that there would be a "payment transaction" for $8,871.50 which I am NOT comfortable with.  I was told there would NOT be a payment, NO interest, and etc. for two years. . . **I am NOT authorizing any payment at this time to Renewal by Anderson.**

Parisi Dec., ¶44; (Doc. No. 27-11) (Emphasis added).

On December 1, 2021, a GreenSky representative responded, stating that the charge to Parisi's account was "part of the loan process":

> The account will be charged because it is part of the loan process but based on your loan plan, we will not bill you until the job is completed or purchase window expiration date 05/26/22.  So the account is being charged but you are not going to be billed just yet.

Parisi Dec., ¶44; (Doc. No. 1-1, p. 9); (Doc. No. 27-11)

On December 2, 2021, the GreenSky representative followed up:

> After explaining the loan process, do you authorize this transaction? If you have any questions, please give me a call.

Parisi Dec., ¶44; (Doc. No. 1-1, p. 9); (Doc. No. 27-11)

On December 10, 2021, Parisi responded that she unequivocally did not authorize

the use of the Shopping Pass:

> You did NOT explain any loan process to me **and I do NOT authorize any transaction which I have already stated.** I do NOT do well with lies. I have many questions related to this situation. I was told I qualified for a 24 month, NO money down, No Interest, and NO payment situation to begin 24 months after installation, now I am being told I did NOT qualify for that and you have removed that original offer. Well this is to inform you again that I am NOT doing business with you or Renewal by Anderson **and IF you sent them money without my consent that is ON you NOT me. I did NOT authorize anything.** I will provide you the name of my attorney and they will deal with this. This is a very sketchy situation you have set up with Renewal by Anderson. I suggest this gets straightened out quickly.

Parisi Dec., ¶44; (Doc 1-1, p. 9); (Doc. No. 27-13) (Emphasis added).

In each of these written communications, Parisi told GreenSky that she did not use

the Shopping Pass and did not authorize its use.  Yet GreenSky deceptively claims Parisi,

not the merchant, used the Shopping Pass, even after its representative acknowledged that

the use of the Shopping Pass was accomplished without Parisi's involvement.

**D.     GreenSky Agreed It Would Cease Attempts to Bind Consumers with Unauthorized Use of Shopping Passes**

GreenSky's attempt to bind Parisi to a Loan Agreement with entirely different

terms than those for which she applied through unauthorized use of her Shopping Pass is

precisely the type of conduct GreenSky agreed to stop when it entered into a Consent Order

with the Consumer Financial Protection Bureau ("CFPB") in 2021.  A copy of the Consent

Order is attached hereto as **Exhibit 2**; (*See also*, Doc. No. 19-1).  The CFPB found that:

- GreenSky trains the merchants with whom it works. CO, ¶10.

- Where merchants submit loan applications on a consumer's behalf, the consumer is not able to view the approved loan terms unless the merchant shares the screen with the consumer.  CO, ¶14.

- GreenSky issues a Shopping Pass, which functions like a credit card, and treats use of the Shopping Pass as acceptance of the loan.  CO, ¶16.

- Merchants misused the Shopping Pass numbers, using the Shopping Pass numbers to apply for payment.  CO, ¶¶20 – 23.

- Between 2014 and 2019, GreenSky received at least 6,000 complaints from consumers who stated they did not authorize submission of a loan application or became aware of the loan for the first time when they noticed GreenSky's name on their credit report or received billing statements. CO, ¶25-26.

- Merchants who generated more loans for GreenSky received a dedicated "Client Growth Manager," some of whom instructed merchants on how to directly access and use consumers' Shopping Pass numbers.  CO, ¶¶36, 39.

- GreenSky engaged in origination and servicing activities for loans consumers did not authorize. CO, ¶59.

- Some consumers did not learn about the loans until well after they were funded. CO, ¶61.

GreenSky was required to take affirmative action to correct the problems highlighted

by the CFPB in the Consent Order, including:

- Obtaining and retaining evidence of a consumer's authorization of a loan in one of the following forms prior to asserting or reporting to a credit reporting agency any obligation on the consumer's part and *prior to the loan being activated* (emphasis added):

    (1) a signed written authorization from the consumer;

9

> (2) an audio recording of a phone call with the consumer containing the consumer's verbal authorization; or
>
> (3) other documentary evidence evidencing consumer authorization of the loan obtained during loan activation procedures using email, the internet, or mobile messaging technology (such as SMS). CO, ¶ 71.

- GreenSky was required to develop and implement policies, practices, procedures, and training materials regarding obtaining and retaining evidence of consumers' loan authorizations consistent with the methods set forth above *before disbursing loan proceeds to a Merchant* (emphasis added). CO, ¶74. (Emphasis added).

- GreenSky was specifically required to develop policies, procedures, and training materials designed to prevent and prohibit Merchants *from using Shopping Pass numbers without consumers' consent* (emphasis added). CO, ¶75. (Emphasis added).

Instead of ensuring the conduct above ceased as it agreed to do, GreenSky doubles down, insisting that Parisi, by *applying* for a loan with one set of terms, agreed to a Loan Agreement containing an arbitration agreement and entirely different terms. After admitting it could not bind Parisi to a new Loan Agreement simply by sending it to her, GreenSky claims she assented to the new Loan Agreement by using the Shopping Pass. The only evidence GreenSky submits of her "use" is an internal purported accounting printout showing GreenSky disbursed funds to its own merchant. GreenSky has no evidence Parisi agreed, authorized, or assented to use of GreenSky's Shopping Pass, despite the CFPB requirement to obtain and retain such evidence "before disbursing loan proceeds to a Merchant." Rather than offering the evidence the CFPB required GreenSky to obtain and retain, *i.e.*, signed written authorization, audio recording of a verbal authorization, or an email or text message evidencing authorization, GreenSky submits an

internal self-serving printout and ignores Parisi's unequivocal written rejection of any authorization of the Shopping Pass use.

## II.    STANDARD OF REVIEW

The existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked. *Avedon Engineering, Inc. v. Seatex*, 126 F. 3d 1279, 1287 (10th Cir. 1997) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) ("[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."). GreenSky argues incorrectly that Rule 12(b)(3) provides for dismissal of this case for improper venue because of an arbitration clause in its Loan Agreement. Because GreenSky has challenged this Court's jurisdiction, Parisi bears the burden of proving proper venue. *See Castle Rock Hef, LLC v. Corba*, 2020 WL 5015261, at *1 (W.D. Ok. March 3, 2020) (citation omitted). In bearing that burden, however, the facts Parisi alleges in her Complaint are taken as true. *Id.*  In addition, the Court must draw "all reasonable inferences and resolves all factual conflicts" in Parisi's favor. *Id.* (quoting *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1260 (10th Cir. 2012).

Under the FAA, if there is a need to resolve material factual disputes as to the formation of an agreement to arbitrate, the court must proceed to a summary trial. *See* 9 U.S.C. § 4. ("If the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof."). The 10th Circuit agrees that "when factual disputes may determine whether the parties agreed to arbitrate, the way to resolve them ...

11

is by proceeding summarily to trial." *Howard v. Ferrellgas Partners, L.P*., 748 F. 3d 975, 984. (10th Cir. 2014). "When parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." *Hardin v. First Cash Fin. Servs., Inc*., 465 F.3d 470, 475 (10th Cir. 2006) (quoting *Avedon Engineering Inc v. Seatex*, 126 F 3d at 1283.  However, a court can determine that there are no material issues of fact in dispute and decide there is no arbitration agreement as a matter of law. *See Ragan v. Howard*, 841 F. 3d 1134, 1139 (10th Cir. 2016) (When parties do not dispute the material facts surrounding an arbitration provision, then a district court, while viewing the facts most favorable to the non-moving party, can decide as a matter of law whether the parties actually agreed to arbitrate.)

## III.    ARGUMENT

GreenSky claims there was an agreement to arbitrate Parisi's claims "as reflected in the extensive language set forth in the Loan Agreement."   (Doc. No. 47, at p. 7). The problem for GreenSky is that Parisi never agreed to the Loan Agreement.  Because there is no agreement, there is no valid arbitration agreement.

 "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Spahr v. Secco*, 330 F.3d 1266, 1269 (10th Cir.2003) (quoting *AT & T Techs*., 475 U.S. at 648, 106 S.Ct. 1415) (internal quotation marks omitted). "[T]o determine whether a party has agreed to arbitrate a dispute," the Court applies "ordinary state-law principles that govern the formation of contracts." *Walker v. BuildDirect.com Techs., Inc*., 733 F.3d 1001, 1004 (10th Cir. 2013).

12

Agreement or mutual assent is essential to a contract. *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017) ("In present-day Oklahoma, a contract is defined by statute as "an agreement to do or not to do a certain thing." Okla. Stat. Ann. tit. 15, § 1. In short, without an agreement, there is no contract."). Although the presence of an arbitration clause generally creates a presumption in favor of arbitration, "this presumption disappears when the parties dispute the existence of a valid arbitration agreement." *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir.2002); *see also, Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998) ("[W]hen the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away."). Here, there is no presumption in favor of arbitration, because Parisi disputes the existence of a valid arbitration agreement. There is no valid arbitration agreement because there is no valid Loan Agreement.

GreenSky argues that the FAA mandates that district courts "shall" enforce arbitration agreements "in accordance with the terms of the agreement," and that this comports with the national policy in favor of arbitration "when parties contract to settle disputes by arbitration." (Doc. No. 47, at p. 6). All of that falls away when there is a dispute about the existence of a valid agreement. *Howard v. Ferrellgas Partners, L.P.*, 748 F. 3d at 977 ("[B]efore the [FAA]'s heavy hand in favor of arbitration swings into play, the parties themselves must agree to have their disputes arbitrated."). Here, because there is no agreement, the parties did not "contract to settle disputes by arbitration." GreenSky attempts to persuade this Court otherwise by using phrases like, "there was clearly an agreement to arbitrate," "there is no question that [Parisi] understood and agreed to have

13

GreenSky service a loan," and "BMO Harris Bank, NA offered to lend funds to [Parisi]. *Id.*, at p.7. Yet none of these are evidence of a valid agreement between the parties. Because the arbitration agreement is contained in the agreement GreenSky attempts to enforce, to which Parisi is not bound, there is no agreement to arbitrate.

In order to have a valid contract, there must be mutual consent or, in other words, a meeting of the minds between the parties. *Oklahoma Gas and Elec. Co. v. Toshiba Int'l Corp.*, 2016 WL 3659941, at *4 (W.D. Ok. July 1, 2016) (citing *Beck v. Reynolds*, 903 P.2d 317, 319 (Okla. 1995) (citing 15 Okla. Stat. § 2)). Consent is mutual if all parties agree on the same thing in the same sense. *Id.* (citing *Beck, supra*; 15 Okla. Stat. § 66.) To achieve mutual consent, there must be an offer by one party and an acceptance of that offer by the other party. *Id.* (citing *Redwine Resources, Inc. v. Predator Technologies, L.L.C.*, 171 P.3d 330, 334 (Okla. Civ. App. 2007)). An acceptance "must be absolute and unqualified," or else it operates as a new proposal or counter-offer. *Id.* (quoting 15 Okla. Stat. § 71.). "In order that an offer and acceptance may result in a binding contract, the acceptance must be absolute, unconditional, and identical with the terms of the offer, and must in every respect meet and correspond with the offer; and any qualification of or departure from those terms invalidates and rejects the offer." *Maddox v. Northern Natural Gas Co.*, 259 F. Spp. 781, 783 (W.D. Ok. 1966) (citing *Hartzell v. Choctaw Lumber Co. of Delaware et al.*, 163 Okl. 240, 22 P.2d 387 (1933) (binding contract requires acceptance to be absolute, unconditional, and identical with terms of offer and must in every respect meet and correspond with offer; any qualification of or departure from those terms invalidates offer); *Nabob Oil Co. v. Bay State Oil and Gas Co.*, 208 Okl. 296, 255 P.2d

14

513 (1953) (where new proposals are made, the making of which in itself constitutes a rejection of the original offer.)).

In the instant action, Parisi and GreenSky did not agree on the same thing in the same sense. There was no meeting of the minds. If there is no meeting of the minds, there is no contract. *Jacks v. CMH Homes, Inc*., 856 F.3d at 1304. Parisi and GreenSky were not in agreement on the most essential terms. *South Central Industries v. Kerrtas Marketing, LLC*, 2022 WL1518935, *2 (W.D. Ok. February 7, 2022) ("[A] meeting of the minds [must be] on all essential terms of the contract."). Interest and payment terms are material terms of a contract, to which, in the case of the bait and switch offered by GreenSky, Parisi never agreed. *See Homestead Golf Club, Inc. v. Pride Stables*, 224 F. 3d 1195, 1200 (10th Cir. 2000) (contract unenforceable because "[i]mportant material terms such as the funding date, interest rate, and payment schedule" had not been agreed upon).

Here, GreenSky sent Parisi a new loan offer, which in itself constituted a rejection of the original offer. In fact, as mentioned by Parisi in her communication to GreenSky, GreenSky told her it had removed its original offer. Parisi Dec., ¶44; (Doc. No. 27-13) ("[N]ow I am being told I did NOT qualify for that and you have removed that original offer.")

GreenSky tries an end-run around these basic contract principles. GreenSky admits that Parisi was not bound to its new terms when it sent its loan package by mail and email, but claims Parisi affirmed and accepted the terms in the new loan package by her use of the Shopping Pass. (Doc. No. 18, at p. 9; Doc. No. 42, at p. 6-7; Doc. No. 47, at p. 8). She did not. GreenSky's evidence of Parisi's affirmance and acceptance via use of the

Shopping Pass is not really evidence at all.  It is insufficient to meet the standard of evidence that CFPB required GreenSky to obtain and retain, and GreenSky agreed to obtain and retain, in the Consent Order, *i.e.,* a signed written authorization from Parisi, an audio recording of a phone call with Parisi containing her verbal authorization, or any other email or text with Parisi evidencing authorization. Instead, GreenSky submits an internal printout of uncertain origin and date with a line item showing, according to GreenSky, that it disbursed funds to its own merchant. It is questionable whether this can even be considered evidence that GreenSky disbursed funds to a merchant, but it most certainly is not evidence of Parisi's authorization of any such disbursement.

Moreover, GreenSky ignores entirely that Parisi rejected, in writing, that she ever authorized use of the Shopping Pass. Parisi's evidence shows that she did so on the very day GreenSky claims the Shopping Pass was used and on subsequent days thereafter.  *See* I., Background and Disputed Facts, *supra*, at pp. 6-7.  GreenSky further ignores its representative's acknowledgement that her account was "charged because it is part of the loan process," and that there was a payment transaction for $8,871.50 because the "merchant charges a percentage upfront on the loan." *Id*. Only after the funds were disbursed (if GreenSky is to be believed that they were disbursed), the representative asked Parisi, "do you authorize this transaction?" *Id*. Parisi, of course, unequivocally responded that she did not.  *Id*.

This would all be egregious enough, but it is even more so given that GreenSky has already garnered the attention of the CFPB for these very practices, and agreed to cease the very conduct it now relies upon here.  GreenSky was required to refund or cancel up to $9

16

million in loans and pay a $2.5 million civil penalty due to the harm consumers endured with its illegal practices. (Doc. No. 39, at p. 2).

## IV.    SUMMARY TRIAL ON MAKING OF AGREEMENT TO ARBITRATE

Parisi will address at the class certification stage GreenSky's specious contentions in its Reply in Support about Parisi's ability to represent a class, with one exception, addressed here, *i.e.*, that Parisi's request for a jury trial on the making of the loan agreement "should preclude her class claims." (Doc. No. 42, at p. 9).  Litigation is best accomplished with all relevant facts and law before the Court at the proper time. GreenSky invites this Court to error requesting it to prematurely determine whether Plaintiff can proffer class wide evidence of common questions for similarly situated customers. *See Francis v. Apex U.S.A.*, 406 F.Supp.3d 1206, 1212-13 (W.D. Ok. 2019)("Rule 23(d)(1)(D) imposes a 'high standard' and a motion to strike class allegations is a 'drastic remedy.'" (citing *Tullie v. Quick Cash, Inc*., No. 14-cv-0491 SMV/SCY, 2014 WL 12782961 at *2 (D. N.M. Dec. 2, 2014) (unpublished op.) (citations omitted)). Thus, "courts in this circuit and elsewhere have ... viewed motions to strike or dismiss class allegations at the pleading stage with particular disfavor" as they "seek to preemptively terminate the class aspects solely on the basis of what is alleged in the complaint, and before the plaintiff has had any meaningful chance to conduct discovery." *Id*. (citing *Hockenbury v. Hanover Ins. Co*., No. CIV-15-1003-D, 2016 WL 552967 at *3 (W.D. Okla. Feb. 10, 2016) (unpublished op.) (citing cases); *cf*. *Wilson v. Landers McLarty Olathe KS, LLC*, No. 18-2051-JAR-GEB, 2018 WL 5617832, at *7 (D. Kan. Oct. 29, 2018) (unpublished op.) (finding "the better course is to allow discovery to proceed on class certification and consider these issues in the context of

17

a motion to certify the class" rather than dismiss at the pleading stage being "mindful of the court's obligation to conduct a 'rigorous analysis' into whether the prerequisites of Rule 23 are met") (cleaned up); *Wornicki v. Brokerpriceopinion.com, Inc*., No. 13-cv-03258-PAB-KMT, 2015 WL 1403814 at *4 (D. Colo. March 23, 2015) (unpublished op.) (recognizing that courts within district "have held motions to strike class allegations to a high standard of proof").This case is not yet in the proper procedural posture for a determination of whether a class should be certified.

Under the FAA, if the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.  9 U.S.C. § 4.   Parisi, has a right and hereby requests, a jury trial on the making of the agreement if this Court does not simply deny GreenSky's Motion and its Motion to Compel Arbitration and Dismiss as a matter of law.  Given that GreenSky has failed to put forth any evidence that Parisi agreed to its Loan Agreement, this Court can certainly decide that there is no arbitration agreement as a matter of law.

## V.    CONCLUSION

GreenSky has already asserted that venue is proper in this District and Division when it removed this action from State Court.  (Doc. No. 1, ¶6).  Accordingly, with all reasonable inferences and resolving all factual conflicts in Parisi's favor, Parisi has met her burden of proving proper venue because she has submitted evidence that she was never bound to the Loan Agreement containing the arbitration agreement and expressly rejected any authorization of the Shopping Pass upon which GreenSky attempts to rely. Accordingly, for all the reasons above and in Parisi's Opposition to GreenSky's Motion to

Compel Arbitration and Dismiss (Doc. No. 39), GreenSky's instant Motion to Dismiss and its Motion to Compel Arbitration and Dismiss, should be denied.

Respectfully submitted this 31st day of October, 2023.

**Varnell & Warwick, P.A.**

/s/ Janet R. Varnell
Janet R. Varnell, FBN: 0071072
400 N. Ashley Drive, Suite 1900
Tampa, FL  33602
Telephone: (352) 753-8600
jvarnell@vandwlaw.com

**Rawls Gahlot, PLLC**

/s/ M. Kathi Rawls
M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA # 22145
2404 S. Broadway
Moore, Ok 73160
Phone: 405-912-3225
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

*Attorneys For Plaintiffs*

19

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 31, 2023, I electronically filed the foregoing with the Clerk of the Court through the CM/ECF System, which will send a notice of electronic filing to all counsel of record.

/s/ Janet R. Varnell
Janet R. Varnell