IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SUSAN PARISI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CIV-23-115-R |
| | ) | |
| OKLAHOMA WINDOWS AND | ) | |
| DOORS, LLC, d/b/a RENEWAL BY | ) | |
| ANDERSEN OF OKLAHOMA; and | ) | |
| BMO HARRIS BANK, NA, d/b/a | ) | |
| GREENSKY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court is Defendant GreenSky, LLC's Motion to Compel Arbitration [Doc. 17] and Motion to Dismiss All Claims Pursuant to Federal Rule of Civil Procedure 12(b)(3) [Doc. 46]. Both motions are fully briefed and at issue [Docs. 39, 42, 56, 65]. The Court addresses both Motions with this Order given their considerable overlap. Both Motions are DENIED for the reasons below.

### I.      BACKGROUND

This case stems from a purported loan agreement to finance the installation of new windows in Plaintiff's home. The chronology of facts proves to be crucial to the Court's determination, so it must be discussed with some particularity. Factual matter is cited from

affidavits provided by each party, allegations in the Complaint, and factual matter in parties' exhibits.[1]

### A. GreenSky and Renewal by Andersen's Business Model

GreenSky, LLC works with merchants to provide consumer loans to customers who need to finance their purchases. Doc. 36: Compl. ¶¶ 43-44. Renewal by Andersen of Oklahoma is one of those merchants, and it advertises to potential customers the ability to finance the cost of replacing windows. *Id.* ¶¶ 44, 59. Customers deal directly with Andersen to initiate their window project; they provide personal information to an Andersen representative via the representative's iPad to apply for a loan from GreenSky. *Id.* ¶¶ 43-48. This information enables GreenSky to make a rapid financing decision on the customer's loan application. *Id.* ¶ 47; Doc. 18-3: Kaliban Decl. ¶¶ 12-13.

Once approved for a loan, GreenSky activates a Shopping Pass, which functions like a credit card, for the applicant's account. Compl. ¶ 51. The Shopping Pass account number is used by the Borrower or Merchant to initiate a transaction with GreenSky and allows loaned funds to be disbursed directly to the Merchant for the planned work. *Id.* ¶¶ 52-53. Merchants may use the Shopping Pass number to apply directly to GreenSky for disbursement of funds to themselves, relying on the previous authorization of the Borrower/Customer to begin a project. *Id.* ¶¶ 52-53, 58; Kaliban Decl. ¶ 29. The terms of

---

[1] The court may look to "evidence outside of the complaint such as . . . affidavits" in considering a motion to dismiss based upon improper venue. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1260 (10th Cir. 2012). Likewise, analyzing a motion to compel arbitration is akin to summary judgment practice, meaning this Court can examine the record to determine whether a genuine dispute of fact regarding the existence of an agreement to arbitrate exists. *See Bellman v. i3 Carbon, LLC*, 563 F. App'x 608, 612 (10th Cir. 2014).

GreenSky's Loan Agreement state that any use of the Shopping Pass constitutes acceptance of the Loan Agreement by the Borrower/Customer. Kaliban Decl. ¶ 29. The terms also direct Borrowers to immediately notify GreenSky regarding unauthorized activity on the account, require that any unauthorized transactions be reported to GreenSky within sixty days, and ensure Borrowers that "[y]ou will have no Loan unless you authorize a transaction[.]" Doc. 39-3 at 6.

### B. The Initial Meeting and Loan Application on November 23, 2021

Susan Parisi received communications from Andersen advertising the ability to upgrade her home's windows with a loan requiring zero money down, zero interest for two years, and zero payments for twenty-four months ("Zero-Interest Loan"). Doc. 39-1: Parisi Decl. ¶¶ 4, 7. Parisi met with Russell Kelley, a representative from Andersen, at her home on November 23, 2021. *Id.* ¶ 4. They decided to replace nine windows in Parisi's home. Compl. ¶¶ 63-64. However, Parisi informed Kelley she was beginning treatment for cancer soon, and she would need the Zero-Interest Loan option due to the costs and time her treatment would entail. *Id.* ¶ 62.

Kelley confirmed that GreenSky offered a Zero-Interest Loan that would enable Parisi to purchase the windows. *Id.* ¶ 61; Parisi Decl. ¶ 7. Kelley stated that Parisi would need to provide information to GreenSky via his iPad and a phone call so that GreenSky could review her creditworthiness. Parisi Decl. ¶¶ 8-14. Parisi electronically signed where she was instructed to on the iPad to authorize the loan application. *Id.* ¶¶ 15-18. In doing so, Parisi only ever intended to apply for the Zero-Interest Loan. *Id.* ¶ 21. Thirty minutes later, GreenSky called Kelley and informed Parisi via speakerphone that she had been

approved for the two-year loan program with GreenSky. Kaliban Decl. ¶ 17; Parisi Decl. ¶¶ 22-26. Kelley showed Parisi his iPad to evidence she had been approved for the Zero-Interest Loan, but neither the loan's financial terms nor contract were visible or capable of being reviewed. Compl. ¶ 65; Parisi Decl. ¶ 28. Before he left her home, Kelley assured Parisi a contract would be mailed to her. Compl. ¶ 66; Parisi Decl. ¶ 29.

It is uncontroverted that a contract was sent to Parisi on November 23. GreenSky states a contract was mailed to Parisi via the United States Postal Service that day (which happened to be the Tuesday before the Thanksgiving holiday). Kaliban Decl. ¶¶ 18-22. GreenSky also states they emailed a copy of the same Loan Agreement to an email address Parisi had provided. Kaliban Decl. ¶¶ 23-27.[2] Additionally, Kelley sent her an email that day containing a contract and financing terms between Andersen and Parisi. Parisi Decl. ¶ 31.

However, Parisi was evidently unaware these contracts were sent to her. She states she never saw either email because they ended up in her spam folder.[3] Parisi Decl. ¶¶ 31-32. The only emailed contract Parisi states she received in her Spam folder was the one from Kelley;[4] the financial terms in that contract were labeled Loan Plan 3541 and reflected

---

[2] Parties are reminded of this Court's Local Rule LCvR7.1(n) regarding exhibits, attachments, and appendices. Both parties erred by duplicating and mislabeling exhibits. For instance, Mr. Kaliban's declaration, itself Exhibit 3 to Document 18, included reference to four additional exhibits within the declaration. The Court would appreciate greater clarity in the parties' use of exhibits and attachments.

[3] Parisi only checked her spam folder at the request of her counsel well over a year after the events discussed herein. Parisi Decl. ¶ 32. Presumably, both emailed contracts were in her spam folder, though she only makes mention of the email from Kelley.

[4] Inexplicably, both parties produce only the supposed attachments to the emails they allegedly sent or received. Plaintiff produced the agreement attached to the alleged email from Kelley, but

the terms of the Zero-Interest Loan. *Id.* ¶ 33. That contract had Parisi's electronic signature affixed to pages she had neither seen nor had described to her by Kelley.[5] *Id.* ¶¶ 33-35. As for the mailed contract, Parisi claims she received it the following week—after her supposed acceptance had already occurred. *Id.* ¶ 42.

### C. Minimal Communication between November 23 and November 29

A few days following their initial meeting, Parisi received a call from Kelley informing her that she had, in fact, not qualified for the Zero-Interest Loan. Parisi Decl. ¶ 39. He told her that he would find out what happened and follow up with her, but Parisi never heard from him again. Compl. ¶¶ 71-72.

### D. The Disputed Acceptance of the Loan Agreement on November 29

Sometime before noon on November 29, 2021 (the Monday following Thanksgiving), the Shopping Pass associated with Parisi's account was charged in the amount of $8,871.50.[6] Parisi Decl. ¶ 40; Kaliban Decl. ¶ 28. GreenSky claims, by virtue of this transaction, Parisi accepted the terms of the Loan Agreement as they stood on that day. Kaliban Decl. ¶ 29. Because of the use of the Shopping Pass, GreenSky claims Parisi accepted the terms of a different loan, not the Zero-Interest Loan Parisi had thought she had obtained. *Id.*; Parisi Decl. ¶ 43; Doc. 39-3 at 6.

---

she produces no record of the email itself. Likewise, Defendant produces the Loan Agreement it supposedly attached in an email to Parisi on November 23, but it fails to produce a record of the email itself.

[5] Parisi believes her signature is forged in two spots on this document. *Id.* ¶¶ 36-38.

[6] The Court notes the holiday because it reduces the amount of business and postal days between Parisi's initial meeting with Kelley and her alleged acceptance. Parisi's email initially disputing the charge [Doc. 27-8] was sent midday, indicating the transaction was processed Monday morning.

The loan Parisi is allegedly bound to is markedly different than the loan Parisi sought. Loan Plan 7541 ("High-Interest Loan") [7] requires payments beginning in six months, charges an annual percentage rate of 24.99%, and projects a total cost of $37,717.08 over the life of the $17,744 loan.[8] Doc. 39-3; Doc. 18-3 at 12. The Loan Agreement states, "THIS IS A DIFFERENT PLAN THAN REQUESTED." Doc. 39-3 at 6. The terms also state "FOR PROTECTION AGAINST UNAUTHORIZED PURCHASES, IDENTIFICATION WILL BE REQUIRED FOR ALL PURCHASES." *Id.*

Parisi received three communications from GreenSky or Kelley regarding the loan for which she was approved. First, the physical copy of the Loan Agreement mailed to Parisi on November 23 reflected the terms of the High-Interest Loan. *Id.* However, Parisi states she did not receive the contract in the mail until sometime after November 29. Parisi Decl. ¶ 42. Second, the alleged email GreenSky sent on November 23 included the same High-Interest Loan Agreement attached. Kaliban Decl. ¶ 23. Parisi did not review this copy of the Loan Agreement, as it presumably went to Parisi's spam folder. Parisi Decl. ¶¶ 31-32. Third, Kelley also sent an email to Parisi on November 23; however, it reflected the terms of the Zero-Interest Loan. *Id.* ¶¶ 31-33. This email sat unopened in Parisi's spam folder, too. *Id.* Consequently, the first time Parisi reviewed a Loan Agreement was after

---

[7] GreenSky labels the Loan Agreements with numerals (Loan Plan 3541 and Loan Plan 7541), but this Court refers to them as the Zero-Interest Loan and the High-Interest Loan, respectively, to aid readers.

[8] This is assuming minimum payments are made as projected by the Truth in Lending Disclosure. The total cost of the Zero-Interest Loan would presumably be lower given the much longer two-year promotional period.

November 29—the date of her alleged acceptance—when she received the physical copy in the mail. *Id.* ¶ 42.

Parisi was notified of the Shopping Pass transaction and promptly reached out to GreenSky's customer service email that same day, November 29, stating she was never informed the $8,871.50 charge was going to take place. Doc. 56-1 at 41; Doc. 27-8. Parisi exchanged several emails with GreenSky over the ensuing days disputing and objecting to the transaction she had allegedly authorized. Doc. 56-1 at 43-44; Parisi Decl. ¶ 44. Amidst the communication back and forth, a GreenSky representative stated the transaction occurred because "[t]he merchant charges a percentage upfront on the loan." Doc. 27-11.

Little evidence exists regarding communication between Andersen and Parisi after November 23. Parisi states she last heard from Kelley when he called to inform her she had not qualified for the Zero-Interest Loan and he would find out why. Compl. ¶¶ 71-72. There is no evidence Kelley informed Parisi of the terms of the High-Interest Loan during that phone call. *Id.* Likewise, there is no evidence Parisi provided authorization for Andersen to proceed with the window project in either the phone call or at any time following November 23. *Id.*

**E. Aftermath**

Over Parisi's objections, GreenSky proceeded to consider Parisi a willing party to the Loan Agreement. Kaliban Decl. ¶ 30; Parisi Decl. ¶ 45. GreenSky billed her and assessed late fees in accordance with the High-Interest Loan. *Id.* The fees and charges continued until the loan was cancelled in October of 2022 near the time this lawsuit commenced. Parisi Decl. ¶¶ 45, 47. Parisi's credit reports still reflect a balance of more

than $8,000 due to GreenSky. *Id.* ¶ 48. Parisi never had any windows installed in her home. *Id.* ¶ 45.

In this action, Parisi, on behalf of herself and a putative class, claims both Andersen and GreenSky violated provisions of the Oklahoma Consumer Credit Code. GreenSky argues the action has been brought in the wrong venue and seeks to enforce an arbitration provision in the High-Interest Loan agreement.

**F. Timeline**

For clarity's sake, the Court reproduces key events below in chronological order:

- *Nov. 23* — Parisi meets with Kelley at home and applies for the Zero-Interest Loan.

- *Nov. 23* — Parisi is approved for a loan by GreenSky. Parisi believes she is approved for the two-year, Zero-Interest Loan when Kelley leaves her home that day.

- *Nov. 23* — Kelley emails Parisi a copy of the electronically-signed agreement between Andersen and Parisi. The document refers to the financial terms of the Zero-Interest Loan. Parisi is unaware of the email.

- *Nov. 23* — GreenSky both mails and emails a copy of the High-Interest Loan to Parisi. Parisi is unaware of the email; the physical mail begins transit.

- *Nov. 24-28* — At some point in this date range, Kelley calls to inform Parisi she has not been approved for the Zero-Interest Loan, but he will find out what happened and get back to her.

- *Nov. 29* — Parisi's Shopping Pass is charged for $8,871.50. GreenSky claims this transaction constituted acceptance of the High-Interest Loan.

- *Nov. 29* — Parisi emails GreenSky to dispute the Shopping Pass charge.

▪ *Following Nov. 30* — Parisi receives the mailed copy of the High-Interest Loan.

## II.    LEGAL STANDARD

When considering a motion to dismiss due to improper venue, a court must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-movant. *Rolico Aviation Ltd. V. Mansfield Heliflight, Inc.*, 07-1075, 2008 WL 640440 at *1 (W.D. Okla. Mar. 5, 2008) (citing 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1352 (3d ed. 2007)). Plaintiffs may rely on well-pleaded facts found in the complaint, and if controverted by defendant's facts, the court is to give greater weight to plaintiff's facts. *Ben-Trei Overseas, L.L.C. v. Gerdau Ameristeel US, Inc.*, 09-CV-153, 2010 WL 582205 at *3 (N.D. Okla. Feb. 10, 2010) (citing *Pierce v. Shorty Small's of Branson*, 137 F.3d 1190, 1192 (10th Cir. 1998)).

When considering a motion to compel arbitration, a court must first determine if there was an agreement and then determine if the agreement provides the moving entity with the right to compel arbitration. *Caclovic v. J.C. Penney Corp.*, 884 F.3d 1051, 1057 (10th Cir. 2018). Courts apply state-law principles governing the formation of contracts to determine if an agreement to arbitrate exists. *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017). The party moving to compel arbitration bears the burden to show the arbitration clause applies. *Id.* If parties dispute the existence of an agreement, the nonmovant should receive the "benefit of all reasonable doubts and inferences that may arise" *Id.* (internal quotation omitted). The process is akin to summary judgment practice. *Id.* "[T]he party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement[.]" *Bellman*

at 612.  If a genuine dispute of material fact prevents determining whether the agreement is enforceable, a district court should proceed to a jury trial, if the nonmoving party so requests, to determine the facts and whether the parties agreed to arbitrate. *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977 (10th Cir. 2014).

## III.    DISCUSSION

Plaintiff and Defendant never entered into a valid Loan Agreement because there was no mutual assent as to the material terms of the loan. As a matter of law, the parties did not contract. Accordingly, no agreement between the parties to arbitrate the issues within the case can be said to exist, and Defendant's motion to compel arbitration is DENIED. Consequently, venue in this Court is proper, and Defendant's motion to dismiss is DENIED.

Oklahoma contract law governs the formation of this agreement and dictates the conclusion Plaintiff and Defendant never entered into the Loan Agreement. The existence of an agreement to arbitrate is a matter of contract between the parties. *Avedeon Engineering, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997). In Oklahoma, an enforceable agreement requires a "meeting of the minds on all essential terms of the contract." *South Central Industries v. Kerrtas Marketing, LLC*, 21-802, 2022 WL 1518935 at *2 (W.D. Okla. Feb. 7, 2022) (quoting *Young v. Chappell*, 239 P.3d 476, 479 (Okla. Civ. App. 2010)). "[T]he consent of the parties must be mutual, and consent is not mutual unless the parties agree on the same thing at the same time." *Smalley v. Bond*, 218 P. 513, 515 (Okla. 1923). For the arbitration clause in the High-Interest Loan to be enforceable, Parisi and GreenSky must have agreed to all the same essential terms at the same time.

10

GreenSky can only show acceptance of the High-Interest Loan in one of two ways: the Shopping Pass transaction was (1) initiated by Parisi or (2) initiated by Andersen with her valid consent.[9] GreenSky fails to provide sufficient evidence on both fronts. GreenSky's evidence tends to show the transaction *occurred* on that day, but it does not indicate whether the transaction was *authorized* by Parisi.

First, GreenSky has provided no evidence that Parisi herself initiated the Shopping Pass transaction. Greensky's only evidence relating to the November 29 transaction is a conclusory declaration that Parisi used the Shopping Pass and authorized Andersen to charge her account for $8,871.50. Kaliban Decl. ¶ 28. Kaliban's statement is supported only by an unidentified transaction ledger showing a charge of that amount processed on that date. *Id.* at 22-23.[10] The only indication the transaction is related to Parisi is that it is attributed to her Shopping Pass number and her name appears as the invoiced account. The absence of additional evidence identifying Parisi is notable, considering the terms of GreenSky's loan agreement state identification is required for all purchases. Doc. 39-3 at 6. Therefore, had GreenSky followed its policies, it would presumably have verified and recorded the identity of the transaction's initiator. Instead, GreenSky produces only the transaction ledger.

In fact, the record indicates Andersen initiated the transaction. The only evidence regarding who initiated the transaction is found in a later email between Parisi and

---

[9] GreenSky does not suggest Parisi accepted their offer in any other way, such as by signing the Loan Agreement sent to her via mail and email.

[10] The transaction ledger appears in the ECF system as pages 22-23 of Doc. 18-3. It appears to have been intended as a separate exhibit.

GreenSky customer service. A GreenSky representative stated the transaction occurred because "[t]he merchant charges a percentage upfront on the loan." Doc. 27-11. Further, the GreenSky representative acknowledged Parisi had initially rejected payment and once again asked if Parisi authorized the transaction after describing how the charge occurred. *Id.* Parisi restated that she did not authorize the transaction. Doc. 27-13. The evidence shows that the Shopping Pass charge occurred on November 29, the charge was initiated by Andersen, and the charge was promptly and consistently disputed by Parisi. Thus, the evidence is insufficient to show Parisi initiated the transaction which allegedly bound her to the High-Interest Loan.

Second, the evidence indicates only that Parisi may have consented to her window project with Andersen under the terms of the Zero-Interest Loan, not the High-Interest Loan.[11] When Kelley, the representative from Andersen, left Parisi's home on November 23, 2021, Parisi believed she had been approved for the two-year, no-interest, no-payment loan. Parisi Decl. ¶¶ 7, 28. Parisi only ever intended to apply for that loan because the two-year grace period was appealing considering her upcoming chemotherapy expenses; she communicated this to Kelley. Parisi Decl. ¶ 21; Compl. ¶ 62. Moreover, the agreement Kelley emailed to Parisi referred to the Zero-Interest Loan. Parisi Decl. ¶ 33. At the close of business on November 23, both Parisi and Andersen appeared to believe the window project would be financed with the aid of Parisi's Zero-Interest Loan. Thus, any

---

[11] Greensky's motion attempts to enforce the arbitration provision in the High-Interest Loan agreement. Thus, determining whether Parisi effectively accepted the Zero-Interest Loan is unnecessary. Consequently, any dispute of fact regarding such acceptance is immaterial.

authorization Parisi gave Andersen on November 23 to proceed with the project by charging Parisi's Shopping Pass was premised upon *this initial set of loan terms*. GreenSky provides no evidence this ever changed.

Because the High-Interest Loan was different in material respects from the Zero-Interest Loan that Parisi had applied for, it constituted an entirely new offer that needed acceptance. "In order that an offer and acceptance may result in a binding contract the acceptance must be . . . identical with the terms of the offer. It must in every respect meet and correspond with the offer[.]" *Anderson v. Garrison*, 402 P.2d 873, 877 (Okla. 1965). GreenSky's Loan Agreement explicitly states, "THIS IS A DIFFERENT PLAN THAN REQUESTED." Doc. 39-3 at 6. A different plan is a different offer. Parisi's apparent consent to the Zero-Interest Loan's terms is not simply transposed to the High-Interest Loan offer. GreenSky provides no evidence that Parisi communicated with Andersen to consent to the High-Interest Loan's terms. Even assuming Andersen had authority to accept the first offer on Parisi's behalf, that authority did not extend to any subsequent offers GreenSky made.

In a last-ditch effort, Defendant attempts to draw the Court's attention to cases in which GreenSky successfully compelled arbitration, but the cases cited are factually distinct from Parisi's. In *Terlizzi v. Altitude Marketing, Inc.*, the borrowers were compelled to arbitrate claims against GreenSky because they had electronically signed an Installment Loan Agreement that was sent to them. 2018 WL 2196090 at *5 (D. Colo. May 14, 2018). Like Parisi, the Terlizzis were surprised by the actual terms of the loan as compared to what had been promised by a sales representative. *Id.* After initially trying to cancel the

transaction, they were persuaded and "recommitted to the transaction[.]" *Id.* Parisi neither committed nor recommitted to a transaction with GreenSky in the same way the Terlizzis did. In *Alfortish v. GreenSky, LLC*, the plaintiffs were compelled to arbitrate claims because they admitted to signing and making payments pursuant to the loan agreement. 16-15084, 2017 WL 699830 at *4 (E.D. La. Feb. 22, 2017). The cases GreenSky cites depict plaintiffs who actively engaged and transacted with GreenSky and later tried to evade the arbitration clause. Conversely, Parisi cannot be shown to have ever entered into an agreement with GreenSky, let alone have made payments pursuant to an agreement.[12]

Quite simply, Plaintiff and Defendant never had the requisite meeting of the minds to form a contract. Plaintiff provided any authorization to proceed only under the loan terms she knew on November 23. On November 29, Defendant sought to bind her to an entirely different set of terms of which she was unaware based upon a third party's actions.[13] There is no factual dispute as to whether Plaintiff authorized Andersen to proceed before November 29 under a different set of loan terms than those presented to her on November 23. Defendant offers only an unidentified transaction ledger to support its conclusion Parisi accepted these new terms via a Shopping Pass transaction. The evidence presented by

---

[12] Parisi's case is more akin to *Ferguson v. GreenSky, Inc.* wherein the formation of an agreement between the plaintiff and GreenSky was in dispute. 22-15780, 2023 WL 4462126 (9th Cir. July 11, 2023). On appeal, the Ninth Circuit found the parties had not entered into an agreement to arbitrate all claims as a matter of California law. *Ferguson* at *2 ("Because the parties did not form an agreement under the applicable statutory requirements, there is no basis upon which to compel arbitration.").

[13] While certain terms, such as the arbitration clauses, in the two offers may have been identical, the financial terms were different. Plaintiff and Defendant never agreed on all essential terms of an offer, so this arbitration clause was never agreed upon.

GreenSky goes only to the existence of the transaction, not Parisi's authorization of it. That is not sufficient to prove a contract between the parties existed.

Accordingly, no summary trial of factual matters is necessary. GreenSky does not carry its burden to present sufficient evidence the November 29 transaction was authorized by Parisi. The conclusory and self-serving affidavit from Mr. Kaliban, supported only by the transaction ledger, is not sufficient evidence. *See Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). As a matter of law, the parties did not agree to the High-Interest Loan and, thus, did not agree to arbitrate any disputes. The Defendant's motion to compel arbitration is DENIED.

Defendant's motion to dismiss the case based on improper venue is also DENIED. Defendant's sole argument that the Western District of Oklahoma is an improper venue relies on its assertion an arbitrator's conference room is the proper venue. The Court rejects that argument.[14]

## IV.    CONCLUSION

Defendant's Motion to Compel Arbitration [Doc. 17] and Motion to Dismiss [Doc. 46] are hereby DENIED for the reasons set forth above.

---

[14] The Court does not address the appropriateness of the Consent Order. Defendant has filed a Motion objecting to its use in the case, and the Court will address the matter separately. The Court did not use the Consent Order as a resource in determining its ruling on the instant Motions. Additionally, Defendant's arguments regarding the appropriateness of class certification that comprise the bulk of its Reply Brief [Doc. 65] are premature. The Court will address class certification at a later date when parties may fully brief the issue.

**IT IS SO ORDERED** this 1st day of December 2023.

**DAVID L. RUSSELL**
**UNITED STATES DISTRICT JUDGE**