# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

**SUSAN PARISI,**

                  **Plaintiff,**

**v.**

**OKLAHOMA WINDOWS AND DOORS, LLC d/b/a RENEWAL BY ANDERSON OF OKLAHOMA, and BMO HARRIS BANK, NA d/b/a GREENSKY, LLC,**

                  **Defendants.**

**Case No.: 5:23-cv-00115-R**

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT OKLAHOMA WINDOWS AND DOORS, LLC d/b/a RENEWAL BY ANDERSON OF OKLAHOMA'S MOTION TO DISMISS THE AMENDED CLASS ACTION <u>COMPLAINT (OR STAY) AND COMPEL ARBITRATION</u>

**VARNELL & WARWICK, P.A.**

Janet R. Varnell, FBN: 0071072
400 N. Ashley Drive, Suite 1900
Tampa, FL  33602
Telephone: (352) 753-8600
jvarnell@vandwlaw.com

**RAWLS GAHLOT, PLLC**

M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA # 22145
2404 S. Broadway
Moore, Ok 73160
Phone: 405-912-3225
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................iii

I.    BACKGROUND AND DISPUTED FACTS ........................................................ 1

      A.    Parisi Agreed to a Credit Check as Part of an Application for a Zero
            Interest Loan.................................................................................................. 1

      B.    Parisi Never Saw the Zero Interest Loan Before Litigation
            Commenced; It Contained Forged Signatures .............................................5

      C.    No Meeting of the Minds ................................................................................ 6

      D.    The Zero Interest Loan Terms Nullify Arbitration ...................................... 9

II.   STANDARD OF REVIEW........................................................................................ 9

III.  ARGUMENT ............................................................................................................. 11

      A.    There is No Presumption in Favor of Arbitration ...................................... 11

      B.    There Was No Mutual Consent................................................................... 14

      C.    The Zero Interest Loan is Unenforceable and Illusory Because There
            Was No Consideration.................................................................................. 16

      D.    Anderson Failed to Comply with Federal and Oklahoma Electronic
            Signature Laws .............................................................................................. 18

      E.    Two Zero Interest Loan Provisions Render Any Commitment to
            Arbitrate Null and Void............................................................................... 21

      F.    Disputed Issues of Fact May Be Resolved After Discovery and a
            Trial ................................................................................................................ 22

      G.    If The Court Finds That Arbitration Is Warranted (It Is Not), The Case
            Should Be Stayed, Not Dismissed............................................................... 24

      H.    Two Zero Interest Loan Provisions Render Any Commitment to
            Arbitrate Null and Void............................................................................... 21

IV.    SUMMARY TRIAL ON MAKING OF AGREEMENT TO ARBITRATE......... 24

V.    CONCLUSION ..................................................................................................... 25

CERTIFICATE OF SERVICE....................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Adair Bus Sales, Inc. v. Blue Bird Corp.*,
   25 F.3d 953 (10th Cir. 1994) ..................................................................................... 24

*AT&T Techs.*,
   475 U.S. at 648, 106 S.Ct. 1415 (1986) .................................................................... 12

*Avedon Engineering Inc v. Seatex*,
   126 F 3d 1279 (10th Cir. 1997) ............................................................................ 11, 22

*Barnes v. Helfenbein*,
   548 P.2d 1014 (Okla. 1976) ....................................................................................... 21

*Beck v. Reynolds*,
   903 P.2d 317 (Okla. 1995) ......................................................................................... 14

*Bellman v. i3Carbon, LLC*,
   563 Fed. App'x. 608 (10th Cir. 2014) ....................................................................... 10

*Ben-Trei Overseas, L.L.C. v. Gerdau Ameristeel US, Inc.*,
   2010 WL 582205 (N.D. Okla. 2010) .......................................................................... 10

*Bilbrey v. Cingular Wireless, LLC*,
   164 P. 3d 131 (Okla. 2007) ........................................................................................ 21

*Caclovic v. J.C. Penney Corp.*,
   884 F.3d 1051 (10th Cir. 2018) .................................................................................. 10

*Dumais v. Am. Golf Corp.*,
   299 F.3d 1216 (10th Cir.2002) ................................................................................... 12

*Fancher v. Westwind Enterprises, Ltd.,*
   2018 WL 11411336 (W.D. Okla. 2018) ...................................................................... 23

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) ........................................... 10

*Hancock v. Am. Tel. & Tel. Co.*,
   701 F.3d 1248 (10th Cir. 2012) .................................................................................. 10

*Hardin v. First Cash Fin. Servs., Inc.*,
    465 F.3d 470 (10th Cir. 2006) ........................................................................ 11, 22

*Hartzell v. Choctaw Lumber Co. of Delaware et al.*,
    163 Okl. 240, 22 P.2d 387 (1933) ........................................................................ 15

*Hill v. Ricoh Ams. Corp.*,
    603 F. 3d 766 (10ᵗʰ Cir. 2010) ............................................................................. 24

*Homestead Golf Club, Inc. v. Pride Stables*,
    224 F. 3d 1195 (10th Cir. 2000) .......................................................................... 16

*Howard v. Ferrellgas Partners, L.*P.,
    748 F. 3d 975 (10th Cir. 2014) ............................................................... 11, 12, 22

*Jacks v. CMH Homes, Inc.*,
    856 F.3d 1301 (10th Cir. 2017) ..................................................................... 12, 16

*Maddox v. Northern Natural Gas Co.*,
    259 F. Spp. 781 (W.D. Okla. 1966) ..................................................................... 15

*Morgan v. Sundance, Inc.*, —— U.S. ——,
    142 S. Ct. 1708, 212 L.Ed.2d 753 (2022) ........................................................... 11

*Nabob Oil Co. v. Bay State Oil and Gas Co.*,
    208 Okl. 296, 255 P.2d 513 (1953) ................................................................ 13, 15

*Okla. Oncology & Hematology P.C. v. U.S. Oncology, Inc.*,
    160 P.3d 936 (Okla. 2007) ................................................................................... 11

*Oklahoma Gas and Elec. Co. v. Toshiba Int'l Corp.*,
    2016 WL 3659941 (W.D. Okla. 2016) ................................................................. 14

*Pan-Am Tobacco Corp. v. Dep't of Corr.*,
    471 So. 2d 4 (Fla. 1984) ...................................................................................... 18

*Pierce v. Shorty Small's of Branson*,
    137 F.3d 1190 (10th Cir. 1998) ........................................................................... 10

*Powers Restaurants, Inc. v. Garrison*,
    465 P.2d 761 (Okla.1970) .................................................................................... 17

iv

*Quazilbash v. Wells Fargo & Company,*
  2010 WL 1643778 (N.D. Ok. 2010) ....................................................................23

*Ragan v. Howard,*
  841 F. 3d 1134 (10th Cir. 2016)..........................................................................11

*Redwine Resources, Inc. v. Predator Technologies, L.L.C.,*
  171 P.3d 330 (Okla. Civ. App. 2007)..................................................................15

*Riley Mfg. Co. v. Anchor Glass Container Corp.,*
  157 F.3d 775 (10th Cir. 1998)..............................................................................12

*Rolico Aviation Ltd. V. Mansfield Heliflight, Inc.*
  2008 WL 640440 (W.D. Okla. 2008)......................................................................9

*South Central Industries v. Kerrtas Marketing, LLC,*
  2022 WL 1518935 (W.D. Okla. 2022)..................................................................16

*Spahr v. Secco,*
  330 F.3d 1266 (10th Cir.2003)..............................................................................12

*Sutton v. David Stanley Chevrolet, Inc.,*
  475 P. 3d 847 (Okla. 2020) ..................................................................................16

*Thompson v. Bar-S Foods Co,*
  174 P. 3d 567 (Okla. 2007) ..................................................................................17

*Volt Info. Sciences Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.,*
  489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) ......................................12

*Walker v. BuildDirect.com Techs., Inc.,*
  733 F.3d 1001 (10th Cir. 2013)............................................................................12

*Williams v. Imhoff,*
  203 F.3d 758 (10th Cir. 2000)..............................................................................24

*Wright v. Fenstermacher,*
  270 P. 2d 625 (Okla. 1954) ..................................................................................17

**Statutes and Regulations**

9 U.S.C. § 2 ................................................................................................................16

9 U.S.C. § 3 ...................................................................................................23, 24

9 U.S.C. § 4 .............................................................................................. 11, 22, 23

12 Oklahoma Statutes Annotated §2023B.2 ....................................................22

12 Oklahoma Statutes Annotated §2023B.3 ....................................................22

12A O.S. § 15-101 *et. seq.*.................................................................................19

12A O.S. §15-102(10) ........................................................................................19

12A O.S. §15-105(b) ..........................................................................................19

15 Okla. Stat. § 2 ...............................................................................................14

15 O.S.2001 § 2.As............................................................................................17

15 Okla. Stat. § 66 .............................................................................................14

15 Okla. Stat. § 71 .............................................................................................15

15 O.S.2001 § 106 .............................................................................................17

15 U.S.C. §7001(c)(1) ..................................................................................18, 19

15 U.S.C. §7006(5).........................................................................................18, 20

## Other

5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1352
    (3d ed. 2007).................................................................................................10

RESTATEMENT (SECOND) OF CONTRACTS § 2 cmt. e (1981) ...............................17

Plaintiff, Lt. Col. Susan Parisi (Ret.) ("Parisi") responds in opposition to Defendant Oklahoma Windows and Doors, LLC d/b/a Renewal By Anderson of Oklahoma's ("Anderson") Motion to Dismiss the Amended Class Action Complaint (Or Stay) and Compel Arbitration (the "Motion"). [ECF Doc. No. 68].  No arbitration agreement exists because no agreement between Anderson and Parisi exists.  The Motion is due to be denied.

## I.     BACKGROUND AND DISPUTED FACTS

Anderson completely ignores this Court's Order finding that Parisi never entered into a valid loan agreement (the "High Interest Agreement") with Defendant Greensky, LLC ("GreenSky"). *See* Order Denying GreenSky Motion to Compel Arbitration and Motion to Dismiss (hereafter, "Order"). [ECF Doc. No. 66].  Because Anderson now attempts to enforce terms in the original loan ("Zero-Interest Loan"), the Court must consider whether Parisi "effectively accepted" that loan. *See id*, p. 12, n. 11.  She did not. And she could not.  Having never agreed or assented to the Zero-Interest Loan for which she was never even approved, Parisi did not agree to the arbitration clause within it.

### A.     <u>Parisi Agreed to a Credit Check as Part of an Application for a Zero Interest Loan</u>

In its Motion, Anderson argues in conclusory fashion that Parisi is bound to arbitrate because she "entered into a contract" with Anderson for the purchase of windows to be installed at her home in exchange for the sum of $17,743.[1]  Motion, ¶1.  The sole basis for

---

[1] Anderson submits a Declaration of Jon Erickson ("Erickson") in Support of its Motion. ECF Doc. No. 69-1.  Erickson, apparently the Chief Operating Officer of Anderson's parent company, Esler Companies LLC, declares that he has personal knowledge of the facts set forth in the declaration. *Id*., ¶1. But rather than facts based on personal knowledge,

Anderson's conclusory statement is that, according to Anderson, Parisi signed the Zero Interest Loan. Motion, p. 17.  But Parisi did not sign the Zero Interest Loan, but rather signed – on an iPad - what the Anderson sales representative told her was a credit check to apply for the Zero-Interest Loan. *See* Exhibit 1, Declaration of Susan Parisi, hereafter, Parisi Decl., ¶10. This occurred when an Anderson representative, Russel Kelly ("Kelly"), came to Parisi's home on November 23, 2021, and told her that she could purchase windows with zero money down, zero interest financing for two years, and zero payments for 24 months after installation. Complaint, ¶61; Parisi Decl., ¶¶4, 7. Parisi had informed Kelly that she was recently diagnosed with cancer and would need the 24-month no payment option due to her health issues. Complaint, ¶62; Parisi Decl., ¶6.

Kelly presented Parisi with his iPad, and asked for her signature to authorize a credit check for the Zero Interest Loan. Parisi Decl., ¶¶8-10.  Parisi was never informed that her signature would be used to agree to the terms of the loan for which she was applying without any further review of those terms. Parisi Dec., ¶13.  Parisi was not informed that her signature could be used to disburse lender financing funds to Anderson. *Id*.  Parisi was never provided with any means to learn that she was agreeing to arbitrate any disputes, nor that she was waiving her right to pursue claims in a class action. Parisi Dec., ¶20.

---

the declaration primarily asserts legal conclusions (*e.g*., Parisi entered into a contract for the purchase of five windows. *Id*., ¶2; Parisi received a copy of the Contract via email the same day that she signed the Contract. *Id*., ¶3), or sets forth purported provisions from the Zero Interest Loan. *Id*., ¶¶4, 5. Thus, only two paragraphs (¶¶1 and 6) of the six- paragraph declaration could possibly be within Erickson's personal knowledge.

Parisi signed the iPad one time. Parisi Decl., ¶15.  Kelly told Parisi he needed some additional signatures for her loan application and thereafter presented his iPad screen to Parisi, swiping through it several times, with only a box for a checkmark and a blank signature line appearing on the screen and visible to Parisi. Parisi Decl., ¶¶16-18. Each time Parisi was directed to check a box on each screen, her signature would become affixed to a signature line on the screen.  *Id*. Parisi was not informed of her right to review any page's contents, nor provided with any opportunity to review a paper copy of the document she signed.  Parisi Dec., ¶¶12, 19. Kelly never asked Parisi to provide consent to conduct transactions by electronic means. Parisi Dec., ¶12. Parisi was not provided with any disclosures regarding how her electronic signature would be utilized and she never provided consent for her electronic signature's use other than for a credit check.  Parisi Decl, ¶¶11, 13.

Shortly after she signed Kelly's iPad, Kelly called a Greensky representative, who informed Parisi that she would be calling her back to let her know if she was approved for a loan.  Parisi Decl., ¶¶22, 23.  Within thirty minutes, the Greensky representative called back and told Parisi she was approved for a two-year loan program, but did not provide details. Parisi Decl., ¶¶25, 26.  That same day, at 4:17 p.m., Greensky emailed Parisi, stating: "It's time to activate your loan!" Parisi Decl. ¶51. Three minutes later, at 4:20 p.m., Greensky again emailed Parisi stating, "It's time to activate your loan!" *Id*.  At 4:22 p.m., Greensky emailed Parisi a third time, stating, "Congratulations on Activating Your Loan!", even though Parisi had not activated it. *Id*. The email further indicated that Parisi would need to register on the GreenSky Customer Portal to "review and save/print your loan

3

documents". *Id*. Parisi did not register on the GreenSky Customer Portal and was not provided access to a copy of the loan document. *Id*. Within a few days of their initial meeting, Kelley called Parisi and told her that he did not know what happened or why she had not been approved for the loan he had discussed with her (and that it had never happened before), but Parisi did not qualify for the Zero-Interest Loan. Complaint, ¶71; Parisi Decl., ¶39.  In fact, on the same day Kelly met with Parisi and he affixed her signature to the Zero Interest Loan pages without her review, GreenSky both emailed and mailed Parisi a new offer, the High Interest Agreement. Order, p. 4, 6 (citing Kaliban Decl., ¶¶18-22, 23).[2]  GreenSky told Parisi it had removed its original offer. Parisi Dec., ¶45.

On or around November 26 to November 29, 2021, Parisi received a letter from GreenSky, informing her that it had sent a payment on her account to Anderson for $8,871.50 for her windows installation.  Parisi Decl., ¶40.  Parisi received an email from GreenSky on November 29, 2021 informing her that "[a]s a courtesy alert, a charge of $8,871.50 from Renewal by Andersen of Oklahoma" had been made on her loan. Parisi Decl., ¶41.  On November 29, 2021, Parisi emailed GreenSky rejecting authorization of the charge. Parisi Decl., ¶42.  Also on November 29, 2021, GreenSky acknowledged that Parisi had rejected the charge. *Id*. When Parisi received the mailed copy of the High Interest

---

[2] Parisi has not found a copy of the High Interest Agreement in her email. After this lawsuit was filed, Parisi located in her archived emails, two emails from GreenSky sent on November 23, 2021, with the subject line, "Time to Activate Your Loan!" and one email with the subject line, "Congratulations on Activating Your Loan!"  Parisi Decl., ¶51. It appears that only by clicking on a link in those emails and "activating" the loan would Parisi have been able to view the High Interest Agreement.

Agreement, Parisi refused to sign it, and objected to any release of funds to Anderson. Parisi Decl., ¶45. To date, no windows have ever been installed at Parisi's home. Complaint, ¶75; Parisi Decl., ¶47. In October of 2022, GreenSky informed Parisi that it had "cancelled" its loan contract. Parisi Decl., ¶49.

**B.      Parisi Never Saw the Zero Interest Loan Before Litigation Commenced; It Contained Forged Signatures**

Despite telling Parisi he would send her a copy of the contract, Parisi never received anything in the mail from Kelly.  Parisi Decl., ¶¶29, 30.  Kelly had emailed a copy of the contract, but it went to Parisi's "spam" junk email folder in her email.  Parisi Decl., ¶31. Parisi only discovered the email after this lawsuit was filed.  Parisi Decl., ¶32.  When Parisi reviewed the emailed contract after litigation began, she observed that several of her electronic signatures had been affixed without her authorization to pages which she had never previously seen, and which Mr. Kelly had never described to her. Parisi Decl., ¶34. Two of the signatures within the contract were not even Parisi's electronic signature, and upon information and belief, those signatures were forged. Parisi Decl., ¶36. The first forged signature is located on Page 5 of the document, identified as the "Greensky Financing Form". Parisi Decl., ¶37.  The signature on the page is not Parisi's. Parisi Decl., ¶¶36, 37. The second forged signature is located on Page 6 of the document and is identified as the HOA authorization and Contact Form. Parisi Decl., ¶¶36, 38. The page contains a checked box for "NO HOA EXISTS for my project," followed by "Please proceed with placing my order." *Id.*  The document also included a separate checked "Yes" box below a

legend, "PROCEED WITH ORDER."  *Id*.  Parisi did not check either box checked on the document and the signature on the page is not Parisi's. *Id.*

### C.    No Meeting of the Minds

The first page of the Zero Interest Loan to which Anderson attempts to bind Parisi includes the following:

> Buyer hereby jointly and severally agrees to purchase the products and/or services of Oklahoma Windows and Doors LLC d/b/a/ Renewal by Anderson of Oklahoma ("Contractor") in accordance with the terms and conditions described in this Agreement Document and Payment Terms, any documents listed in the Table of Contents, and any other document attached to this Agreement Document, the terms of which are all agreed to by the parties and incorporated herein by reference (collectively, this "Agreement").

Parisi Decl., ¶33; ECF Doc. No. 69-1.

The Contract terms below that paragraph include the Total Job Amount of $17,743, Amount Financed of $17,743, and Method of Payment as "Financing." *Id*.  A GreenSky Financing Form is included in the Table of Contents, is attached to the Zero Interest Loan, and is part of the Zero Interest Loan. *Id*.  As previously noted, upon information and belief, Parisi's signature on this form is forged. Parisi Decl., ¶36. The GreenSky Financing Form lists "Plan #3541 – 24-month promotional period. Interest waived if balance paid off before promotional period ends." Parisi Decl., ¶33, ECF Doc. No. 69-1.  The form includes on line No. 3, "Total Greensky Finance Amount" with the amount of $17,743. *Id*.  The form also includes on line No. 4, "Greensky financed at order (50%)" with the amount of $8,871.50. *Id*.  Parisi did not see this form during her meeting with Kelly, nor sign the form.  Parisi Decl., ¶¶17, 19, 37.

6

GreenSky did not approve Parisi for Plan #3541 identified on the GreenSky Financing Form. Parisi Decl., ¶45. Instead, on the same day Parisi met with Kelly, GreenSky sent a different contract to Parisi for signature, the High Interest Agreement. Order, p. 4 (citing Kaliban Decl., ¶¶18-22). According to GreenSky, it also emailed Parisi a copy of the High Interest Agreement. Order, p. 6 (citing Kaliban Decl., ¶23).[3] On or around November 29, 2021, Parisi received a copy of the High Interest Agreement in the mail. Parisi Decl., ¶42. Parisi never signed that agreement. Parisi Decl., ¶45. In written communication, dated November 29, 2021, the same day as the alleged use of a GreenSky Shopping Pass assigned to her (which operated like a credit card to pay a 50% deposit to Anderson), Parisi stated that that she was never informed about the Shopping Pass use:

> OK, I was never informed/told that an $8,000 + dollar charge was going to take place! I chose the two-year nothing down, no interest, no payment option. And I was informed the clock started ticking when the windows were installed. So what else is going to be done without my knowledge? This little trick makes me think twice about proceeding. Someone best be ta[l]king to me about this. I am under treatment for bone marrow cancer and I don't need any more surprises! It is not right [to find] this out after the fact.

Parisi Decl., ¶42.

Also on November 29, 2021, a GreenSky representative sent Parisi an email acknowledging that she rejected the charge of $8,871.50 from Anderson and said Anderson would be in touch with her directly:

> Thank you for your response rejecting the charge of $8,871.50 from Renewal by Andersen of Ok on your loan ending in 2561. Renewal by Andersen of Ok will be in touch with you directly.

---

[3] *See* n. 2, *supra*, p. 4.

*Id.*

Nevertheless, on December 1, 2021, a GreenSky representative told Parisi that there was a payment transaction for $8,871.50 because the "merchant charges a percentage upfront on the loan" account. Parisi Dec. *Id.*  Parisi responded:

> Well it certainly would help to know this information up front which I wasn't told that there would be a "payment transaction" for $8,871.50 which I am NOT comfortable with. I was told there would NOT be a payment, NO interest, and etc. for two years. . . I am NOT authorizing any payment at this time to Renewal by Anderson.

Parisi Decl., ¶¶45, 46.

On December 1, 2021, a GreenSky representative responded, stating that the charge to Parisi's account was "part of the loan process":

> The account will be charged because it is part of the loan process but based on your loan plan, we will not bill you until the job is completed or purchase window expiration date 05/26/22.  So the account is being charged but you are not going to be billed just yet.

*Id.*

On December 2, 2021, the GreenSky representative followed up:

> After explaining the loan process, do you authorize this transaction? If you have any questions, please give me a call.

*Id.*

On December 10, 2021, Parisi responded that she unequivocally did not authorize the use of the Shopping Pass:

> You did NOT explain any loan process to me and I do NOT authorize any transaction which I have already stated. I do NOT do well with lies. I have many questions related to this situation. I was told I qualified for a 24 month, NO money down, No Interest, and NO payment situation to begin 24 months after installation, now I am being told I did NOT qualify for that and you have removed that original offer. Well this is to inform you again that I am

8

NOT doing business with you or Renewal by Anderson and IF you sent them money without my consent that is ON you NOT me. I did NOT authorize anything. I will provide you the name of my attorney and they will deal with this. This is a very sketchy situation you have set up with Renewal by Anderson. I suggest this gets straightened out quickly.

*Id.*

## D.  The Zero Interest Loan Terms Nullify Arbitration

The Zero Interest Loan itself contains two provisions that nullify any purported arbitration agreement:

First, the Zero Interest Loan provides:

> Neither of the parties nor the arbitrator will have any authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any other claims or any other proceeding involving third parties. In the event a court determines that this limitation on joinder or class action claims is unenforceable, then this entire commitment to arbitrate will become null and void and the parties must submit all claims to the jurisdiction of the courts.

Parisi Decl., ¶33, ECF Doc. No. 69-1.

The Zero Interest Loan also provides:

> The parties agree that any action or claim or request for an injunction shall not be subject to arbitration.

*Id.*

## II.    STANDARD OF REVIEW

When considering a motion to dismiss due to improper venue, a court must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-movant. *Rolico Aviation Ltd. V. Mansfield Heliflight, Inc.*, 07-1075, 2008 WL 640440 at *1 (W.D. Okla. Mar. 5, 2008) (citing 5B Charles Alan Wright & Arthur R.

Miller, Federal Practice & Procedure § 1352 (3d ed. 2007)). Plaintiffs may rely on well-pleaded facts found in the complaint, and if controverted by defendant's facts, the court is to give greater weight to plaintiff's facts. *Ben-Trei Overseas, L.L.C. v. Gerdau Ameristeel US, Inc.*, 2010 WL 582205 at *3 (N.D. Okla. Feb. 10, 2010) (citing *Pierce v. Shorty Small's of Branson*, 137 F.3d 1190, 1192 (10th Cir. 1998)).

When considering a motion to compel arbitration, a court must first determine if there was an agreement and then determine if the agreement provides the moving entity with the right to compel arbitration. *Caclovic v. J.C. Penney Corp.*, 884 F.3d 1051, 1057 (10th Cir. 2018); *see also, First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) ("[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."). The Tenth Circuit has held that the party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement; if it does so, the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement. *Bellman v. i3Carbon, LLC*, 563 Fed. App'x. 608, 612 (10th Cir. 2014). In bearing that burden, the facts that Parisi alleges in her Complaint must be taken as true. *Id.* In addition, the Court must draw "all reasonable inferences and resolve all factual conflicts" in Parisi's favor. *Id.* (quoting *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012).

Under the Federal Arbitration Act ("FAA"), if there is a need to resolve material factual disputes as to the formation of an agreement to arbitrate, the court must proceed to

a summary trial. *See* 9 U.S.C. § 4. ("If the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof."). The 10th Circuit agrees that "when factual disputes may determine whether the parties agreed to arbitrate, the way to resolve them ... is by proceeding summarily to trial." *Howard v. Ferrellgas Partners, L.*P., 748 F. 3d 975, 984 (10th Cir. 2014). "When parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) (quoting *Avedon Engineering Inc v. Seatex*, 126 F 3d at 1279, 1283 (10th Cir. 1997). However, a court can determine that there are no material issues of fact in dispute and decide there is no arbitration agreement as a matter of law. *See Ragan v. Howard*, 841 F. 3d 1134, 1139 (10th Cir. 2016) (When parties do not dispute the material facts surrounding an arbitration provision, then a district court, while viewing the facts most favorable to the non-moving party, can decide as a matter of law whether the parties actually agreed to arbitrate.)

## III.    ARGUMENT

### A.    There is No Presumption in Favor of Arbitration

Courts will not impose arbitration upon parties where they have not agreed to arbitrate. *See Morgan v. Sundance, Inc.*, —— U.S. ——, 142 S. Ct. 1708, 1713, 212 L.Ed.2d 753 (2022) ("The federal policy is about treating arbitration contracts like all others, not about fostering arbitration."); *See also, Okla. Oncology & Hematology P.C. v. U.S. Oncology, Inc.*, 160 P.3d 936 at 12 ¶ 22 (Okla. 2007) (citing *Volt Info. Sciences Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d

488 (1989) (arbitration is a matter of consent, not coercion)). Any presumption in favor of arbitration "disappears when the parties dispute the existence of a valid arbitration agreement." *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir.2002); *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998) ("[W]hen the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away."); *Howard v. Ferrellgas Partners, L.P.*, 748 F. 3d at 977 ("[B]efore the [FAA]'s heavy hand in favor of arbitration swings into play, the parties themselves must agree to have their disputes arbitrated."). Parisi disputes the existence of a valid enforceable agreement.

"[T]o determine whether a party has agreed to arbitrate a dispute," a court applies "ordinary state-law principles that govern the formation of contracts." *Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1004 (10th Cir. 2013). *Spahr v. Secco*, 330 F.3d 1266, 1269 (10th Cir.2003) (quoting *AT&T Techs.*, 475 U.S. at 648, 106 S.Ct. 1415 (1986)) (internal quotation marks omitted) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). Agreement or mutual assent is essential to a contract. *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017) ("In present-day Oklahoma, a contract is defined by statute as "an agreement to do or not to do a certain thing." Okla. Stat. Ann. tit. 15, § 1. In short, without an agreement, there is no contract.").

Anderson argues that Parisi "expressly agreed" to arbitrate her dispute. [ECF Doc. No. 69, p. 10.]  According to Anderson, Parisi is bound by execution of the Zero Interest Loan even if she did not read or understand its terms. *Id.*, p. 11. The problem for Anderson

12

is that Parisi did not even know she was agreeing to *enter into a contract* when Kelly presented her with his iPad for her to provide an electronic signature. That is quite a different thing than entering into an agreement but not reading its terms. Kelly told Parisi he needed her signature to check her credit worthiness. Then he told her he needed additional signatures for her loan application. Thereafter, her electronic signature was affixed to several pages of a contract without her knowledge. Anderson argues that "the fact that Plaintiff signed" the Zero Interest Loan, "which was emailed to her on the same date she signed it, is more than sufficient evidence to conclude the existence of an arbitration agreement and enforce it." Motion, p. 17. But Anderson fails to cite to one Oklahoma state or federal case holding that a consumer who is told she is signing an iPad electronically for a credit check is bound to a contract she has not previously seen.

Parisi did not see or agree to the Zero Interest Loan terms, and in fact, GreenSky never offered those terms to Parisi. On the same day Kelly emailed the Zero Interest Loan to Parisi's spam folder, GreenSky sent Parisi a different offer, which in itself constituted a rejection of the Zero Interest Loan. *Nabob Oil Co. v. Bay State Oil and Gas Co.*, 208 Okl. 296, 255 P.2d 513 (1953) (making a new proposal constitutes a rejection of the original offer.) In fact, as mentioned by Parisi in her communication to GreenSky, GreenSky told her it had removed its original offer. Parisi Decl., ¶45.

Anderson argues that because Parisi admitted that she signed "something on [Kelly's] electronic tablet" and Kelly told her that she would receive a copy of a contract, that means that there is valid agreement. Motion, p. 19. It does not. First, Parisi's declaration that Anderson quotes explains that she never received a copy of any contract:

13

> On November 23, 2021, a home evaluation to replace my windows was completed by Mr. Kelly. I was not informed that there would be a down payment of $8,871.50 and I did not authorize a payment of $8,871.50 for the work. I did not receive a copy of a contract but Mr. **Kelly had me sign something on his electronic tablet. He told me he would send a copy of the contract** but I have never received one.

[ECF Doc. No. 27-5, p.2, ¶6] (emphasis added).

Kelly promised to send a contract. But because the contract was emailed, Parisi never received it when it went to her junk/spam email folder. Parisi never saw any of the pages to which her electronic signature was affixed, and in fact, some of the places her signature appears to be affixed that contain material terms, are, upon information and belief, forgeries. Parisi may have understood that a contract would be sent to her based on her credit application, but that cannot be the same as understanding there would be no opportunity to review its terms before she agreed to proceed. If she had an opportunity to review what Kelly sent, she would have likely noticed that two of the most important pages, including the financing terms and a notice to proceed with the windows order, appeared to include forged signatures. But she did not see these or any of the Zero Interest Loan pages. Without her agreement to – or even knowledge of - the terms offered, no contract was formed.  *Oklahoma Gas and Elec. Co. v. Toshiba Int'l Corp.*, 2016 WL 3659941, at *4 (W.D. Okla. July 1, 2016) (citing *Beck v. Reynolds*, 903 P.2d 317, 319 (Okla. 1995) (citing 15 Okla. Stat. § 2)).

### B.      There Was No Mutual Consent

Consent is mutual if all parties agree on the same thing in the same sense. *Id*. (citing *Beck, supra*; 15 Okla. Stat. § 66.) To achieve mutual consent, there must be an offer by one

party and an acceptance of that offer by the other party. *Id.* (citing *Redwine Resources, Inc. v. Predator Technologies, L.L.C.*, 171 P.3d 330, 334 (Okla. Civ. App. 2007)). An acceptance "must be absolute and unqualified," or else it operates as a new proposal or counter-offer. *Id.* (quoting 15 Okla. Stat. § 71.). "In order that an offer and acceptance may result in a binding contract, the acceptance must be absolute, unconditional, and identical with the terms of the offer, and must in every respect meet and correspond with the offer; and any qualification of or departure from those terms invalidates and rejects the offer." *Maddox v. Northern Natural Gas Co.*, 259 F. Spp. 781, 783 (W.D. Okla. 1966) (citing *Hartzell v. Choctaw Lumber Co. of Delaware et al.*, 163 Okl. 240, 22 P.2d 387 (1933) (binding contract requires acceptance to be absolute, unconditional, and identical with terms of offer and must in every respect meet and correspond with offer; any qualification of or departure from those terms invalidates offer); *Nabob Oil Co. v. Bay State Oil and Gas Co.*, 208 Okl. 296, 255 P.2d 513 (1953) (where new proposals are made, the making of which in itself constitutes a rejection of the original offer.)).

Here, Parisi never viewed, let alone agreed to essential terms. Her acceptance could not be absolute, unconditional, and identical with the terms of the offer because 1) the offer's terms were unknown to her; and 2) the financing terms for which Parisi applied were never offered to her. Parisi was told she was signing Kelly's iPad to authorize her credit being checked for a loan application. She never saw the pages to which her signature was being affixed, and never received a paper copy of what was being signed. Whether Kelly intentionally misled Parisi or not, Parisi did not know she was being obligated to a contract that included an arbitration clause or a waiver of class action. *See Sutton v. David*

15

*Stanley Chevrolet, Inc.*, 475 P. 3d 847, 857 (Okla. 2020) (affirming denial of motion to compel arbitration and finding that representations of finance manager, who held car purchase agreement in one hand while pointing to signature lines with the other hand, created false impression and caused plaintiff to unknowingly give up right to jury trial).

It is undisputed that Parisi was not approved for a Zero Interest Loan, but instead only approved for a different plan (the High Interest Agreement) that required payments within six months. In other words, the Zero Interest Loan sent to Parisi's spam folder did not represent the terms of an actual offer being made to Parisi for her purchase of windows. The parties did not agree on the same thing in the same sense. There was no meeting of the minds. If there is no meeting of the minds, there is no contract. *Jacks v. CMH Homes, Inc.,* 856 F.3d at 1304. Parisi and Anderson were not in agreement on the most essential terms because Parisi was never even approved for the Zero Interest Loan. *South Central Industries v. Kerrtas Marketing, LLC*, 2022 WL 1518935, *2 (W.D. Okla. February 7, 2022) (an enforceable contract requires "a meeting of the minds on all the essential terms of the contract.") (cleaned up); *see also, Homestead Golf Club, Inc. v. Pride Stables*, 224 F. 3d 1195, 1200 (10th Cir. 2000) (contract unenforceable because "[i]mportant material terms such as the funding date, interest rate, and payment schedule" had not been agreed upon).

**C.      The Zero Interest Loan is Unenforceable and Illusory Because There Was No Consideration**

The Zero Interest Loan is invalid under basic state law contract principles. 9 U.S.C. § 2 (requiring arbitration of contracts involving commerce, "save upon such grounds as

exist at law or in equity for the revocation of any contract."). An essential element of a contract is sufficient consideration. 15 O.S.2001 § 2. As a general rule, consideration exists as long as there is a benefit to the promisor or a detriment to the promisee. *See Powers Restaurants, Inc. v. Garrison*, 465 P.2d 761, 763 (Okla.1970) (To be enforceable, a contract must be supported by valid consideration); *See also* 15 O.S.2001 § 106 (defining consideration). Here, the Zero Interest Loan offered to Parisi was entirely illusory. Even if she had intended to enter into a contract – and at the time she provided her electronic signature, she did not – Parisi received no benefit as the promisor. *See Thompson v. Bar-S Foods Co*, 174 P. 3d 567, 574-75 (Okla. 2007) (finding employment contract containing arbitration clause unenforceable for lack of consideration.) If the agreement were held to be enforceable, Parisi would be required to arbitrate her claim and waive her right to a class action trial in exchange for a loan that did not exist – no Zero Interest Loan was ever actually offered to her. In fact, even if Anderson could argue somehow that the Zero Interest Loan *was* offered to Parisi (which would create a disputed material fact), it was certainly withdrawn without notice when GreenSky offered its High Interest Loan, making any contract for the Zero Interest Loan illusory. RESTATEMENT (SECOND) OF CONTRACTS § 2 cmt. e (1981) (Even if a present intention is manifested, the reservation of an option to change that intention means that there can be no promisee who is justified in an expectation of performance.); *see also, Wright v. Fenstermacher*, 270 P. 2d 625, 627 (Okla. 1954) (equitable relief appropriate when that which was undertaken to be performed was so essential a part of the bargain that the failure of it must be considered as destroying or vitiating the entire consideration of the contract). Accordingly, even assuming arguendo

17

that there ever was a contract between these parties, the grounds exist at law or in equity for the revocation of that contract. As a matter of law, the Zero Interest Loan is an illusory, unenforceable contract, and as such, no agreement to arbitrate exists; *see also Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4, 5 (Fla. 1984) ("It is basic hornbook law that a contract which is not mutually enforceable is an illusory contract.").

D.    **Anderson Failed to Comply with Federal and Oklahoma Electronic Signature Laws**

Parisi never assented to the terms of the Zero Interest Loan.  Parisi only provided her electronic signature because she was told it was needed for a check on her creditworthiness as part of an application for a loan. Parisi did not affirmatively consent, as required by law, to having her electronic signature used to agree to loan terms.

The Electronic Signatures in Global and National Commerce Act ("E-Sign Act") requires that where a transaction involves a consumer, like Parisi, the consumer must affirmatively consent to the use of her electronic signature and have not withdrawn her consent. 15 U.S.C. §7001(c)(1)(A). The E-Sign Act defines an electronic signature as follows: "The term 'electronic signature' means an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the ***intent*** to sign the record." (emphasis added). 15 U.S.C. §7006(5). Pursuant to the E-Sign Act, prior to consenting, a consumer must be provided with a clear and conspicuous statement, *inter alia*, of (1) any right or option to have the record provided or made available on paper or in non-electronic form; (2) the right to withdraw the consent to have the record provided in electronic form; and (3) whether the consent applies only to

18

the particular transaction which gave rise to the obligation to provide the electronic signature or to identified categories of records that may be provided or made available during the course of the relationship.  15 U.S.C. §7001(c)(1)(B).

The Uniform Electronic Transactions Act ("UETA") is a model act for adoption by states that encourages the lawful use of electronic documents and records. Oklahoma has adopted its own version of the UETA, the Oklahoma Uniform Electronic Transactions Act ("OUETA"). 12A O.S. § 15-101 *et. seq*. The OUETA includes the same definition of electronic signature as the E-Sign Act: "Electronic signature" means an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the ***intent*** to sign the record. (emphasis added). 12A O.S. §15-102(10). The OUETA requires that electronic signatures are valid "only between parties each of which has agreed to conduct transactions by electronic means." 12A O.S. §15-105(b). Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." *Id*. ¶ 15-105(b).

Anderson has it backwards when it argues that "[t]here is no indication that Plaintiff requested or attempted to review the [contract] terms, and [Anderson] refused." Motion, p. 18.  Compliance with the E-Sign Act requires Anderson to provide a clear and conspicuous statement to Parisi informing her of her right or option to have the record provided or made available on paper or in non-electronic form; her right to withdraw her consent to have the record provided in electronic form; and whether her consent applies only to the particular transaction which gave rise to the obligation to provide the electronic signature – her credit

19

check - or to identified categories of records that may be provided or made available during the course of the relationship, such as loan documents. Anderson never asked Parisi to provide her consent to conduct transactions by electronic means. It did not provide Parisi with a clear and conspicuous statement that she had the right to receive a copy of what she signed provided on paper or non-electronic form, the right to withdraw her consent to have the record provided in electronic form, and most importantly, whether her consent applied to the credit check and loan application only or whether there were other identified categories of documents to which her e-signature could be applied, such as the Zero Interest Loan. Parisi had no intent to agree to provide her approval to any specific loan terms that she had yet to review. *See* 15 U.S.C. §7006(5) ("The term 'electronic signature' means an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the ***intent*** to sign the record.") (emphasis added). Parisi's only intent when she provided a signature to Anderson was to have her credit checked to see if she was eligible for a zero interest, zero downpayment, zero payments for twenty-four months loan. As such, Parisi disputes that she ever validly assented to the terms of the Zero Interest Loan, let alone to the arbitration provision included in it. Certainly, the same e-signatures used to agree to have credit checked for a loan application without any notice of further potential use cannot be evidence of an agreement to arbitrate disputes between the parties.

20

**E.      Two Zero Interest Loan Provisions Render Any Commitment to Arbitrate Null and Void**

The Terms and Conditions included in the Zero Interest Loan include a provision that removes any authority or power of the parties or the arbitrator to proceed with a class action or to join or consolidate any claim with any other proceeding involving third parties. *See* Section I(C), *supra*. According to the terms, if the Court determines that this limitation on class action or joinder is unenforceable, then the entire "commitment to arbitrate" is null and void. *Id*.  In this case, Parisi was never informed that she was going to be held to a class action waiver by applying for a loan to finance windows.  Nor could she know that an indispensable third party like GreenSky could not be joined in any arbitration proceeding. This makes the arbitration clause unconscionable, first because Parisi never agreed to allow her signature to be used to enter into a contract with Anderson that waived her class action rights, and second, because a third party – Greensky - who is intricately bound up in the dispute cannot be joined. *Bilbrey v. Cingular Wireless, LLC*, 164 P. 3d 131, 136 (Okla. 2007) (quoting *Barnes v. Helfenbein*, 548 P.2d 1014, 1020 (Okla. 1976) ("The basic test of unconscionability of a contract is whether under the circumstances existing at the time of making of the contract, and in light of the general commercial background and commercial needs of a particular case, clauses are so one-sided as to oppress or unfairly surprise one of the parties.").

Further, the Zero Interest Loan terms include a provision excluding any action for an injunction from arbitration. *See* Section I(C), *supra* ("The parties agree that any action or claim or request for an injunction shall not be subject to arbitration"). Parisi has

21

specifically requested injunctive relief in her lawsuit and thus her claim "shall not be subject to arbitration."  *See* Complaint, *e.g.*, ¶¶8, 39 ("This class action seeks injunctive and monetary relief to redress an unlawful and deceptive pattern of wrongdoing followed by Anderson, in concert with its co-defendant, Harris/GreenSky (jointly Defendants), in its credit extension sale of consumer goods and services in the State of Oklahoma"; "The Class Representative requests a certification of a "hybrid" class for monetary damages under 12 Oklahoma Statutes Annotated §2023B.3 and for equitable relief under 12 Oklahoma Statutes Annotated §2023B.2").

Accordingly, even if the Court were to find that Parisi agreed to the Zero Interest Loan terms, and it should not, those terms include provisions that render any "commitment to arbitrate" null and void.

### F.    Disputed Issues of Fact May Be Resolved After Discovery and a Trial

Under the FAA, if there is a need to resolve material factual disputes as to the formation of an agreement to arbitrate, the court must proceed to a summary trial. *See* 9 U.S.C. § 4. ("If the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof."). The 10th Circuit agrees that "when factual disputes may determine whether the parties agreed to arbitrate, the way to resolve them ... is by proceeding summarily to trial". *See Howard v. Ferrellgas Partners, L.P.*, 748 F.3d at 984. "When parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) (quoting *Avedon Engineering Inc v. Seatex*, 126 F 3d at 1283.

Anderson cannot meet its burden to show there is an agreement to arbitrate. Parisi denies ever entering into the Zero Interest Loan. The evidence of an agreement attached to Oklahoma's Motion is a contract that Parisi never saw prior to her signature being affixed to it, includes a financing plan that was not offered to Parisi, for which Parisi was never approved, and includes key substantively material pages with forged signatures, including the financing form itself, and the approval for Anderson to proceed with the windows order. Accordingly, this Court can deny Anderson' Motion as a matter of law. *See Quazilbash v. Wells Fargo & Company*, 2010 WL 1643778 *2 (N.D. Ok. 2010) (denying motion to compel arbitration where defendant failed to show that there was an agreement to arbitrate and there was genuine issue of fact whether plaintiff entered into account agreement at issue). However, if the Court does not do so, Parisi has the right to demand a jury trial on the disputed facts regarding the existence of a binding agreement. See 9 U.S.C. § 4:

> If the making of an arbitration agreement or the failure, neglect or refusal to perform the same be an issue, the court shall proceed summarily to the trial thereof ... if the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed.

*Id*.

Because Parisi has provided her Declaration supporting the lack of a valid arbitration agreement, and the record reflects that Parisi never accepted the Zero Interest Loan and never authorized payment to Anderson, a jury trial on the existence of a valid and enforceable agreement is required if the Court does not deny Anderson's Motion.

**G.      If The Court Finds That Arbitration Is Warranted (It Is Not), The Case Should Be Stayed, Not Dismissed**

Although arbitration should not be compelled for the reasons set out above, even if this Court were to require arbitration, the matter should be stayed and not dismissed. 9 U.S.C. § 3. This statutory requirement is followed in the Tenth Circuit. *See Fancher v. Westwind Enterprises, Ltd.,* 2018 WL 11411336, *2 (W.D. Okla. Aug. 8, 2018) (citing *Williams v. Imhoff*, 203 F.3d 758, 764 (10th Cir. 2000) ("Under the FAA, a court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." (quotation marks and citation omitted); *Adair Bus Sales, Inc. v. Blue Bird Corp*., 25 F.3d 953, 955 (10th Cir. 1994) (indicating, when a district court dismissed a suit and ordered the parties to arbitrate, that "[t]he proper course ... would have been for the district court to grant [the movant's] motion and stay the action pending arbitration"); *see also, Hill v. Ricoh Ams. Corp.,* 603 F. 3d 766, 771 (10th Cir. 2010) ("Section 3 of the Act, 9 U.S.C. § 3, obliges courts to stay litigation on matters that the parties have agreed to arbitrate").

**IV**.      **SUMMARY TRIAL ON MAKING OF AGREEMENT TO ARBITRATE**

Under the FAA, if the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.  9 U.S.C. § 4.   Parisi, has a right and hereby requests, a jury trial on the making of the agreement if this Court does not simply deny Anderson's Motion as a matter of law. However, given that Parisi has sufficiently met her burden to show that there is no valid

24

Zero Interest Loan, this Court can certainly decide that there is no arbitration agreement as a matter of law.

## V.  CONCLUSION

With all reasonable inferences and resolving all factual conflicts in Parisi's favor, Parisi has met her burden of proving proper venue because she has submitted evidence that she was never bound to the Zero Interest Loan containing the arbitration agreement. Accordingly, for all the reasons above, Anderson's Motion to Dismiss the Amended Class Action Complaint (or Stay) and Compel Arbitration should be denied.

Respectfully submitted this 28th day of December, 2023.

**Varnell & Warwick, P.A.**

/s/ Janet R. Varnell
Janet R. Varnell, FBN: 0071072
400 N. Ashley Drive, Suite 1900
Tampa, FL  33602
Telephone: (352) 753-8600
jvarnell@vandwlaw.com

**Rawls Gahlot, PLLC**

/s/ M. Kathi Rawls
M. Kathi Rawls, OBA #18814
Minal Gahlot, OBA # 22145
2404 S. Broadway
Moore, Ok 73160
Phone: 405-912-3225
kathi@rawlsgahlot.com
minal@rawlsgahlot.com

*Attorneys For Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 28, 2023, I electronically filed the foregoing with the Clerk of the Court through the CM/ECF System, which will send a notice of electronic filing to all counsel of record.

/s/ Janet R. Varnell
Janet R. Varnell

26