**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**June 6, 2025**

_____

**Christopher M. Wolpert**
**Clerk of Court**

SUSAN PARISI,

    Plaintiff - Appellee,

v.

GREENSKY, LLC, (incorrectly identified
as BMO Harris Bank, NA, d/b/a Greensky,
LLC),

    Defendant - Appellant,

and

OKLAHOMA WINDOWS AND DOORS
LLC, d/b/a Renewal by Andersen of
Oklahoma,

    Defendant.

No. 23-6218
(D.C. No. 5:23-CV-00115-R)
(W.D. Okla.)

_____

SUSAN PARISI,

    Plaintiff - Appellee,

v.

OKLAHOMA WINDOWS AND DOORS,
LLC, d/b/a Renewal by Andersen of
Oklahoma,

    Defendant - Appellant,

and

No. 24-6043
(D.C. No. 5:23-CV-00115-R)
(W.D. Okla.)

GREENSKY, LLC, (incorrectly identified
as BMO Harris Bank, NA, d/b/a Greensky,
LLC),

     Defendant.

---

**ORDER AND JUDGMENT**[*]

---

Before **MORITZ**, **MURPHY**, and **CARSON**, Circuit Judges.

---

## I.    INTRODUCTION

In this consolidated matter, GreenSky, LLC ("GreenSky") and Oklahoma Windows and Doors LLC d/b/a Renewal by Anderson ("RBA") appeal the denial of their respective motions to compel arbitration. The district court did not err in determining, based on the undisputed facts, neither GreenSky nor RBA formed a valid arbitration agreement with Plaintiff-Appellee Susan Parisi. Because no reasonable jury could find that any arbitration agreement had been validly formed, the district court's subsequent orders denying motions to compel without a trial were not erroneous. Accordingly, exercising jurisdiction pursuant to 9 U.S.C. § 16(a), the court **affirms** both orders denying motions to compel arbitration.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## II.    BACKGROUND

Susan Parisi responded to an advertisement from RBA promoting an opportunity to upgrade her home windows through a loan requiring no down payment, with zero percent interest and no payment required for twenty-four months following the window installation ("Zero-Interest Loan"). On November 23, 2021, Parisi met with Russell Kelley, an RBA representative, to discuss the opportunity.

Parisi informed Kelley she was beginning treatment for cancer soon and needed the Zero-Interest Loan due to the medical costs. Kelley confirmed Parisi's window replacement would be eligible for financing through the Zero-Interest Loan which was offered by GreenSky. He asked Parisi to sign a credit application on his iPad to allow GreenSky to review her creditworthiness. He did not inform her that her signature could be used for anything other than the credit check. She signed as requested.

Kelley then told Parisi he required additional signatures to secure the Zero-Interest Loan. He proceeded to swipe up on his iPad and showed Parisi a screen displaying only a checkbox and a signature line. By checking the box, Parisi's original electronic signature was affixed to the new signature line. Without providing any additional explanation, Kelley presented such a screen approximately twelve times and Parisi checked the box each time. Parisi was unaware she was assenting to any contract; she only intended to apply for the Zero-Interest Loan.

About thirty minutes later, Parisi spoke over the phone with a GreenSky representative who confirmed she had been approved for the two-year loan program

with GreenSky. Kelley showed his iPad screen to Parisi to evidence she had been approved for the Zero-Interest Loan, but the loan's financial terms were not visible.

Following the meeting, two different agreements were sent to Parisi. First, Kelley emailed Parisi a copy of an agreement. The agreement was a contract between RBA and Parisi for the purchase and installation of windows ("Windows Contract"). Parisi's signature appeared fourteen times throughout the document. On its second page, the Windows Contract identified "Financing" as the "Method of Payment." The fifth page, titled "GreenSky Financing Form," described Parisi's financing plan as "Plan # 3541 – 24 month promotional period. Interest waived if balance paid off before promotional period ends."[1] Spanning pages eight and nine was an arbitration clause which stated, "any dispute" between the "Buyer and Contractor . . . will be determined by binding arbitration." The email containing this agreement was sorted into Parisi's spam folder and she discovered it only after the litigation began.

GreenSky also mailed a paper copy of an agreement to Parisi's home address. The first page of the document announced Parisi had been approved for a loan, albeit under Plan 7541, a different plan than requested. Under Plan 7541, Parisi had up to six months to purchase her windows. She would be required to start her monthly payments when the "24 month promotional (promo) plan began." The promotional plan would begin at the earlier of the purchase window expiration date and the completion of the window installation.

---

[1] Parisi claims her signatures on this page and the following page titled "HOA Authorization & Contact Form" are forged.

Also included in the first page of the agreement was a "Shopping Pass" and information on how it related to the loan. The Shopping Pass was an online tool activated by GreenSky upon the approval of a loan. The Shopping Pass functioned like a credit card: GreenSky issued to the borrower an account number associated with the loan. GreenSky would disburse funds directly to the merchant as payment for goods or services if the borrower or an authorized user provided the account number to the merchant or permitted transactions. Crucially, the use of the Shopping Pass constituted acceptance of the terms "of the accompanying Loan Agreement."

A document titled "Installment Loan Agreement" ("Loan Agreement") accompanied the Shopping Pass. It confirmed Parisi was approved for a loan. Rather than the Zero-Interest Loan, however, the "Lender," BMO Harris Bank N.A., had extended a line of credit at an annual interest rate of 24.99% ("High-Interest Loan").[2] The payment schedule required Parisi to begin monthly payments approximately one month after the purchase window expiration date or the installation of windows. Although BMO Harris Bank N.A.'s signature appeared next to the "Lender" designation, GreenSky's signature did not appear in the Loan Agreement, nor was there a signature line dedicated to GreenSky.

---

[2] The Loan Agreement offered Parisi a credit of $17,744.00. At an interest rate of 24.99%, this line of credit would accrue $19,973.08 in finance charges if Parisi complied with the payment schedule outlined within the Loan Agreement. The payment schedule contemplated a total of eighty-four monthly payments, totaling $37,717.08.

The Loan Agreement contained an arbitration provision which provided, in relevant part, "[a]ny Claim will be resolved . . . by arbitration." The term "Claim" was defined as "any claim, dispute or controversy of every kind and nature," including "claims by or against any third party . . . (including, but not limited to, . . . their agents)."

At one point between November 23 and November 29, 2021, Kelley called Parisi to let her know she had not qualified for the Zero-Interest Loan. Parisi never heard from Kelley afterwards.

On November 29, 2021, Parisi received an email from GreenSky notifying her RBA made a charge on her loan. Parisi emailed GreenSky the same day to dispute the charge and to clarify she only intended to apply for the Zero-Interest Loan. A GreenSky representative acknowledged Parisi's email, construing it to mean that she was "rejecting" the charge by RBA on her loan. Her loan, however, was eventually cancelled in October 2022, and she was billed for payments and charged late fees until that time. In the days following her email exchange, Parisi received a paper copy of the Shopping Pass and the Loan Agreement. RBA never installed any windows at Parisi's home.

Parisi brought a class action suit against RBA and GreenSky in Oklahoma state court, alleging unlawful and deceptive practices in violation of Oklahoma state

law.[3] Upon removal of the matter to the Western District of Oklahoma, GreenSky and

RBA filed motions to compel arbitration. The district court denied both motions and

further denied GreenSky's motion for reconsideration.

## III.   DISCUSSION

This court reviews de novo the decision of the district court to grant or deny a

motion to compel arbitration. *Reeves v. Enter. Prods. Partners, LP*, 17 F.4th 1008,

1011 (10th Cir. 2021). The analysis resembles that of summary judgment practice:

the party moving to compel arbitration carries the burden to show that a valid,

enforceable arbitration agreement exists. *Hancock v. Am. Tel & Tel. Co. Inc.*, 701

F.3d 1248, 1261 (10th Cir. 2012). The court gives the benefit of all reasonable doubts

and inferences to the non-moving party. *Id.* "When parties dispute the making of an

agreement to arbitrate, a jury trial on the existence of the agreement is warranted

unless there are no genuine issues of material fact regarding the parties' agreement."

*Hardin v. First Cash Fin. Servs. Inc.*, 465 F.3d 470, 475 (10th Cir. 2006).

### A.   Windows Contract

RBA argues the district court erred in denying its motion to compel, despite

the arbitration clause within the Windows Contract.

Arbitration is a matter of contract and consent. *Coinbase, Inc. v. Suski*, 602

U.S. 143, 147-48 (2024). Parties "cannot be required to submit to arbitration any

---

[3] The petition filed in the Oklahoma state court incorrectly identified the defendants. Upon removal of the matter, the Western District of Oklahoma granted Parisi's motion for leave to amend to rectify the error.

dispute which [they have] not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quotation omitted). "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Techs., Inc. v. Comm'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *see Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219-20 (10th Cir. 2002) (explaining the "strong presumption" in favor of arbitration "disappears when the parties dispute the existence of a valid arbitration agreement").

Parisi has consistently argued RBA failed to prove the existence of an arbitration agreement. Not only is the record devoid of clear and unmistakable evidence of a valid arbitration agreement, but the issue raised by Parisi is one of contract formation. *See Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1106-07 (10th Cir. 2020). Contract formation is a matter of judicial determination and cannot be delegated to an arbitrator. *Id.*; *see* 9 U.S.C. § 4 (providing that courts are to direct parties to arbitration only "upon being satisfied that the making of the agreement for arbitration . . . is not in issue").

RBA raises three arguments to remove the "gateway" issue of arbitrability from the court. *Howsam*, 537 U.S. at 83. First, it argues the parties expressly agreed to delegate the issue of arbitrability to the arbitrator. Second, it asserts the delegation clause is severable and, therefore, separately enforceable from other, potentially invalid, provisions of the purported agreement. Third, RBA contends Parisi waived her challenge to the delegation clause by failing to so specify in her argument. All

three arguments assume the existence of a valid arbitration agreement. *See AT & T Techs., Inc.*, 475 U.S. at 648-49 ("[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration."). Because Parisi raised the issue of contract formation, the court shall "not assume that the parties agreed to arbitrate arbitrability." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010). "[A] delegation clause cannot be severed from an agreement that does not exist"; even if Parisi failed to direct her challenge specifically at the delegation clause, the court must first determine whether an arbitration agreement exists. *Fedor*, 976 F.3d at 1104.

To determine whether the Windows Contract was validly formed, the court applies "ordinary state-law principles." *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017) (quotation omitted). The parties agree Oklahoma law controls. Under Oklahoma law, "[a] valid contract requires the parties' mutual consent to the terms." *Williams v. TAMKO Bldg. Prods., Inc.*, 451 P.3d 146, 151 (Okla. 2019). "[C]onsent is not mutual unless the parties all agree upon the same thing in the same sense." *Beck v. Reynolds*, 903 P.2d 317, 319 (Okla. 1995) (quotation and alteration omitted); *see Clark v. Clark*, 57 P.3d 95, 99 (Okla. Civ. App. 2002) (explaining a valid contract requires "a meeting of the minds").

The district court concluded no reasonable jury could find the Windows Contract was ever validly formed. *Parisi v. Okla. Windows & Doors, LLC*, 717 F. Supp. 3d 1100, 1105-06 (W.D. Okla. 2024) (analyzing the flawed nature of the offer and acceptance). The district court explained RBA failed to proffer sufficient

evidence to establish a meeting of the minds between the supposed contracting parties.

The district court first ascertained that payment terms were "an essential element" of the Windows Contract. *Parisi*, 717 F. Supp. 3d. at 1105. RBA's attempt to skirt the issue by characterizing it as one of enforceability rather than formation is misplaced. A contract cannot be enforced if not valid. *Young v. Chappell*, 239 P.3d 476, 479 (Okla. Civ. App. 2010). A valid, enforceable contract requires the meeting of the minds on "all the essential terms of the contract." *Id.* The district court did not err in analyzing, as part of its formation inquiry, which terms of the Windows Contract were essential.

The determination itself—that the payment terms were an essential element to the Windows Contract—finds support in the uncontested portions of the record. Parisi needed the Zero-Interest Loan to afford her upcoming cancer treatment. *Parisi*, 717 F. Supp. 3d at 1102. She communicated her life circumstances to Kelley. *See id.* "Parisi was not seeking new windows . . . at any cost; Parisi was seeking new windows *only with the assistance of the Zero-Interest Loan*." *Id.* at 1105. "In essence, the Zero-Interest Loan was the foundation of the entire transaction." *Id.* RBA strains credibility by asserting the essential terms comprise only the purchase and installation of the windows, to the exclusion of the payment terms. It further

undermines its position by carefully omitting, and failing to address, the relevant and undisputed record facts.[4]

Next, the district court explained RBA's "offer was defective in describing the loan's actual financial terms" because it "professed to offer something it could not deliver." *Parisi*, 717 F. Supp. 3d at 1105. This determination was based on two underlying premises: 1) the Windows Contract "promised Parisi the Zero-Interest Loan," *id.*, and 2) GreenSky instead offered Parisi the High-Interest Loan which "charge[d] an annual percentage rate of 24.99%," *id.* at 1103. Citing to the "express terms" of the Windows Contract, RBA argues it never made such a promise. Appellants' Opening Br. at 39. It asserts the district court erroneously added a financing contingency to the agreement. In the alternative, RBA contends that even if the Windows Contract contained certain financing guarantees, Parisi's remedy is to enforce those guarantees through arbitration, rather than contest the existence of the arbitration agreement.

---

[4] For example, RBA notes Parisi "acknowledge[d] that she was interested in Anderson's advertised replacement windows for her home," Appellants' Reply Br. at 16 (quotation omitted), without conceding the advertisement promoted "the ability to upgrade . . . windows with a loan requiring zero money down, zero interest for two years, and zero payments for twenty-four months." *Parisi v. Okla. Windows & Doors, LLC*, 717 F. Supp. 3d 1100, 1102 (W.D. Okla. 2024).

In another instance, RBA claims Parisi "further acknowledged that RBA's sales representative informed Parisi she could purchase the windows," Appellants' Reply Br. at 16 (quotation omitted), but does not reference how Kelley had not only "confirmed Parisi's project was eligible for the advertised Zero-Interest Loan," but also displayed his iPad to her to "evidence she had been approved for said loan." *Parisi*, 717 F. Supp. 3d at 1102.

This line of argument is inconsistent with the undisputed facts. From the outset of their discussion, Kelley confirmed Parisi's project would be eligible for the Zero-Interest Loan. *See Parisi*, 717 F. Supp. 3d at 1102. After obtaining her signatures to allegedly check creditworthiness, Kelley showed Parisi his iPad to evidence she had been approved for the Zero-Interest Loan. *See id.* The Windows Contract contained a "GreenSky Financing Form," bearing Parisi's signature, which provides she was approved for Payment Plan #3541, offering a twenty-four-month promotional period and waiver of interest if the balance was paid off before the promotional period ended.

In any event, RBA's position is untenable either way because the payment terms were an essential element of the agreement. For the Windows Contract to be enforceable, there must have been mutual consent on all essential elements, including the payment terms. *See Beck*, 903 P.2d at 319. If RBA made an offer which did not encompass payment terms, the Windows Contract could not have been validly formed. If, on the other hand, the offer contained payment terms, but RBA and Parisi failed to "agree upon the same thing in the same sense," the agreement would likewise not have been formed. *Id.* (quotation omitted).[5] If the Windows Contract was never formed, then Parisi cannot be required to submit to arbitration any dispute resulting from the alleged contract. *See Howsam*, 537 U.S. at 83.

---

[5] On appeal, RBA concedes "the crux of the dispute in this entire lawsuit" is the parties' disagreement as to the interest rate Parisi believes she was promised. Appellants' Reply Br. at 17

Finally, the district court determined "Parisi's alleged acceptance of the invalid offer ha[d] no legal import." *Parisi*, 717 F. Supp. 3d at 1105. Because Parisi only "assent[ed] to the Zero-Interest Loan offer," *id.*, her acceptance was not "identical [to] the terms of the offer" even assuming RBA made a valid offer, *Nabob Oil Co. v. Bay State Oil & Gas Co.*, 255 P.2d 513, 515 (Okla. 1953). RBA asserts Parisi's signatures carry dispositive weight to the contrary. Rather than pointing to record facts to rebut the district court's conclusion, RBA fixates on the duty of a party to apprise themselves of the contract before signing the instrument. It claims Parisi's signatures create a presumption that she understood and agreed to the terms of the agreement. It argues the presumption, when taken with the record facts, establishes the existence of a valid arbitration agreement or, at minimum, creates a question of material fact for the jury.

"A person signing an instrument is presumed to know its contents." *Mayfield v. Fid. State Bank of Cleveland*, 249 P. 136, 136 (Okla. 1926). "Generally, if a party to a contract can read and has the opportunity to read the contract but fails to do so, he cannot escape its liability." *First Nat'l Bank & Tr. Co. of El Reno v. Stinchcomb*, 734 P.2d 852, 854 (Okla. Civ. App. 1987). This rule, however, is not absolute. *See id.* ("[T]his rule is overcome when there is a strong showing of fraud or some equally valid excuse for such ignorance."); *cf. Hancock*, 701 F.3d at 1256 ("[C]ontract law principles in . . .Oklahoma indicate that if a clickwrap agreement gives a consumer

reasonable notice of its terms and the consumer affirmatively manifests assent to the terms, the consumer is bound by the terms.").[6]

The district court's conclusion as to the nature of Parisi's assent is not erroneous. The GreenSky Financing Form bearing her signature clearly offered the promotional Zero-Interest Loan. The only other mention of payment terms appeared on the second page, where the "Method of Payment" was ambiguously identified as "Financing." To the extent Parisi's signatures reflect assent, she assented to the terms as they appear on the GreenSky Financing Form.

RBA failed to proffer sufficient evidence such that a reasonable jury could find that Parisi and RBA formed a valid arbitration agreement. The district court did not err in denying RBA's motion to compel arbitration without a trial.

---

[6] RBA fails to refute that "Kelley did not inform Parisi her signature could be used for purposes other than the credit check and loan application." *Parisi*, 717 F. Supp. 3d at 1102. After Parisi signed once, Kelley indicated he required additional signatures for the Zero-Interest Loan. *Id.* Thereafter, he "proceeded to swipe through additional pages on his iPad on which Parisi could see only a signature line and a check box," asking her to check the box which would affix her signature on every signature line. *Id.*

Perhaps conceding Parisi did not have an opportunity to review the Windows Contract before applying her signature, RBA points to an email copy of the contract which Kelley sent to Parisi. RBA argues Parisi's signatures, taken together with the email copy, prove the existence of the arbitration agreement. In order to consent, however, Parisi must have "had or should have had actual knowledge of the arbitration agreement" before she signed. *Williams v. TAMKO Bldg. Prods., Inc.*, 451 P.3d 146, 151 (Okla. 2019). The email copy sent to Parisi after she signed would not satisfy this requirement.

### B. Loan Agreement

Next, GreenSky contends the district court erred in denying its motion to compel despite the Loan Agreement's arbitration provision. The district court determined no reasonable factfinder could find that the parties entered into an arbitration agreement because the Loan Agreement lacked mutual assent. *Parisi v. Okla. Windows & Doors, LLC*, 704 F. Supp. 3d 1269, 1276 (W.D. Okla. 2023) ("*Parisi II*"). The district court subsequently denied GreenSky's motion to compel without a trial because a valid arbitration agreement did not exist. *Id.* at 1279.

GreenSky is not a signatory to the Loan Agreement. It describes itself as an "agent" of BMO Harris and claims to only be a party to the arbitration provision. Appellants' Reply Br. at 23 n.18. It contends the district court erred in denying its motion to compel based on the conclusion no jury could find that a Loan Agreement was formed.

Regardless of GreenSky's role within the Loan Agreement, arbitration is a matter of consent and contract. *Suski*, 602 U.S. at 147-48. Parisi cannot be required to arbitrate disputes if she did not agree to do so. *Howsam*, 537 U.S. at 83. Despite suggesting the arbitration provision exists as a separate "GreenSky Arbitration Agreement," GreenSky recognizes Parisi's assent to the arbitration provision must flow from her assent to the Loan Agreement. The Loan Agreement is the only instrument by which GreenSky claims Parisi is contractually bound to arbitrate disputes. The district court thus did not err in analyzing the Loan Agreement as the only way to determine whether the parties formed an arbitration agreement.

Nor did the district court err in identifying the issue as one of contract formation. Quoting her out of context, GreenSky claims Parisi disputes only the enforceability, and not the valid formation, of the Loan Agreement. Validity concerns "what it takes to enter into [a contract]." *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 581 U.S. 246, 254-55 (2017). Enforceability, on the other hand, asks whether "agreements once properly made" may be enforced. *Id.* at 255. In her response in opposition to GreenSky's motion to compel in the district court, Parisi made her position clear: "GreenSky failed to prove the existence of an agreement to arbitrate between it and Parisi." App. Vol. I at A132. Her subsequent arguments as to the absence of mutual assent and meeting of the minds pertain to contract formation, not to enforceability. *See* Okla. Stat. tit. 15, § 2 (identifying parties' consent as one of the elements of a validly formed contract). She maintains this position on appeal.

The parties agree Oklahoma law governs the formation of the Loan Agreement. The district court interpreted the Loan Agreement as providing Parisi with two ways to manifest her assent: 1) by initiating a transaction using the Shopping Pass herself or 2) by RBA initiating the transaction using the Shopping Pass with Parisi's valid consent. *Parisi II*, 704 F. Supp. 3d at 1276. GreenSky objects to the construction, arguing that the mere "[u]se" of the Shopping Pass—regardless of the user—amounts to the acceptance of the terms of the Loan Agreement. Appellants' Opening Br. at 57-58.

The "meaning assigned by the trial court to a contract" is a legal question

reviewed de novo. *May v. Mid-Century Ins. Co.*, 151 P.3d 132, 140 (Okla. 2006).

GreenSky quotes from a provision of the Loan Agreement which, in full, states:

> Use of this Shopping Pass or the associated Loan by (any) Borrower (or
> any authorized user) to make a purchase constitutes acceptance by (all)
> Borrower(s) of the terms of the accompanying Loan Agreement.

The provision clearly indicates that the Shopping Pass must be used by the

"Borrower," in this case, Parisi, or "any authorized user" to constitute acceptance of

its terms.[7] Further supporting the district court's interpretation are the following

provisions surrounding the use of the Shopping Pass:

- Only those named on this Shopping Pass are authorized to make purchases.

- You[, the Borrower,] have zero liability for transactions that you do not
  authorize.

- You[, the Borrower,] will have no Loan unless you authorize a transaction.

Only Parisi's name appears on the Shopping Pass.

Next, the district court concluded the undisputed evidence demonstrated RBA

had initiated a transaction using the Shopping Pass without Parisi's valid

authorization. *See Parisi II*, 704 F. Supp. 3d at 1277. "The only evidence" as to who

initiated the transaction was found in an email between Parisi and a GreenSky

representative. *Id.* The representative clarified the transaction occurred "because the

---

[7] During oral argument on appeal, counsel for RBA conceded she could not
find a provision in either the Windows Contract or the Loan Agreement which
allowed RBA to initiate a transaction using the Shopping Pass without Parisi's valid
consent.

merchant charges a percentage upfront on the loan." *Id.* (quotation omitted). Following the notice of the transaction, Parisi "promptly and consistently disputed" the validity of the charge, asserting she never authorized it. *Id.* GreenSky does not identify any evidence that would allow a jury to reach a contrary conclusion.

The district court did not err in ruling, in light of the undisputed material facts, that no reasonable factfinder could find that Parisi had manifested assent to the Loan Agreement. It was not erroneous for the district court to deny GreenSky's motion to compel without a trial because there was no valid arbitration agreement.

## IV.    CONCLUSION

The district court's orders denying RBA and GreenSky's motions to compel are **affirmed**.

Entered for the Court

Michael R. Murphy
Circuit Judge

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert                                           Jane K. Castro
Clerk of Court                                                  Chief Deputy Clerk

June 06, 2025

Mr. Derrick T. DeWitt
Mr. Kyle R. Prince
DeWitt Paruolo & Meek
705 NW 4th Street
Oklahoma City, OK 73102

Mr. Barry Goheen
Pierson Ferdinand
100 Mount Paran Ridge
Atlanta, GA 30327-3561

Ms. Sheila D. Sayne
Sayne Law
3220 South 85th East Avenue
Tulsa, OK 74145

Ms. Diane J. Zelmer
Berenson Law
4495 Military Trail, Suite 203
Jupiter, FL 33458

**RE:    23-6218 & 24-6043, Parisi v. GreenSky, et al**
Dist/Ag docket: 5:23-CV-00115-R

Dear Counsel:

Attached is a copy of the order and judgment issued today in this matter. The court has
entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40(d)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rule 40 and 10th Cir. R. 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc: Sean W. Fleming
Hannah Meredith Kieschnick
Shelby Hannah Leighton
Pamela G. Levinson
M. Kathi Rawls
Janet R. Varnell

CMW/at