## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

SUSAN PARISI,

      **Plaintiff,**

v.

OKLAHOMA WINDOWS AND
DOORS, LLC d/b/a RENEWAL BY
ANDERSON OF OKLAHOMA,
BMO HARRIS BANK, NA, and
GREENSKY, LLC,

      **Defendants.**

Case No.: 5:23-cv-00115-R

CLASS ACTION

JURY TRIAL DEMAND

## FOURTH AMENDED CLASS ACTION COMPLAINT
## FOR MONETARY AND INJUNCTIVE RELIEF

Plaintiff, Susan Parisi ("Parisi"), individually, on behalf of herself and all others similarly situated, upon information and belief by and through her counsel of record, files her Fourth Amended Class Action Complaint and states:

1. This class action challenges a home-improvement financing scheme in which a merchant (Renewal by Andersen of Oklahoma, hereafter "Andersen"), a financial technology company (GreenSky, LLC, hereafter "GreenSky"), and a bank (BMO Harris Bank, NA, hereafter "BMO Harris Bank") jointly turn a salesperson's kitchen-table pitch into a loan the consumer never knowingly accepted—then weaponize credit reporting to coerce payment.

2. Prior to and at the sales call, the merchant markets home improvement products with very attractive terms such as "no money down, no interest, no payments for

24 months." Using GreenSky's fully electronic-based portal, the merchant captures the consumer's personal and financial information and transmits an application to GreenSky's system. GreenSky and its program bank decide credit eligibility and—without furnishing the consumer with disclosures she can keep or a contract to review—issue a "Shopping Pass," an access credential GreenSky treats as loan acceptance once the merchant uses it to draw funds. The proceeds never go to the consumer; GreenSky disburses directly to the merchant. Weeks later, the consumer first learns a very different credit obligation has been opened in her name when collection letters arrive or a negative tradeline appears.

3.    That is what happened to Plaintiff Parisi, a decorated veteran. She applied only for a deferred, zero-interest loan because she was in active cancer treatment. Instead, Defendants placed her in an earlier-pay, interest-bearing loan, funded a Shopping-Pass "charge" to the merchant, and reported the debt—without ever providing pre-consummation TILA/OCCC disclosures in a form she could keep or an accurate dispute notation to consumer reporting agencies. The Consumer Financial Protection Bureau has already condemned materially identical GreenSky practices in a 2021 Consent Order (attached as **Exhibit 1**). Defendants' own documents and conduct show the merchant acts as GreenSky's agent in intake, activation, and funding, and the bank funds and/or takes assignment of the loans generated by that process.

4.    Defendants' scheme thrives on opacity. In the never-ending effort of home improvement financiers to evade consumer protection laws, Defendants created an entirely new financing construct that blurs the lines between sellers, lenders, creditors, and assignees. Plaintiff and the Class seek relief under Oklahoma and federal law—including the Oklahoma

Consumer Credit Code, the Oklahoma Consumer Protection Act, the Truth in Lending Act and Regulation Z, and the Electronic Fund Transfer Act – to remedy uniform misconduct baked into Defendants' business model.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because Defendants removed this putative class action from state court and averred that at least one class member is a citizen of a state different from at least one defendant, the proposed class consists of 100 or more members, and that the matter in controversy exceeds $5,000,000 million in the aggregate, exclusive of interest and costs based on reasonable estimates. The exercise of supplemental jurisdiction over Plaintiffs' related state-law causes of action is appropriate under 28 U.S.C. § 1367.

6. The District Court for the Western District of Oklahoma has personal jurisdiction over the parties in this matter as it is the residence of Parisi, and the Defendants conduct business regularly in Oklahoma.

7. Venue is proper in the Western District of Oklahoma under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District and because the Defendants transact business in this District.

## PARTIES

8. Plaintiff Parisi is a natural citizen and resident of Oklahoma County, Oklahoma, and an Oklahoma citizen. Parisi was an Oklahoma citizen for more than six (6) months prior to the filing of this litigation.

9.      Defendant GreenSky is a financial technology company with headquarters in Atlanta, Georgia.  GreenSky originates and brokers loans around the country through its GreenSky Program, including in Oklahoma. The loans are effectuated through a network of Program Merchants who are engaged in home solicitation sales of consumer goods as that term is defined by 14A O.S. § 2-501.

10.     BMO Harris Bank is part of the BMO Financial Group, which provides banking services throughout North America.  It is a wholly owned subsidiary of the Canadian Bank of Montreal ("BMO"). It is headquartered in Chicago, Illinois.  Upon information and belief, BMO Harris Bank entered into a loan origination agreement with GreenSky to extend loans to consumers for home improvements in the State of Oklahoma.

11.     Defendant Andersen is a foreign limited liability company and has its principal place of business in Oklahoma.  Andersen is a GreenSky Program Merchant that utilizes home solicitors to sell consumer credit sales of goods as defined by 14A O.S. § 2-501.

**Factual Allegations**

**Overview of GreenSky Program and Roles of Each Defendant**

12.     Defendant GreenSky engages in business throughout the United States including Oklahoma. It engages in origination and servicing activities related to the GreenSky Program which offers and provides financial products and services to consumers primarily for personal, family, or household purposes through GreenSky Program banks, using proprietary technology and algorithms. These loans typically range from a few thousand dollars to tens of thousands of dollars.

13.    The GreenSky Program Merchants ("Merchants") are third-party providers of services or sellers of retail products who intake, submit, or facilitate submission of consumer loan applications to GreenSky for the purpose of financing consumer purchases from the Merchant. All GreenSky Program Merchants are contracted with and act as agents of GreenSky.

14.    Andersen is a GreenSky Program Merchant that solicits consumers door-to-door and responds to consumer inquiries regarding the fixing, improvement, and replacement of windows and doors at residential homes. Andersen is one of the largest replacement window companies in the country.

15.    The GreenSky Program banks are certain federally insured banks with whom GreenSky contracts to fund consumer loans, including Defendant BMO Harris Bank. GreenSky, through its Merchants, acts as an agent for the GreenSky Program banks.

16.    Merchants must apply to participate in the GreenSky Program. Once a Merchant is accepted into the Program, GreenSky is responsible for and trains its Merchants on the use of its proprietary internet-based loan origination process.  This is the most commonly used process for origination of GreenSky financing.

**How the "Shopping Pass" Works: Intake, Activation, and Merchant Draws**

17.    Merchants are also trained on how to market and promote GreenSky Program loans, intake consumers' personal and financial information, and submit loan applications to GreenSky on behalf of consumers, typically via a tablet.

18.    When a Merchant submits a loan application through GreenSky's website or mobile application, the approved loan terms are displayed on the computer or tablet at the

conclusion of the application process. In the in-home or door-to-door sales context, where a Merchant submits a loan application on a consumer's behalf, the consumer can only view the loan terms if the Merchant shares the screen with the consumer.

19.    Upon GreenSky's loan approval, GreenSky generates a "Shopping Pass" for the consumer's loan that functions similar to a credit card. However, Greensky's loan is closed end consumer credit for the amount of the home improvement project.  The consumer is not provided a copy of the loan terms or any meaningful opportunity to understand what they are agreeing to.

20.    GreenSky does not disburse the loan proceeds to the consumer. Rather, to pay for a product or service, GreenSky allows the Merchant to use the consumer's Shopping Pass number or other authorization to receive payment from GreenSky. GreenSky treats the Merchant's use of the Shopping Pass, or associated funds, as acceptance of the loan.

21.    Greensky then disburses loan proceeds directly to the Merchant without any attempt to verify this charge with the consumer.

**Bait-and-Switch Loan Terms and the Absence of Retainable Disclosures**

22.    Consumers were often offered particular loan terms at the original point of sale, but GreenSky permitted the Merchants to apply for and/or accept a loan with different terms without a consumer's knowledge by use of its unique Shopping Pass program.

23.    Sometimes consumers received mailed or emailed loan documents after their in-home meeting, but these were often missed – either because they went to a spam folder or because the consumers, who did not know that the actual loans had been applied for and/or accepted by the Merchant, thought it was just promotional marketing material. Because they

6

had no contemplation that they would be sent differing loan terms, by the time they received or reviewed anything, the Shopping Passes were activated and they had supposedly "accepted" the loan. Because of the unique scheme permitting the Merchant to act on behalf of a consumer, the consumer was unaware of the loan, its terms, or the concomitant obligations and consequences.

**Direct Disbursement to Merchant and Post-Funding Discovery by Consumers**

24.    Most consumers became aware of the loan for the first time when they saw evidence of the loan on their credit report or received billing statements, collection letters, and calls from GreenSky. On information and belief, under GreenSky's standard process, the loan proceeds never pass to the consumer; instead, once a Merchant uses the Shopping Pass or submits an electronic draw, GreenSky disburses the funds directly to the Merchant and treats that draw as the consumer's acceptance of the loan.

25.    Consumers are not given contemporaneous written disclosures or executed loan documents at or before disbursement, nor are they notified that a draw has occurred. As a result, many consumers first learn that a loan was opened and funded in their name only after the fact—when a GreenSky tradeline appears on their credit report or when they begin receiving billing statements, dunning letters, collection emails, or calls referencing an account they never reviewed or authorized.

26.    In other instances, "loan packets" arrive weeks later—sometimes sent to email addresses entered by the Merchant or mailed to the consumer's home and reasonably mistaken for marketing—by which time payment obligations have begun to accrue, promotional terms (if any) have been triggered, and negative credit reporting or fees may

7

already have been imposed. This direct-to-merchant funding model deprives consumers of any meaningful opportunity to review, understand, or assent to the actual loan terms before liability and credit consequences attach.

**Prior Federal Enforcement Against GreenSky (2021 CFPB Consent Order)**

27.     GreenSky's Program, in which it engages with a local merchant on the ground to connect directly with consumers as an agent for it and its Program Banks, is a scheme that the Consumer Financial Protection Bureau (the "CFPB") found to be unfair, deceptive, and to violate law.

28.     Indeed, GreenSky entered into a Consent Order with the CFPB on July 12, 2021. GreenSky's assigns, which include BMO Harris Bank, were also bound by the Consent Order.  The conduct that the CFPB detailed at length in the Consent Order is nearly identical to the GreenSky business practices that Plaintiff and members of the Class experienced. Attached as **Exhibit 1** is a true and accurate copy of the CFPB Consent Order.

29.     The Consent Order established that GreenSky failed to properly monitor and confirm that its Merchants were acting in a fair and reasonable manner as they engaged in transactions with consumers.

30.     It also established that GreenSky's policies and procedures with respect to its Merchants enabled its Merchants to secure loans for consumers without consumers' knowledge or authorization. One reason this occurred, according to the Consent Order, was because GreenSky authorized Merchants to use the Shopping Pass accounts set up in the consumers' names to pay themselves from loan funds, without any verification on

8

GreenSky's part that the consumers knew that a Shopping Pass was set up for use or that the Merchant was able to and had accessed it.

31.     One of the causes of GreenSky's inability to properly monitor its Merchants was that the company maintained an entirely electronic application process that allowed Merchants to use consumer data to submit applications when the consumer was not aware of what the Merchant was doing.

32.     GreenSky failed to inquire whether its Merchants obtained written authorization from consumers prior to the Merchants submitting loan applications.

33.     The CFPB established that GreenSky's training process for its Merchants was woefully inadequate and did not help to prevent the problems that resulted for consumers.

34.     The CFPB found that GreenSky allowed Merchants to take out millions of dollars in loans to thousands of consumers without their knowledge or consent between 2014 and 2019. GreenSky was ordered to provide cash redress totaling between $750,000 and $3,000,000 in the form of checks mailed to consumers (Cash Redress); and loan cancellations in an amount up to $6,000,000 (Credit Redress).

35.     Nevertheless, GreenSky continued to engage in these same practices even after the Consent Order with the CFPB.

**Plaintiff Parisi's Experience**

36.     Here, the proposed class representative, Plaintiff Parisi, responded to an advertisement from Anderson promoting an opportunity to upgrade her home windows through a loan requiring no down payment, with zero percent interest and no payment required for twenty-four months following the window installation (Zero-Interest Loan).

37.   Parisi met with Russell Kelley ("Kelly"), of Defendant, Andersen, on or around November 23, 2021, to discuss the opportunity.

38.   Kelly told Parisi she could purchase the windows with zero money down, zero interest on the loan for two years, and zero payments for 24 months after the installation, the terms she had seen advertised in one of Andersen's marketing flyers.

39.   Parisi informed Kelly she had recently been diagnosed with multiple myeloma and would need the 24-month option due to her health issues and the costs and time related to her treatment. Parisi therefore only agreed to apply for the zero interest, zero payment loan.

40.   Kelly and Parisi discussed the windows she wanted to replace on her home and made choices regarding those windows. Kelly indicated that they would install nine (9) windows on a "split plan" by planning to install five windows at that time and the rest at another time.

41.   Kelly told Parisi she would need to sign a credit application so Oklahoma Windows could review her credit-worthiness for the financing. Kelly came to Parisi's kitchen counter and placed an iPad device in front of himself as Parisi stood next to him.

42.   Parisi signed the iPad on one signature line after Kelly told her that her signature would be used to authorize a credit review and to apply for a loan. She was not informed of a right to review a paper copy of the document she signed, was not asked to provide consent to conduct transactions by electronic means, or told that she had the right to withdraw her consent if she had given it.

43.    Parisi was not informed that her signature could be used to agree to terms of a loan without any further review and she was not informed that her signature could be used on anything other than the credit check and loan application.

44.    After Parisi signed the iPad, Kelly "swiped" the iPad in an upward motion and stated that he "needed some additional signatures to secure the zero-interest loan." When he presented each of the subsequent locations for Parisi's signatures on additional screens, Parisi was only able to view a signature line and a box she was asked to check that permitted her signature to be affixed on subsequent signature lines. Parisi was never provided a hard copy of any contract or contract terms to review prior to her checking these boxes.

45.    Following her completing the box checking, Kelly took the iPad, submitted the loan application with Parisi's information into the GreenSky loan portal, and transmitted it electronically to GreenSky via GreenSky's iPad-based electronic portal, then made a call on his cell phone and placed a person on the other end of the call on speakerphone.

46.    The person on the other end of the call identified herself as a representative of GreenSky, proceeded to ask Parisi about her personal identification information, and then informed Parisi she would call back to let her know if she was approved for the loan.

47.    Within a half hour that same day, the GreenSky representative called Kelly's cell phone and she was placed on speakerphone again.  The GreenSky representative said, "Congratulations! You have been approved for the two-year loan program with GreenSky!"

48.    BMO Harris Bank, acting through GreenSky, had denied Parisi's request for the zero interest, zero payments for 24 months after installation loan, and instead approved a different product with much earlier repayment obligations and a much higher interest rate.

49.     None of the Defendants took any action to reasonably inform Parisi that she was denied the loan for which she had applied.

50.     Based upon Kelly's and the GreenSky representative's statements that she had been approved for a loan with a deferred payment for 24 months without interest, Parisi agreed to the purchase but was not presented with and, therefore, did not execute any hard-copy documents, nor did Defendants provide Parisi with TILA disclosures; Parisi only entered her signature on the iPad when applying for the loan.

51.     Kelly never mailed her a copy of the contract and Parisi was not provided any further disclosures about the interest she would be paying on the credit extension, or on any of the terms.

52.     As it turned out, because Kelly had failed to disclose that Parisi was denied for the loan for which she had applied, Parisi was placed into a contract with GreenSky without her knowledge that contained entirely different terms.

53.     Without Parisi's knowledge, GreenSky created a "Shopping Pass" account in her name, allowed Andersen to access it, and caused BMO Harris Bank to disburse $8,871.50 on her behalf.  Parisi never received a written contract or copy of disclosures in a form she could keep.  The Shopping Pass functioned as an "access device" within the meaning of the Electronic Fund Transfer Act because it was an account number and electronic authorization mechanism capable of initiating electronic fund transfers in Parisi's name.

54.     Parisi did not discover that she was placed in a loan for which she had not applied until weeks later after GreenSky had already funded her "Shopping Pass" account without her knowledge and paid the money out of it to Andersen.

55.    On or about November 26, 2021, Parisi received a letter from GreenSky stating that it had sent Andersen a payment of $8,871.50 for the sale of its windows to Parisi.

56.    GreenSky's letter also informed Parisi that if she did not authorize the payment, she should contact GreenSky immediately, which Parisi did.

57.    Parisi immediately contacted Kelly with Andersen, who falsely told Parisi this had never happened before and he would follow up to find out what happened.

58.    Parisi never heard from Kelly again.

59.    On or around November 29, 2021, Parisi emailed GreenSky at service@greensky.com to tell them that she had not been notified about the $8,871.50 payment, had not authorized it, and only applied for the two-year, nothing down, no payments loan.

60.    GreenSky then mailed Parisi a contract that she had not previously seen reflecting that GreenSky had placed her in a different loan plan than the one she applied for, and that required payments within 6 months after installation of the windows.

61.    Parisi informed GreenSky that she could not agree to such a loan because of the cancer treatment she was undergoing, which would not be completed until the end of 2022.

62.    Andersen never installed any windows at Parisi's home.

63.    Parisi disputed that she owed GreenSky any money on the contract; her dispute was acknowledged by GreenSky in writing to Parisi shortly thereafter.

64.　However, GreenSky did not notify the credit bureaus to whom it reported Parisi's loan that she disputed the alleged debt, which continued to reflect that Parisi had a balance due on the loan of over $8,000.

65.　GreenSky ignored Parisi's request to delete its tradeline (the line item for GreenSky appearing on Parisi's credit report), ignored the fact she had been defrauded, and ignored her request to provide her a copy of the alleged signed contract.

66.　On December 10, 2021, Parisi again objected to the new loan being reported under her name and credit history.

67.　On December 10, 2021, GreenSky's Customer Solutions department replied via email, saying that "[o]ur records shows you signed agreeing to the loan terms."

68.　GreenSky failed to conduct any written investigation on Parisi's complaints but instead, in a subsequent email on December 10, 2021, a customer solutions representative wrote that "I am going to see if I can get the plan change approved" for her.

69.　On December 17, 2021, GreenSky stated, "got the plan changed and to let GreenSky know when the account was created".

70.　Remarkably, GreenSky sent Parisi a letter stating that she had failed to "participate" in her own complaint and its resolution.

71.　GreenSky continued its false reporting on the purported loan it established through Andersen.

72.　 Parisi endured continued stress from GreenSky's harassment and defamation throughout 2022. For example, nearly a full year after she first disputed the loan, on October 2, 2022, GreenSky mailed Parisi a past due notice and collection letter reflecting that Parisi

owed GreenSky a payment on lender BMO Harris Bank's loan with a total balance of $9,688.50, a past due amount of $224.50, and fees of $78.00.

73.     GreenSky's actions are directly violative of the July 12, 2021, CFPB Consent Order entered into by GreenSky.

74.     On July 18, 2022, Parisi sent a formal letter to GreenSky again reiterating the details of Andersen's fraud and GreenSky's participation, but the communication failed to eliminate GreenSky's false reporting to others about her.

75.     GreenSky was then notified that Parisi had retained undersigned counsel as a result of its actions and all future communications should cease with Parisi.

76.     GreenSky continued to contact Parisi after receipt of undersigned counsel's notice, and continued to defame her in its credit reporting. GreenSky continued to harass and bill Parisi, falsely indicating that she was past due; causing Parisi unnecessary anguish and emotional distress while undergoing cancer treatment.

77.     GreenSky ratified and benefited from Andersen's violations of law when it refused to delete the false and defamatory information it published regarding Parisi.

78.     GreenSky failed to conduct a meaningful investigation of Parisi's dispute following receipt of Parisi's statements in this regard.

79.     GreenSky purposefully and intentionally continued to falsely report that Parisi was in default even after undersigned counsel requested all communications cease.

80.     As a direct result of Defendants' unlawful conduct, Parisi suffered concrete and particularized injuries, including having an $8,871.50 debt obligation falsely attributed

to her, negative credit reporting, additional anxiety and stress while in the midst of a serious health crisis, and out of pocket costs to dispute the debt.

**Agency, Assignee, and Vicarious Liability**

**Actual and Apparent Authority**

81.    GreenSky authorizes Merchants to solicit, intake, and submit consumer credit applications through GreenSky's proprietary portal; provides the software, login credentials, and step-by-step workflows used to capture consumer data; controls whether and when a loan is activated; issues "shopping pass" credentials; and disburses proceeds directly to the Merchant.

82.    GreenSky trains, monitors, audits, and disciplines Merchants; sets uniform rules for application intake, activation, funding, and complaint handling; and reserves the right to suspend or terminate Merchants who do not follow GreenSky's procedures.

83.    By virtue of GreenSky's right to control the manner and means of application intake, activation, and funding, Merchants act as GreenSky's actual agents when they market GreenSky financing, collect consumer information, submit applications, activate accounts, and initiate disbursements.

84.    Alternatively, GreenSky cloaked Merchants with apparent authority by furnishing the platform and tools used at the sales call; directing uniform scripts, forms, and workflows; and permitting Merchant personnel to arrange, activate, or charge against a GreenSky account. GreenSky is therefore liable for the acts and omissions of Merchants within the scope of that authority.

16

85.    BMO Harris Bank funds and/or acquires the obligations generated through this uniform process and, with GreenSky, directs credit reporting, dispute handling, and collection. Merchants also act with actual and apparent authority for the bank to the extent they consummate, activate, or draw on the credit the bank funds or owns.

**Ratification**

86.    Even if a Merchant exceeded actual authority, GreenSky and BMO Harris Bank ratified the Merchant's conduct by accepting the benefits of unauthorized or improperly documented transactions, disbursing proceeds to the Merchant, booking or collecting the account, and furnishing credit information after receiving complaints and disputes describing the underlying misconduct.

**Joint Enterprise / Civil Conspiracy (in the alternative)**

87.    GreenSky, BMO Harris Bank, and Merchants operated a joint enterprise to originate and collect consumer credit. They shared a common business purpose, used GreenSky's standardized systems and rules, and each had a right to control material aspects of the scheme.

88.    In the alternative, Defendants agreed, expressly or tacitly, to a common course of unlawful conduct and provided substantial assistance to each other to accomplish it, rendering each liable for the others' acts in furtherance of the scheme.

**Assignee Liability**

89.    BMO Harris Bank is liable as an assignee because the violations alleged herein were apparent on the face of the assigned documents and records, including the absence of required pre-consummation disclosures in a form the consumer could keep, activation

without executed consumer authorization, and other defects evident from the standardized application and funding materials.

90.    To the extent applicable, any holder-in-due-course or "Holder Rule" notice renders the bank and any other assignee subject to all claims and defenses the consumer could assert against the seller/merchant arising from the transaction.

91.    Under Oklahoma's consumer credit statutes and other governing law, "creditor" liability extends to any person required to make disclosures or who takes assignment of an obligation with violations apparent on its face. The bank is therefore liable for statutory and actual damages, fees, and other relief as alleged in the claims below.

**Non-Delegable Duties; Vicarious Liability**

92.    Defendants' duties to provide accurate, timely, and retainable consumer credit disclosures, to obtain and retain evidence of consumer authorization before activation or funding, and to report credit information fairly and accurately are non-delegable.

93.    Defendants are vicariously liable for the acts and omissions performed within the scope of their agency, joint enterprise, or conspiracy and for the foreseeable consequences of the standardized processes they designed, controlled, and profited from.

**CLASS ACTION ALLEGATIONS**

**Class Definitions**

94.    Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23(b)(2)-(3) on behalf of the following Class (the "Greensky Class"): All Oklahoma consumers who, from November 23, 2019 through the present, had a GreenSky Shopping

18

Pass account opened in their name where the acceptance of the loan terms was made through the use of the Shopping Pass number by a GreenSky Merchant.

95.     The "BMO Harris Bank Subclass" is defined as all members of the Greensky Class whose loans were funded by or assigned to Defendant Harris.

96.     The "Anderson Subclass" is defined as all members of the Greensky Class whose loans were charged for products or services sold by Anderson.

**Exclusions and Limitations**

97.     Excluded from the Class and Subclasses are: (i) the presiding judge(s), magistrate judge(s), and any other judicial officer assigned to this action, together with their chambers staff and immediate family members; (ii) Defendants; Defendants' parents, subsidiaries, and affiliates; and any of their current or former officers, directors, partners, members, employees, and agents; and (iii) counsel of record for any party in this action.

98.     The Statute of Limitations applicable to each cause of action shall further restrict liability under these definitions.

99.     Plaintiff expressly reserves her right to amend, add to, modify, and/or otherwise change the proposed class definitions as discovery in this action progresses.

**Rule 23(a) Requirements**

100.    **<u>Numerosity pursuant to Rule 23(a)(1)</u>**:  Upon information and belief, there are at least several hundred or potentially thousands of consumers in the Class.  The Class and Subclasses are so large that the joinder of all of its members is impracticable.  The exact number of members of the Class and Subclasses can be determined using the Defendants' business records.

101. **Commonality and Predominance pursuant to Rule 23(a)(2) and (b)(3)**: Absent certification of the Class and Subclasses, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on Defendants.  This action involves common questions of law and fact which predominate over any questions affecting individual members of the Class. They include, without limitation:

- Whether Defendants created Shopping Pass accounts and initiated electronic fund transfers without valid consumer authorization under 15 U.S.C. § 1693a(12);

- Whether GreenSky issued consumer loans within the meaning of the Oklahoma Consumer Credit Code, 14A O.S. § 1-101, et seq; and TILA, 15 U.S.C. §1601 et seq.;

- Whether Defendants delivered all required disclosures, including but not limited to the identity of the lender's assignee, the actual "amount financed," when payment obligations would commence, information about the right to obtain disclosures upon request, the amount of finance charges imposed on the consumer, and any imposition of fees or penalties for late payments, as required by 14A O.S. § 3-306 and 15 U.S.C. §1601 et seq.;

- Whether Defendants provided adequate TILA closed-end consumer credit disclosures to Plaintiff and the putative Class prior to consummation or liability for the loans;

- Whether GreenSky permitted its "Shopping Pass" to be accessed by its Merchants, including Andersen, to permit acceptance of loan terms and/or to obligate consumers without authorization from Plaintiff and the Class members;

- Whether the Defendants reported negative information about Plaintiffs and the Class to third parties, including the credit bureaus; and

- Whether Defendants' practices have injured Plaintiff and the Class in an amount to be determined at trial.

102. **Typicality pursuant to Rule 23(a)(3)**: Plaintiff's claims are typical of the claims of the proposed Class members. Defendants harmed Plaintiff and Class members in much the same manner offering financing through its fully electronic loan application process, failing to provide meaningful disclosures regarding loan terms and then permitting Merchants to accept and/or otherwise make charges on the Shopping Pass account. Plaintiff's experience with Defendants is typical of the claims and experiences of members of the Class because, among other reasons, Plaintiff's claims arise from Defendants' practices that are applicable to the entire Class.

103. **Adequacy pursuant to Rule 23(a)(4)**: Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other members of the Class she seeks to represent. Plaintiff has retained counsel who are competent and experienced in complex class action litigation, and through them, Plaintiff intends to prosecute this action vigorously. She and her counsel will fairly and adequately protect Class members' interests.

104. **Declaratory and Injunctive Relief pursuant to Rule 23(b)(2)**: Defendants have acted or refused to act on grounds generally applicable to Plaintiff and Class members, making final injunctive relief and declaratory relief appropriate for the Class as a whole. Defendants engaged in substantially similar conduct for each member of the Class.

21

**Predominance and Superiority pursuant to Rule 23(b)(3):**

105. The core liability questions turn on Defendants' uniform policies and practices, which apply identically to all Class members and do not depend on individualized proof. Common questions include:

    a.    Whether Defendants' standardized intake, activation, and funding process failed to provide required pre-consummation disclosures in a form the consumer could keep;

    b.    Whether GreenSky's "shopping pass" activation and direct-to-merchant disbursement model can create a binding loan absent executed consumer authorization;

    c.    Whether Defendants' uniform training, controls, and merchant-oversight policies render Merchants agents of GreenSky and the bank;

    d.    Whether BMO Harris Bank, as funder and/or assignee, is liable for disclosure defects apparent on the face of the records;

    e.    Whether Defendants' standardized furnishing and dispute-handling practices violated federal and state law; and

    f.    The availability of statutory damages and class-wide injunctive or declaratory relief.

106. Plaintiff will prove liability with common evidence: platform logs and metadata; uniform scripts, training, and merchant agreements; system-level rules for activation and disbursement; redress/complaint policies; credit-reporting and dispute-handling procedures; and Defendants' internal audits and analyses. This evidence is

maintained centrally by Defendants and does not vary from consumer to consumer. Whether and when disclosures issued, in what form, and whether a consumer authorization existed are shown by Defendants' electronic records, template documents, and data fields, not by individualized oral recollections.

107.    Statutory damages for disclosure violations and furnisher misconduct are dictated by statute and are computed from Defendants' own data (e.g., finance charges, account type, time period). Any restitutionary or cancellation relief likewise turns on fields in Defendants' loan and servicing systems (activation date, disbursement amount, chargebacks, and tradeline status). These can be calculated for all Class members using a common methodology.

108.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy. No unusual difficulties are likely to be encountered in this class action's management. Individual litigation will cause ongoing harm to Plaintiff and the Class members, create the potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system itself. By contrast, a class action provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS

### Count I – (Against All Defendants)
### Violation of Oklahoma Consumer Credit Code §14A-2-301, et seq.

109.    Plaintiff re-alleges and re-incorporates the factual and class allegations set forth above in paragraphs 1 – 108, as if set forth fully herein.

23

110.    Plaintiff and Class Members are consumers within the meaning of Okla. Stat. 14A, §1-301(11) in that Plaintiff and Class Members are natural persons who sought or acquired credit primarily for personal, family, or household purposes, either their debt is payable in installments or a loan finance charge is made; and the principal does not exceed Fifty Thousand Dollars ($50,000.00).

111.    Defendants are either creditors, sellers, arrangers of consumer sales credit, lenders, creditors, or assignees within the meaning of Oklahoma Consumer Credit Code §14A-2-301, et seq.

112.    Plaintiff and Class Members are debtors within the meaning of O.S. §24-1: ("A debtor is one who, by reason of an existing obligation, is, or may become, liable to pay money to another, whether such liability is certain or contingent.").

113.    GreenSky was an arranger of consumer sales credit, a lender or creditor and a servicer of consumer credit.

114.    Defendant Andersen acted at all relevant times as a merchant seller and agent of the other Defendants in connection with the sale and financing of consumer goods. Andersen advertised, marketed home-improvement products, solicited consumers in their homes, collected consumer information to submit loan applications, extended consumer credit and then used that information to create an obligation on Parisi and other members of the Anderson subclass' Shopping Pass accounts.

115.    Defendant BMO Harris Bank was at all relevant times the lender, creditor and/or assignee for the loans made to Parisi and other members of the BMO Harris Bank subclass.

116.    Defendants are regularly engaged in the business of originating and extending "consumer loans" pursuant to the Oklahoma Consumer Credit Code, §14A-3-104 (2024), in which:

117.    (a) the debtor is a person other than an organization;

118.    (b) the debt is incurred primarily for a personal, family or household purpose;

119.    Defendants regularly originate and/or issue consumer loans for products and services that fail to comply with the accurate disclosure requirements of the Oklahoma Consumer Credit Code (OCCC), Part 3, including:

    a.    Defendants failed to deliver all material disclosures, prior to consummation, in a form that Parisi or Class members may keep in violation of 14A O.S. § 3-306;

    b.    Defendants failed to accurately disclose to the Class Representative or Class members "the amount financed" or to disclose the amount of credit to which the debtor has use, or to segregate those amounts from other amounts in violation of 14A O.S. § 3-306 2(b) (i);

    c.    Defendants failed to disclose to the Class Representative or Class members a statement of the debtor's right to obtain, upon a written request, a written itemization of the amount financed, and included spaces for a "yes" and "no" indication to be initialed by the debtor to indicate whether the debtor wants a written itemization of the amount financed in violation of 14A O.S. § 3-306 2(cc) (ii);

    d.    Defendants failed to provide a written itemization of the amount financed in violation of 14A O.S. § 3-306 2(cc) (ii) that included a disclosure of the following:

        i.    the amount that is or will be paid directly to the debtor;

        ii.    the amount that is or will be credited to the debtor's account to discharge obligations owed to the lender;

        iii.    each amount that is or will be paid to third persons by the lender on the debtor's behalf, together with an identification of or reference to the third person; and

        iv.    the total amount of any charges described in 14A O.S. §3-306 2 (b) (i) (cc).

        v.    The sum of the amount financed and the finance charge, which shall be termed the "total of payments"; and

        vi.    The number, amount, and due dates or period of payments scheduled to repay the total of payments.

    e.    Descriptive explanations of the terms "amount financed," "finance charge," "annual percentage rate," and "total of payments," as specified by the Administrator;

    f.    Any dollar charge or percentage amount which may be imposed by a lender solely on account of a late payment, other than a deferral or extension charge;

26

g.   A statement indicating whether or not the debtor is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge. A statement indicating whether or not a penalty will be imposed in those same circumstances if the obligation involves a finance charge computed from time to time by application of a rate to the unpaid principal balance; and

h.   A statement that the debtor should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties.

120.   The preceding list of disclosure violations by Defendants, as it relates to the loans issued to the Plaintiff and the Class, are prohibited under 14A O.S. § 3-306 2(aa) through (k).

121.   Defendants' conduct constitutes a violation of the Oklahoma Consumer Credit Code and they are liable for the violations mentioned herein pursuant to O.S. §14A-5-203.

122.   As a direct and proximate result of Defendants' violations, Plaintiff and Class Members suffered actual damages, including but not limited to inability to shop for credit on informed terms, reputational harm to their creditworthiness, time expended disputing unauthorized use of shopping passes.

**WHEREFORE**, Plaintiff respectfully request that the Court enter judgment in Plaintiff's favor and against Defendant, and award the following relief:

a. Actual and Statutory damages and penalties as provided under the OCCC;

b. Reasonable attorney's fees and costs; and

c. Such other and further relief as the Court deems just and proper.

**Count II– (Against All Defendants)**
**Violation of Truth in Lending Act – Failure to Disclose (15 U.S.C. §1601 et seq)**

123.    Plaintiff re-alleges and re-incorporates the factual and class allegations set forth above in paragraphs 1 – 108, as if set forth fully herein.

124.    Plaintiff and Class Members are "consumers" within the meaning of 15 U.S.C. § 1602(i), in that they are natural persons who sought or acquired credit primarily for personal, family, or household purposes.

125.    Defendants are "creditors" or "facilitators of credit extensions" within the meaning of 15 U.S.C. § 1602(g) and Regulation Z, 12 C.F.R. § 1026.2(a)(17), as Defendants regularly work together to facilitate or extend consumer credit loans payable in more than four installments or which are subject to a finance charge.

126.    On or about November 23, 2021, Plaintiff applied for a consumer credit transaction with Andersen and Greensky, as defined by 15 U.S.C. § 1602(f).

127.    The Truth in Lending Act ("TILA") requires creditors to provide clear and conspicuous disclosures of certain material terms of the credit transaction before consummation, including but not limited to:

a. The annual percentage rate (APR), 15 U.S.C. § 1638(a)(4);

b. The finance charge, 15 U.S.C. § 1638(a)(3);

28

   c.    The amount financed, 15 U.S.C. § 1638(a)(2)(A);

   d.    The total of payments, 15 U.S.C. § 1638(a)(5); and

   e.    The payment schedule, 15 U.S.C. § 1638(a)(6).

128.   Defendants intentionally failed to disclose and provide Plaintiff and Class Members with accurate and complete disclosures required under TILA and its implementing regulation, Regulation Z (12 C.F.R. Part 1026), including but not limited to:

   a.    Failure to clearly and accurately disclose the APR;

   b.    Failure to disclose the total finance charge and total of payments; and

   c.    Failure to disclose the payment schedule in a clear and conspicuous manner.

129.   Defendants' failure to comply with TILA's disclosure requirements deprived Plaintiff and Class Members of the ability to compare credit terms available in the marketplace and frustrated Congress's intent in enacting TILA. See 15 U.S.C. § 1601(a).

130.   Defendants' conduct constitutes a violation of TILA, 15 U.S.C. § 1638, and Regulation Z, 12 C.F.R. §§ 1026.17–1026.18.

131.   Pursuant to 15 U.S.C. § 1640(a), Plaintiff and Class Members are entitled to actual damages, statutory damages, attorney's fees, and costs.

**WHEREFORE**, Plaintiff respectfully requests judgment in Plaintiff's and the Class's favor and against Defendants, and that the Court award:

   a.    Statutory damages as provided by 15 U.S.C. § 1640(a)(2);

   b.    Reasonable attorney's fees and costs under 15 U.S.C. § 1640(a)(3); and

   c.    Such other relief as the Court deems just and proper.

## Count III– (Against All Defendants)
## Violation of the Oklahoma Consumer Protection Act
## (Okla. Stat. tit. 15, § 751 et seq.)

132.    Plaintiff re-alleges and re-incorporates the factual and class allegations set forth above in paragraphs 1 –108, as if set forth fully herein.

133.    Plaintiff and Class Members are "consumers" within the meaning of Okla. Stat. tit. 15, § 752(2), in that they are persons who purchased or leased services or property primarily for personal, family, or household purposes.

134.    Defendants are "persons" and "suppliers" engaged in commerce as defined by Okla. Stat. tit. 15, § 752(1), (6).

135.    The Oklahoma Consumer Protection Act ("OCPA") prohibits "[u]nfair or deceptive trade practices," including misrepresentations, omissions of material fact, and unconscionable practices in the conduct of trade or commerce. Okla. Stat. tit. 15, § 753(20), (22).

136.    On or about November 23, 2021, Plaintiff applied for financing of consumer products and sought financing from Defendants through their agents or representatives.

137.    In connection with this transaction, Defendants engaged in unlawful practices under the OCPA, including but not limited to:

      a.     Failing to disclose material credit terms and costs, thereby misleading Plaintiff regarding the true cost of the transaction (Okla. Stat. tit. 15, § 753(5), (8));

b.    Making false or misleading representations concerning rights, remedies, or obligations under the contract (Okla. Stat. tit. 15, § 753(8)); and

c.    Engaging in unfair and deceptive practices likely to mislead reasonable consumers, in violation of Okla. Stat. tit. 15, § 753(20).

138.    Defendants' omissions and misrepresentations were material and likely to deceive a reasonable consumer.

139.    Defendants' conduct constitutes an "unlawful practice" under the OCPA.

140.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members suffered damages, including but not limited to the loss of the ability to make informed credit decisions, reputational harm to their creditworthiness, time expended disputing unauthorized use of shopping passes, and emotional distress.

141.    Pursuant to Okla. Stat. tit. 15, § 761.1, Plaintiff and Class Members are entitled to actual damages, attorney's fees, costs, and injunctive relief.

142.    Because Defendants' conduct was willful and knowing, Plaintiff and Class Members are further entitled to treble damages under Okla. Stat. tit. 15, § 761.1(C).

**WHEREFORE**, Plaintiff respectfully requests judgment in Plaintiff's favor and against Defendant, and that the Court award:

a.    Actual damages and treble damages for willful and knowing violations;

b.    Attorney's fees and costs under Okla. Stat. tit. 15, § 761.1;

c.    Declaratory and injunctive relief to prevent further violations; and

d.    Such other relief as the Court deems just and proper.

### Count IV– (Against All Defendants)
### Violation of the Electronic Fund Transfer Act –
### Improper Issuance of Access Device (15 U.S.C. § 1693i)

143.    Plaintiff re-alleges and incorporates by reference paragraphs 1- 108 as though fully set forth herein. Plaintiff asserts this Count on behalf of herself and the Class defined in the Complaint.

144.    This Count arises under the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq., and Regulation E, 12 C.F.R. Part 1005.

145.    An "account" under the EFTA includes a demand deposit, savings deposit, or other asset account established primarily for personal, family, or household purposes and held by a financial institution. 15 U.S.C. § 1693a(2).

146.    An "unauthorized electronic fund transfer" ("EFT") is a transfer from a consumer account initiated by a person other than the consumer without actual authority and from which the consumer receives no benefit. 15 U.S.C. § 1693a(12).

147.    An "access device" includes any card, code, or other means of account access used to initiate EFTs. 15 U.S.C. § 1693a(1).

**Defendants Unauthorized Issuance of an Access Device**

148.    Pursuant to 15 U.S.C. § 1693i(a), part of the Electronic Fund Transfer Act (EFTA), an access device can only be issued in two specific circumstances:

- In response to a consumer's request or application.

- As a renewal or replacement for a previously "accepted access device".

149.    Defendants issued an unauthorized access device.

150.    BMO Harris Bank was the program bank that held the GreenSky "Shopping Pass" accounts to which the challenged transfers posted. As the financial institution of record, BMO Harris Bank owed the duties imposed by the EFTA and Regulation E, including ensuring that EFTs were authorized and complying with error-resolution obligations.

151.    GreenSky administered the program on the banks' behalf, controlled program rules and systems, reviewed or processed merchant-submitted applications and "authorizations," and serviced the accounts (including funding/disbursement, billing/collection, and credit reporting). GreenSky acted with actual authority from—and as agent for—BMO Harris Bank in origination, account setup, disbursement, servicing, and error handling.

152.    Andersen and other program Merchants were enrolled, trained, and credentialed to market financing, intake consumer information, present "authorizations," and submit disbursement requests through GreenSky's platform. In performing those functions, Andersen acted as GreenSky's agent and BMO Harris Bank's sub-agent, and participated with GreenSky and BMO Harris Bank in a joint enterprise to finance merchant sales through the program.

**Unauthorized Transfers and Invalid Electronic "Consent"**

153.    Defendants created Shopping Pass accounts and caused funds to be disbursed in Plaintiff's and Class members' names without their knowledge or valid authorization. Consumers did not request these accounts, did not authorize the disbursements.

154.    Defendants contend that consumers authorized the transactions by signing on electronic tablets provided by GreenSky Merchants. Any such electronic "consent" was not

valid under the Electronic Signatures in Global and National Commerce Act ("E-SIGN"), 15 U.S.C. § 7001(c), because consumers were not provided the required clear and conspicuous disclosures (including the right to receive records on paper, the scope of consent, the right to withdraw consent without penalty, and hardware/software requirements), nor did they affirmatively consent in a manner reasonably demonstrating their ability to access the records in the electronic form to be used.

155.    Because purported electronic consent did not comply with E-SIGN, it did not authorize electronic fund transfers. The resulting transfers were therefore "unauthorized electronic fund transfers" within the meaning of 15 U.S.C. § 1693a(12).

156.    Program funding flowed at the direction of Defendants: Merchants, including Andersen, used the Shopping Pass number or credential to request payment; GreenSky approved/requested disbursement; and loan proceeds were paid directly to the merchant rather than to the consumer—linking merchant intake/"authorization" to bank-level disbursement.

**Error-Resolution Failures**

157.    After Plaintiff and other Class members discovered the unauthorized accounts and timely disputed them, BMO Harris Bank and GreenSky failed to conduct reasonable investigations, failed to correct errors and recredit, and continued to treat the debts as valid and to report/collect them, in violation of 15 U.S.C. § 1693f and Regulation E.

**Agency, Joint-Enterprise, and Ratification**

158.    In marketing, financing, collecting consumer information, presenting "authorizations," and submitting disbursement requests through GreenSky's systems,

Andersen and other program Merchants acted within the scope of their agency for GreenSky and sub-agency for BMO Harris Bank. GreenSky's control of program rules, access credentials, application review, and funding decisions, and BMO Harris Bank's role as account-holding banks, establish agency and sub-agency relationships.

159.    GreenSky, BMO Harris Bank, and program Merchants, including Andersen, operated as joint actors with a common purpose of financing merchant sales, shared benefits including GreenSky program fees, bank interest/fees, and coordinated roles. Each is liable for acts/omissions of the others undertaken as agents of one another.

160.    In all events, each Defendant ratified the unauthorized conduct by accepting merchant "authorizations," funding merchant disbursements, servicing and collecting on the resulting debts, reporting them to consumer reporting agencies, and refusing to correct after notice—thereby adopting and benefitting from the wrongful acts.

161.    As a direct and proximate result of Defendants' EFTA violations, Plaintiff and Class members sustained injuries including, without limitation: liability for unauthorized debts, out-of-pocket losses (including time and expense to dispute/correct), and damage to credit reputation.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, request that the Court:

A.    Declare that the disputed transfers were unauthorized electronic fund transfers under 15 U.S.C. § 1693a (12), and that Defendants violated the EFTA and Regulation E, including § 1693f;

35

B.  Declare that any electronic signatures or "authorizations" obtained without compliance with E-SIGN (15 U.S.C. § 7001(c)) are invalid to authorize EFTs;

C.  Enter judgment holding BMO Harris Bank and GreenSky directly liable, and holding Andersen liable under agency/joint-enterprise principles for initiating or causing the initiation of unauthorized EFTs;

D.  Award actual damages and statutory damages as provided by 15 U.S.C. § 1693m(a) (including, in a class action, an additional amount not to exceed the lesser of $500,000 or 1% of Defendants' net worth), together with costs and reasonable attorney's fees; and

E.  Grant such other and further relief as the Court deems just and proper.

Dated: February 24, 2026

**VARNELL & WARWICK, P.A.**

/s/ Janet R. Varnell
Janet R. Varnell, FBN: 0071072
400 N. Ashley Drive, Suite 1900
Tampa, FL  33602
Telephone: (352) 753-8600
jvarnell@vandwlaw.com

**RAWLS LAW OFFICE PLLC**

/s/ M. Kathi Rawls
M. Kathi Rawls, OBA #18814
222 NW 13th  St.
Oklahoma City,  OK  73103
Kathi@carfraud.net
mkr@rawlslawoffice.com

**NATIONAL ASSOCIATION OF
CONSUMER ADVOCATES**

Eric Zell, Ohio Bar #0084318
1215 17th St. NW, 5th Floor

Washington, DC 20006
202-452-1989 x111
eric@consumeradvocates.org

***Attorneys for Plaintiff and the Putative Class***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 24, 2026, I electronically filed the foregoing with the Clerk of the Court through the CM/ECF System, which will send a notice of electronic filing to all counsel of record.

/s/ Janet R. Varnell
Janet R. Varnell